PITTA & DREIER LLP
499 Park Avenue
New York, New York 10022
(212) 652-3890

*Attorneys for Defendant New York Hotel &*
*Motel Trades Council, AFL-CIO*

Bruce J. Cooper (BC 2764)
Michael J. D'Angelo (MD 3030)

UNITED STATES DISTRICT COURT`
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH BEJJANI, HENRY BOLEJSZO, ALAIN BREDA, AHMAD BULLA, VIRGIL COSTACHE, GEOFFREY HABERER, RUHEL HASSAN, RICKY GARCIA, ABDELKABIR KAHTANE, MOHAMMED KHAMFRI, KATHY KRINKE, STYLIANOS LOUKISSAS, ERICH LUNZER, JAIRO MARTINEZ, EDILBERTO MORCOS, JOHN O'CONNOR, AART VAN DERLAAN, OSCAR FLORES, and ROBERTO ZEGARRA, | 07-Civ-10729 (HB) (DCF)<br><br>**AFFIRMATION** |
| Plaintiffs, | |
| -against- | |
| MANHATTAN SHERATON CORPORATION d/b/a ST. REGIS HOTEL, and NEW YORK HOTEL and MOTEL TRADES COUNCIL, AFL-CIO, | |
| Defendants. | |

I, BRUCE J. COOPER, an attorney admitted to practice in the Courts of the State of New York and this Court hereby affirm under the penalty of perjury as follows:

1.      I am a member of the firm of Pitta & Dreier, LLP, attorneys for Defendant New York Hotel & Motel Trades Council, AFL-CIO ("Union") in the above entitled action.  I

make this affirmation in support of the Union's motion to dismiss the Second Amended Complaint[1] ("Complaint") pursuant to Rule 12(b) (1) and (6) of the Federal Rules of Civil Procedures.

      2.    Set forth below are documents submitted in support of the Union's motion; each document is referenced in, attached or are integral, to the Complaint, or are documents of which the Court may take judicial notice. Copies of the following documents are attached hereto and made a part hereof and marked as Exhibits:

## EXHIBITS

A.    Second Amended Complaint.

B.    Industry Wide Agreement (IWA).

C.    Hilton Hotel Arbitration Demand.

D.    St. Regis Arbitration Demand U05 -649.

E.    Hilton Hotel Award of Impartial Chairperson Ross, #2007-40 ("Ross [Hilton] Award").

F.    Hotel Association's Emergency Request Demand for Clarification of Ross [Hilton] Award.

G.    Mandarin Oriental Hotel demand regarding room rental issue.

H.    IC Ross' Award #2007-85R re Hotel Association's Emergency Request (Clarification [Association] Award").

I.    Robert Felix's letter, dated March 18, 2008; and Bruce J. Cooper's Reply letter dated March 27, 2008.

J.    St. Regis Hotel Settlement agreement re Tip Pooling.

---

[1] The original complaint was filed by plaintiffs *pro se* on November 30 2007, and served February 19, 2008; on March 3, 2008, plaintiffs *pro se* served an amended complaint; and on April 7, 2008, plaintiffs , by counsel, served a second amended complaint.

    **K.**    IC Evan's Award and transcript of hearing before the Honorable Allen G. Schwartz confirming IC Evans' Award denying Roosevelt Hotel's request for use of court reporter.

    **L.**    **(i)** Joseph Farelli's letter to Felix re various grievances, dated April 11, 2008, **(ii)** Robert Felix's letter, dated April 15, 2008, **(iii)** Joseph Farelli's reply letter, dated April 15, 2008, and **(iv)** Robert Felix's letter dated April 21, 2008.

    **M.**    Richard Maroko's reply letter to plaintiffs' request for decisions.

**WHEREFORE**, it is respectfully requested that the Court grant the Motion to Dismiss the Second Amended Complaint in its entirety, with costs and disbursements to the Defendant Union.

Dated: New York New York
       May 12, 2008

                                   Bruce J. Cooper (BC 2764)

Of Counsel:
Michael J. D'Angelo (MD 3030)

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

JOSEPH BEJJANI, ALAIN BREDA
ABDELKABIR KAHTANE, MOHAMMED KHAMFRI
KATHY KRINKE, STYLIANOS LOUKISSAS
ERICH LUNZER, JAIRO MARTINEZ
EDILBERTO MORCOS, JOHN O'CONNOR
AART VAN DERLAAN and RICKY GARCIA

            Plaintiffs,

    - against -

MANHATTAN SHERATON CORPORATION
d/b/a ST. REGIS HOTEL, and NEW YORK HOTEL
and MOTEL TRADES COUNCIL, AFL-CIO
          Defendants.

-------------------------------------------------------------x

    07 Civ. 10729 (HB) (DCF)

Plaintiffs amend the caption to read as follows:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

JOSEPH BEJJANI, HENRY BOLEJSZO
ALAIN BREDA, AHMAD BULLA
VIRGIL COSTACHE, GEOFFREY HABERER,
RUHEL HASSAN, RICKY GARCIA
ABDELKABIR KAHTANE, MOHAMMED KHAMFRI
KATHY KRINKE, STYLIANOS LOUKISSAS
ERICH LUNZER, JAIRO MARTINEZ
EDILBERTO MORCOS, JOHN O'CONNOR
AART VAN DERLAAN, OSCAR FLORES,
and ROBERTO ZEGARRA
           Plaintiffs,

    - against -

MANHATTAN SHERATON CORPORATION
d/b/a ST. REGIS HOTEL, and NEW YORK HOTEL
and MOTEL TRADES COUNCIL, AFL-CIO
          Defendants.

-------------------------------------------------------------x

**SECOND AMENDED**
**COMPLAINT**

**07 Civ. 10729 (HB) (DCF)**

**JURY TRIAL**
**REQUESTED**

    Plaintiffs by their attorney Robert N. Felix, for their Second Amended Complaint

allege as follows:

## SUMMARY OF ACTION

1.    This civil action is filed pursuant to the provisions of Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185(a) to *inter alia* enforce a labor arbitration award, made pursuant to a collective bargaining agreement entitled Industry-Wide Agreement ("IWA") between the Hotel Association of New York ("Association") of which defendant Manhattan Sheraton Corporation d/b/a St. Regis Hotel ("Employer" or "Hotel") is a member and Defendant New York Hotel and Motel Trades Council, AFL-CIO ("Union" or "Local 6"). Plaintiffs seek the full benefits of said award, along with interest, attorney's fees and costs.

2.    Plaintiffs also bring suit against the Union for breach of the duty of fair representation and against their Employer for breach of the IWA with the Union. Plaintiffs seek back pay, gratuities, make whole relief, benefits, pre-judgment interest, attorney's fees and costs.

3.    Plaintiffs also bring suit against the Union pursuant to the provisions of Section 102 of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") (Title I), 29 U.S.C. §§412, 414, and pursuant to the Union's duty of fair representation, for the Union's failure to provide Plaintiffs with all decisions rendered in labor disputes submitted to the Impartial Chairperson involving arbitrations that were submitted for binding arbitration in the hotel industry and to compel the Union to provide Plaintiffs with said decisions.

4.    In addition, Plaintiffs bring a supplemental state claim to recover gratuities and wages, pre-judgment interest, reasonable attorneys' fees and court costs for defendants' willful violation of the New York State Labor Law section 196-d and any other relevant provisions.

## JURISDICTION AND VENUE

5.      This court has jurisdiction over the subject matter of this complaint under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), Section 102 of the LMRDA, 29 U.S.C. §412 and under 28 U.S.C. §§ 1331 and 1337 (1970) and 28 U.S.C. §§ 2201 and 2202. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a), because the state claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiffs and Defendants. Venue lies within this jurisdiction pursuant to 28 U.S.C. §§1931 and 1337.

## PARTIES

6.      Plaintiffs are banquet servers employed by Defendant Hotel under the terms and conditions of the IWA between the Hotel and the Union.

7.      Plaintiff, Joseph Bejjani, resides in New York County in the State of New York.

8.      Plaintiff, Henry Bolejszo, resides in Bergen County in the State of New Jersey.

9.      Plaintiff, Ahmad Bulla, resides in Queens County in the State of New York.

10.     Plaintiff, Alain Breda, resides in Sussex County in the State of New Jersey.

11.     Plaintiff, Virgil Costache, resides in Queens County in the State of New York.

12.     Plaintiff, Oscar Flores, resides in Queens County in the State of New York.

13.     Plaintiff, Geoffrey Haberer, resides in Bergen County in the State of New Jersey.

14.     Plaintiff, Ruhel Hassan, resides in Queens County in the State of New York.

15.    Plaintiff, Ricky Garcia, resides in Hudson County, in the State of New Jersey.

16.    Plaintiff, Abdelkabir Kahtane, resides in Bergen County in the State of New Jersey.

17.    Plaintiff, Mohamed Khanfri, resides in Bergen County in the State of New Jersey.

18.    Plaintiff, Kathy Krinke, resides in Nassau County in the State of New York.

19.    Plaintiff, Stylianos Loukissas resides in Queens County in the State of New York.

20.    Plaintiff, Erich Lunzer, resides in Queens County in the State of New York.

21.    Plaintiff, Jairo Martinez, resides in Queens County in the State of New York.

22.    Plaintiff, Edilberto Morcos, resides in Hudson County in the State of New Jersey.

23.    Plaintiff, John O'Connor, resides in New York County, in the State of New York.

24.    Plaintiff, Aart Van Derlaan, resides in Hudson County in the State of New Jersey.

25.    Plaintiff, Roberto Zegarra, resides in Bergen County in the State of New Jersey.

26.    The Union is a labor organization within the meaning of Section 301(a) of the LMRA, 29 U.S.C. § 185(a) and 29 U.S.C. § 152. The Union represents, for the purposes of collective bargaining persons employed, *inter alia*, as banquet waiters in the hotel industry in New York and specifically represents Plaintiffs for purposes of collective bargaining. The Union's principal office is located at 709 Eighth Avenue, New York, New York 10036.

27.    The Hotel employs employees represented by the Union in the hotel industry, which is an industry affecting interstate commerce, and is an employer within the meaning of Section 301(a) of the LMRA, 29 U.S.C. § 185(a) and Sections 501(1) and (3) of the LMRA, 29 U.S.C. § 142(1) and (3) and 29 U.S.C. § 152(2). The Hotel's principal place of business is Two East 55th Street, New York, New York 10022.

## FACTUAL ALLEGATIONS

### Room Rental Issues

28.    For all material times including July 1, 1995, the Union and the Hotel have been parties to a collective bargaining agreement.

29.    The Agreement was entered into for the benefit of the employees in the bargaining unit, and Plaintiffs, as members of the bargaining unit, are entitled to the benefits of the Agreement and to enforce the provisions of the Agreement.

30.    Article 26 of the IWA provides for final and binding arbitration as the means for resolving disputes between the parties.

31.    The IWA reads in pertinent part:

> "All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson ["IC"], and his/her decision shall be final and binding upon the parties hereto…. All arbitration hearings shall be heard at the Office of the Impartial Chairperson…."

32.    Either party to the IWA may resort to the courts to enforce an arbitration award.

33.    Union members affected by an industry-wide award have standing to enforce such arbitration award.

34.    Article 47(D)(1) of the IWA, in pertinent part, reads "Effective July 1, 1995, except as otherwise provided herein, the UNION and the EMPLOYER agree that with respect to banquet functions, a minimum gratuity equal to fifteen percent (15%) shall be paid to tip category employees (banquet waiters/waitresses and captains) working said functions, pursuant to established practice in each hotel as of July 1, 1995."

35.    In accordance with the IWA, a dispute, with industry-wide application, between the Union and Hilton New York, another employer-hotel covered by the IWA, was submitted to the IC for binding arbitration.

36.    The industry-wide dispute ultimately decided by the IC was whether under Article 47(D)(1) of the IWA gratuities had to be paid by hotel(s) to tip category employees (banquet waiters/waitresses and captains) for charges hotel(s) billed customers for room rentals in conjunction with banquet functions.

37.    Hearings related to the aforementioned industry-wide dispute were held before the IC, Philip Ross, on March 4 and June 16, 2004; February 16, 2005; May 1 and September 29, 2006; and May 16, 2007.

38.    By decision #2007-40, dated August 23, 2007, the IC sustained the Union's grievance and issued an Award ("Ross Award") which stated, in part, as follows:

> I sustain the Union's grievance and direct the Hotel to henceforth pay gratuities in accordance with this Award and make whole all tipped banquet employees for any income lost as a result of the Hotel's violation. I hereby direct the parties to meet and determine this amount and, absent an agreement, I will retain jurisdiction over the matter.

39.    The Ross Award has industry-wide application.

6

40.    The IC Ross acted within his authority in fashioning the Award.

41.    The Employer has failed to comply with the industry-wide Ross Award, thereby depriving Plaintiffs with proper past and future gratuities.

42.    The Union is the exclusive collective bargaining representative for banquet waiters including Plaintiffs.

43.    The Union has a duty to fairly represent all employees of the Employer with respect to the processing of grievances arising under the IWA and enforcing awards of the IC rendered after binding arbitration which affect its members, including Plaintiffs.

44.    On a date believed to be in 1998, some banquet servers began complaining to the Union about room rental charges on banquet meeting events.

45.    At the time, the Union refused to take action.

46.    Subsequently, these complaints became more frequent and emphasized the onerous effects of the room rental charges on banquet waiters' income.

47.    On July 27, 2005, at a meeting between the banquet servers and the Union, the Union stated that there was already an on-going "industry wide" room rental arbitration claim.

48.    At the same meeting, the Union claimed to be in possession of room rental records from the St. Regis hotel covering the period between 1998 and 2003.

49.    On or about August 5, 2005, the Union handed the banquet servers a printout of the notes from the July 27, 2005 meeting enumerating the following outstanding eight grievances:

    1) Overstaffing of functions
    2) Bar remaining open past scheduled hours
    3) Room Rentals displacing Food & Beverage Charges
    4) Grace Period
    5) Minimum Payments
    6) Meetings without Food
    7) AM Meetings

8) Coffee Breaks

50.     In a notice dated February 3, 2006, the Union advised Plaintiffs that a room rental

arbitration case specific to their Employer had now been filed on their behalf under index No.

U05-649.

51.     The grievance charged the hotel with "improper and illegal reduction in gratuity to

Banquet Servers", as the Hotel "has simultaneously increased the percentage of banquet revenue

charged to Room Rental and decreased the percentage of banquet revenue charge to Food &

Beverage."

52.     On March 3, 2006, Plaintiffs' delegates asked the Union not to limit their claim to

the increase in the "room rental" fee but rather to seek the entire gratuity forfeited by the

existence of a room rental fee.

53.     The Union stated that it can only argue based on Article 47(D)(1) of the IWA

limiting the Hotel to the pre-1995 established practice regarding gratuities.

54.     In contrast, in the Hilton case, the Union argued that the language of Article

47(D)(1) guarantees gratuities on the entire banquet bill.

55.     Also on March 3, 2006, the Union stated that it did request records from the Hotel

going back to 1995 and that the Hotel did not furnish any records prior to 1998.

56.     Also, on March 3, 2006, the Union stated that it would use the hotel's records to

calculate the rate of increase of the room rental charges in relation to the food & beverage

charges from 1998 to 2003.

57.     The Union further stated that it would then project the change backwards to

establish what that ratio was prior to the 1995 contract.

58.     Also on March 3, 2006, the Hotel admitted in the presence of the Union that it did

not have room rental records going back to 1995.

59.    In April of 2007 and again in June 2007, Plaintiffs notified the Union that the Hotel had now extended the room rental charges to social banquets.

60.    At an unknown date, the Union removed the Room Rental issue from the banquet servers list of grievances, and modified the notes of the July 27, 2005 meeting accordingly.

61.    On June 7, 2007, at a meeting between the banquet servers and the Union, one of the items discussed was the status of the room rental issue.

62.    At that same meeting, the Union stated that it was awaiting an arbitration decision regarding the Hilton Hotel that will have industry-wide implications.

63.    On June 15, 2007, Plaintiffs' delegates met with the Union and the Hotel regarding the extension of the room rental fee to social banquets.

64.    The Hotel promised answers on this issue but the Union subsequently dodged the delegates' requests for these answers.

65.    In the Union's weekly newspaper ("Hotel Voice") issue of September 3, 2007, the Union announced a favorable decision in the Hilton's case.  The decision was handed down on August 23, 2007.

66.    Without mentioning the Hilton decision, the Hotel stated to some plaintiffs on September 19, 2007 that it will never again charge room rental charges on Food & Beverage ("F&B") functions, yet immediately afterwards began to charge room rentals on most banquet functions while still failing to pay gratuities on these new fees.

67.    On October 19, 2007, Plaintiffs' delegate asked the Union for a copy of the Hilton decision.

68.    On the next day, the Union, through a Server with close ties to Union President, Peter Ward ("Ward"), began a campaign seeking to fill an open assistant delegate slot.

69.     This waiter stated in essence that banquet servers will never get anything through the Union because of delegate Bejjani stressing his influence with Ward.

70.     This aforementioned campaign ended unsuccessfully five days later on October 25, 2007.

71.     On the same date, the Union hand delivered the Hilton's room rental decision to Plaintiff's delegate now notifying the delegate that the Hotel Association had called for an emergency hearing for October 30, 2007 seeking clarification on the decision.

72.     The decision (the Ross Award) showed that the Union made two main arguments under Article 47(D)(1).  First, the Union argued that "the plain language of the [Article] requires that banquet gratuities be paid on the entire banquet bill and does not provide for or allow any 'carve outs'...." And second, "even if the [Article] allows hotels to exclude room rental fees from the calculation of banquet gratuities as an established practice, the Hotel has failed to establish that such a practice existed in 1995".

73.     The decision also states that the banquet delegate at the Hilton "testified that prior to July 1, 1995, the Hotel's practice was not to charge a room rental fee and a banquet check was usually comprised of food and beverages charges.  There were very few exceptions to the room rental fee charges."

74.     The records necessary to prove an established practice for charging room rental fees on banquet events include at a minimum banquet event orders, banquet contracts and guest bills.

75.     In response to a subpoena duces tecum on a different issue, the St. Regis Hotel stated in writing on August 23, 2005, that it did not have any banquet event orders, banquet contracts, or guest bills going back to 1995.

76.    The Ross Award held that Article 47(D)(1) of the IWA "requires the hotel to include room rental in gratuity computations" and even extended its "holding to mean that the [hotel] may [not] create or maintain a charge called something other than room rental, but having the same effect of diverting revenue."

77.    The holding applies to room rental and "any other fees or charges to banquet guests, regardless of what they may be called or when they were created."

78.    The emergency hearing set for October 30, 2007 did not take place though all parties showed up for the hearing.

79.    On that same date, plaintiffs' delegate stated to the Union's attorney that he wanted the Award enforced in Court.

80.    The Union never enforced the Award in Court.

81.    There were many adversarial collusive actions taken by the Union. For example, on November 8, 2007, Plaintiffs' delegates had a pre-scheduled meeting with the Union's business agent at the Hotel to address several open banquet issues.

82.    The Union had pre-arranged, without the delegates' knowledge to have the Hotel present at the aforementioned meeting which appeared to be a clear setup aimed at having Plaintiffs in effect waive their right to the full benefits of the Hilton decision.

83.    Over Plaintiffs' delegates' strenuous objection, the business agent initially made a false statement claiming he had told the delegates that the Hotel would be present.

84.    Claiming that he had specific orders, the business agent then insisted on having the delegates inspect certain Banquet Event Orders dating from August 30, 2007 to the present in order to verify their accuracy, and then listen to the Hotel's position as to the applicability of the Hilton decision to itself.

85. The delegates adamantly demanded equal and fair treatment from the Union and the enforcement of the industry-wide Hilton decision.

86. On that same day, the Union acknowledged that the industry-wide Hilton decision applied to the Mandarin Oriental hotel.

87. On that same day, the Union stated that it was making strenuous efforts to have the Mandarin Oriental hotel accept the Hilton decision.

88. On that same day, the Union refused to take similar action to have the St. Regis hotel enforce the Hilton industry-wide Award.

89. On November 27, 2007, the Hotel Association challenged the industry-wide applicability of the Hilton decision.

90. The IC ruled verbally that the Hilton decision is applicable industry-wide.

91. At no time did the Arbitrator state that there would be an additional written decision on the matter, and immediately following the hearing, the Union president Ward clearly affirmed this understanding expressing regret that the IC had not written an additional decision.

92. In its Hotel Voice issue of December 3, 2007, the Union expressly altered this understanding by stating "the arbitrator's written decision ha[s] not yet been issued. It is expected to be delivered shortly".

93. In a letter dated December 11, 2007 denying plaintiffs' delegates unfettered access to all arbitration decisions addressing the IWA, the Union included a copy of this written decision #2007-85R dated December 4, 2007.

94. This new written decision states in pertinent part "As in all impartial Chairperson Decisions, the Hilton Award #2007-40 has industry-wide application and is final and binding on all parties to the Industry-Wide Agreement ("IWA"). There is nothing in its language that limits or restricts its scope. However, the Award is based upon Article 47(D)(1) of the IWA, which

was enacted in 1995 as a Union benefit circumscribing each Hotel's established practices which remain the starting point of the Award's individual Hotel application."

95.    On November 30, 2007, plaintiffs filed the instant civil action.

96.    On or about February 19, 2008, the initial complaint was served on the defendants.

97.    On or about March 3, 2008, plaintiffs served an amended complaint on defendants.

98.    The amended complaint raised several new issues including the room rental issue.

99.    On March 6, 2008, the Union reinstated plaintiffs' room rental case #U05-649 as if the Ross Award had no application.

100.    The arbitration date was set for March 19, 2008, one day before the initial conference before this Court.

101.    Also on March 6, 2008, the Union distributed what it purported to be an offer of about $1.8 million for room rental back-pay to all banquet tipped employees including plaintiffs, but limited all future banquet gratuity application to only 92.4% of the banquet bill.

102.    The actual losses to banquet servers are estimated to be substantially higher.

103.    The offer was dated March 6, 2008.

104.    On March 12, 2008, plaintiffs wrote directly to the Union objecting to this sudden maneuver, demanding that this arbitration be withdrawn without prejudice and the Ross Award enforced.

105.    On March 18, 2008, Plaintiffs through counsel wrote a letter to the Union's counsel, the Hotel's counsel and the IC protesting this proposed arbitration.

106.    The letter, in pertinent part, stated;

13

[T]he union is not seeking to obtain compliance with the IC's Award, but remarkably it is seeking, instead, to obtain a much less favorable new award for the St. Regis banquet waiters, presenting an issue that presumes that the St. Regis Hotel had an established practice regarding charging room rentals prior to the 1995 contract. Not only is this an issue for the hotel to arguably raise and prove, I am informed that the hotel has already conceded that it has no proof of such practice and it is appalling that the union would seek to dilute the benefits already obtained in the Hilton decision by attempting to concede a practice, that not only never existed, but is not provable and if provable, that burden rests with the hotel to grieve and arbitrate.

107.  The letter also made the following observation:

The union, without any justification, is now seeking again to arbitrate before the IC the room rental/gratuity issue when the IC has already issued a final decision on this issue. Thus, the doctrine of *functus officio* in arbitrations applies, which presumes that an arbitrator's final decision on an issue strips him of authority to consider that issue further. . . . Thus, there is no longer a labor dispute as to the hotels' liability for gratuities on room rentals, only the separate issue of damages.

108.  On March 18, 2008, the Union related that the arbitration was adjourned at the Hotel's request. No reason was given for this adjournment and no new date was set.

109.  The Union has acted with malice, in bad faith and in an arbitrary, discriminatory, perfunctory and grossly negligent manner and has failed to represent Plaintiffs fairly regarding their right to gratuities from room rental charges billed by the Employer at banquet functions, and by failing to enforce the terms of the Ross Award, which confers substantial benefits for Plaintiffs.

110.  Specifically, the Union has failed to confirm the Ross Award in federal court, thereby depriving Plaintiffs of substantial benefits.

**Tip Pool Issues**

14

111.    The Hotel has violated the IWA for years and continues to violate the IWA by underpaying gratuities owed on banquet functions.

112.    The Hotel has been able to effectively mask these underpayments through the vehicle of a Tip Pool it imposed on its banquet servers ("Tip Pool").

113.    The Hotel has violated New York State Labor Law §196-d by establishing and maintaining this Tip Pool.

114.    The Tip Pool was "designed" by the Hotel to guarantee that all banquet servers earn the same amount of gratuities.

115.    As designed, the Tip Pool makes it difficult for banquet servers to readily detect and calculate the Hotel's underpayments.

116.    Banquet servers for years have complained to the Union regarding these underpayments and the Union has failed to properly address the servers' grievances.

117.    Both the Hotel and the Union had, however, for years taken the position that any server could exit the Tip Pool at any time.

118.    Both the Hotel and the Union reversed this position when a substantial number of servers requested to leave the Tip Pool.

119.    This reversal in position was initially taken by the Union, and the Hotel followed the Union's lead at the Union's explicit request.

120.    In November 2003, some servers filed complaints with the New York State Department of Labor ("NYDOL") seeking to exit the Tip Pool under NYS Labor Law §196-d.

121.    The Hotel subsequently requested arbitration before the IC to declare the Tip Pool as an established practice.

122.    Banquet servers had no choice but to rely on their union to represent them in opposing the Hotel's position.

15

123.    The servers believed that the Union had a conflict of interest in this representation and as the facts unfolded the conflict proved real.

124.    During the arbitration process, the Union suppresses material evidence, refuses to subpoena union officials who would show that the Tip Pool is not an established practice, refuses to compel a union member to testify, destroys evidence, and colludes with the Hotel to destroy material evidence.

125.    In or about the end of May of 2007, the Union and the Hotel agree to a settlement whereby the Tip Pool would be disbanded but the banquet servers would not receive any damages for their monetary losses.

126.    The settlement also absolves both the Hotel and the Union from any wrongdoing regarding the Tip Pool and declares the Tip Pool was lawfully constituted and maintained under the IWA

127.    This is a concession that the Union did not have to make, and if true, would be a reason not to disband the Tip Pool

128.    This concession by the Union deprives banquet servers of income earned estimated to be in the millions.

129.    This concession further shows that the Union's position regarding the Tip Pool is aligned with the Hotel's.

130.    The Union's posture to its banquet servers that the Tip Pool was not properly established was a sham.

131.    The Union had no intention of allowing the IC to determine whether the Tip Pool was legally established and properly maintained because such decision would have far reaching industry-wide effect.

132.. The Union throughout its alleged representation of the banquet servers at the St. Regis continues to support the concept that Tip Pools are legally established and maintained throughout the industry.

133. The Union's alleged representation of these servers is a conflict of interest.

134. The settlement also grants the Hotel absolute authority to establish rules that can potentially impose adverse work conditions on banquet servers.

135. The Union and the Hotel were simultaneously colluding to deprive the banquet servers of income through other proposed settlements thereby showing that they were exacting a price from the servers for the disbanding of the Tip Pool.

136. The banquet servers objected to the settlement on the Tip Pool issue because it was negotiated through collusion to deprive the banquet servers of earned income.

137. The settlement remained in limbo until Plaintiffs filed this civil action.

138. Just before the first conference in this case, the Hotel implemented the Tip pool settlement by disbanding the Tip Pool and implemented rules that adversely affect banquet servers.

139. Since the Tip Pool was disbanded, the Hotel has continued to deprive banquet servers of their proper gratuities, with the knowledge and acquiescence of the Union.

140. One clear result of the disbanding of the Tip Pool is the blatant manner in which the Hotel is underpaying the servers. It is no longer masked behind the Tip Pool.

141. The post Tip Pool period shows that the servers were correct all along that the Hotel was underpaying banquet servers with the assistance of the Union.

142. The post Tip Pool period also shows that the settlement implemented between the Hotel and the Union regarding the Tip Pool must be nullified because it is collusive and deprives banquet servers of their gratuities, which cannot be waived.

143.    Plaintiffs all began working for the Employer on August 19, 1991 or shortly thereafter.

144.    As early as 1992, some plaintiffs began to realize that the Tip Pool was designed to enhance the Hotel's profits at their expense.

145.    At an unknown date in 1992, Plaintiff Breda advised the Hotel that he wished to exit the Tip Pool, and the Hotel told Breda that this action was within his rights but he was warned that should he actually exit the Tip Pool, he would be assigned to the less lucrative banquet functions in order to dilute his gratuity income.  Breda felt intimidated and did not pursue the issue.

146.    At a meeting held on April 1, 1993, the Hotel and the Union advised banquet servers that the Tip Pool was optional and that it could be exited at anytime by any participant.

147.    Union President Ward was present at that meeting.

148.    This meeting was tape recorded by the banquet servers.

149.    Years later when Ward was asked to testify at the Tip Pool arbitration, he refused.

150.    The banquet servers offered Ward the opportunity to listen to the tape. He ignored the offer and never testified.

151.    Between April 1, 1993 and November 2003, both the Hotel and the Union continued to advocate that the Tip Pool could be exited at any time.

152.    In January of 2001, the Hotel allowed a banquet server, Andre Coadic ("Coadic"), to exit the Tip Pool.

153.    Coadic kept all his earnings from gratuities from every banquet function that he worked for about two months and, as a result, he earned more gratuities than all other servers for performing the same exact duties performed by a participant in the Tip Pool.

154.   Additionally, to facilitate Coadic's greater gratuity earnings, the Hotel unlawfully drew money from the Tip Pool, thereby further draining banquet servers' gratuity earnings.

155.   On June 7, 2002, Plaintiff O'Connor notified both the Hotel and the Union that he wished to exit the Tip Pool. Both the Union and the Hotel approved the request.

156.   Plaintiff O'Connor did not complete the exit process fearing retaliation.

157.   At a later date, plaintiff O'Connor learned that Union President Ward was angered by his attempt to exit the tip pool.

158.   On or about October 2003, some banquet servers consulted with the NYDOL and learned that the Tip Pool violates some of the provisions of the New York State Labor Law.

159.   On October 16, 2003, some banquet servers presented Management with a petition bearing 14 banquet servers signatures asking to exit the Tip Pool. The Union was also given a copy of this request.

160.   The banquet crew consisted of 30 servers / bartenders.

161.   On October 24, 2003, at an emergency meeting of servers, the Union reversed its long standing stated position and opposed the banquet servers' exit from the Tip Pool advising them for the first time that it has an agreement with the Hotel binding the servers to the Tip Pool.

162.   The Union refused to show the servers a copy of this agreement.

163.   On October 28, 2003, the Union reiterated this new position.

164.   On October 31, 2003, the Hotel advised the servers that they could not leave the Tip Pool because it is a stipulated practice.

165.   The Hotel claimed that this agreement was in the form of a "handshake".

166.   The Hotel added that it received a phone call from the Union asking it to "absolutely not" let the banquet servers exit the Tip Pool.

167. On or about November 3, 2003, some servers filed a complaint with the NYDOL invoking NYS Labor Law §196-d.

168. On or about June 17, 2004 the NYDOL declared the Tip Pool illegal.

169. The Hotel made numerous statements that it was in the process of disbanding the Tip Pool, and that it was in discussions with the Union about implementing this.

170. On October 12, 2004, however, some servers received a Notice of Conference from the DOL set for November 4, 2004.

171. At this conference, the Hotel argued that Federal law pre-empts State law noting that it had recently filed for arbitration and that the grievance had already passed the mediation process.

172. The Hotel stated that it will rely on Article 47(D)(1) of the IWA claiming that the Tip Pool is a pre-existing practice sanctioned by the 1995 amendment to the IWA.

173. The Union had never informed any of the servers that the Hotel had filed for arbitration on this matter or that a mediation conference had taken place.

174. The Hotel asked for a clarification of its obligation under the IWA (re: 196d-NYS Labor Law) to break the Tip Pool.

175. The Arbitration was set for December 14, 2004.

176. On December 7, 2004, some plaintiffs requested that the Union grant them a change of venue and representation by an independent attorney on the grounds that the Union had already assumed a fraudulent adversarial position on the matter.

177. The next Arbitration date was February 3, 2005, and the Union and its attorney had yet to meet with any of the plaintiffs to prepare for the arbitration.

178. On that date, some plaintiffs showed up for the arbitration and saw that Ward was already meeting with the servers who did not wish to exit the Tip Pool.

20

179.    Ward told the servers that the Union had made a verbal agreement with the Hotel sanctioning the tip pool when the hotel was reopened in 1991.

180.    On that same date, plaintiff O'Connor accused Ward of having clearly taken an adversarial position on the case.

181.    Also on that same date, the Union made a statement reiterating that it had made an agreement with the Hotel regarding the Tip Pool, adding that "when [the Union] makes an agreement, [the Union] lives up to it."

182.    Some Plaintiffs met with Union Attorney Joseph Farelli ("Farelli") on February 18, 2005, March 28, 2005, April 22, 2005, May 6, 2005 and September 13, 2005, to prepare the case.

183.    Farelli stated to the banquet servers on many occasions that his allegiance is to the Union.

184.    Farelli also stated to the banquet servers that he would not subpoena Union officials to assist the banquet servers in this manner.

185.    At other times Farelli indicated that Union officials had information that would benefit banquet servers.

186.    No testimony whatsoever was taken in this arbitration.

187.    In preparing the case, Farelli stated that the Hotel would have to show that the Tip Pool was a practice that existed before the 1995 IWA and that the practice is still the same, and thus contractual under Article 47(D)(1).

188.    Farelli also stated that he would show both the pre-1995 IWA and post-1995 IWA practice included the right to leave the Tip Pool at anytime.

189.    Farelli also stated that he would make legal arguments to the effect, among other things, that the IWA cannot violate NYS Labor Law 196-d inasmuch as banquet servers are

being asked to share gratuities with servers working different functions and with servers who are not even working at all.

190.    Instead, showing his allegiance to the Union and his adversarial stance towards the banquet servers, Farelli sought a NYDOL opinion to justify the imposition of the Tip Pool upon the banquet servers.

191.    On May 6, 2005, some Plaintiffs told Farelli that they needed records from the Hotel to show that there was a period when a certain banquet Server worked outside the Tip Pool.

192.    Some Plaintiffs asked Farelli to subpoena two years worth of records (years 2000 and 2001) so that the Hotel would not know that Plaintiffs were looking for records specifically relating to that server.

193.    Farelli asked some plaintiffs to divulge to him the identity of this banquet server and to inform him when that server worked outside the Tip Pool which they did.

194.    The server was identified as Coadic.

195.    On May 9, 2005, the Union, through president Ward, claimed to be in possession of a document that purported to show that banquet waiters had 'agreed' to the Tip Pool after having taken a vote on the matter in 1993.

196.    On May 10, 2005, servers wrote to the Union asserting that they never took such a vote on the Tip Pool and objected to any such 'document', asking for a copy and for preservation of the original for future evidence. The Union ignored their request.

197.    On September 13, 2005, Farelli advised some Plaintiffs that the Hotel had turned over six boxes of documents.

198.    Farelli claimed that he had no knowledge as to the information contained in the boxes or why the banquet waiters wanted the documents.

199.    The records turned over did not contain Coadic's information, although complete records for 2001 would have shown that Coadic had left the Tip Pool for several months in 2001.

200.    Plaintiffs' delegate learned subsequently (but not until months later – on April 28, 2006) that Farelli had disclosed to the Hotel that the records requested would show that Coadic had not been participating in the Tip Pool during a certain period of time.

201.    On September 14th, 2005, the Hotel stated that Coadic's documents were not available and then asserted that "the documents don't exist".

202.    On information and belief, the Hotel, with assistance from the Union, destroyed the documents that would show that Coadic worked outside the Tip Pool.

203.    Additionally, in preparing the case, the Union actively suppressed all of Plaintiffs' material evidence including Ward's testimony.

204.    On January 30, 2006, some Plaintiffs inquired of Farelli about the long delay in putting the case on the Calendar. Farelli stated that the Union did not want to put the case before Impartial Chairman Ira Drogan and that it was trying to have the case heard before Impartial Chairman Philip Ross.

205.    Some nine months earlier, on April 22, 2005, Farelli had stated that it would be wrong and dishonorable for the Union to delay a case in order to get a specific arbitrator on the case and praised IC Drogan.

206.    On August 1, 2006, some Plaintiffs raised a conflict of interest claim before the IC asking him, among other things, to recuse himself and grant the banquet servers a change of venue to have the case heard before an Arbitrator from the American Arbitration Association.

207.    Some plaintiffs objected, among other things, to any representation by Farelli or the Union and to the destruction and suppression of material evidence.

23

208.    Some plaintiffs also requested, among other things, the use of a stenographer and/or admissible tape recording during the hearing.

209.    A tape recorder was used at the banquet servers' previous hearing before the IC in 1994.

210.    The IC denied some requests and ignored others.

211.    The order of the IC was dated August 2, 2006. The IC stated: "… I do not and will not knowingly receive ex parte communications", "The senders of the communication are not parties to the case… and have no standing before me. They may not address me, orally or in writing, except through counsel.", "I will not recuse myself", and "In accordance with longstanding practice of this Office I will not permit the recording or transcription of proceedings of arbitration hearings."

212.    Banquet servers were not advised of the IC's decision until June or May 2007.

213.    On June 1, 2007, the Union handed some Plaintiffs a document purporting to be a settlement between the parties on the Tip Pool bearing the Hotel's signature dated May 29, 2007, and the Union's signature dated May 31, 2007.

214.    The purported 'settlement' disbands the Tip Pool, but declares the Tip Pool was lawfully constituted and maintained under the IWA, withdraws the Hotel's grievance and an alleged Union's Tip Pool grievance and any related requests, disavows admission of any liability or fact giving rise to liability, disclaims any precedential values the settlement may have at other Hotels, and refers all disputes over the interpretation of this settlement to the Impartial Chairman's Office.

215.    The alleged Union Tip Pool grievance was filed without plaintiffs' knowledge. Plaintiffs were given notice of this grievance after it had already been withdrawn as a part of the settlement.

216.    The settlement also states that all "gratuities paid from a function shall be distributed to Servers who work the function, based upon the number of covers assigned to each Server." This clause takes away a contractual guarantee as Plaintiffs are entitled to gratuities based on a minimum number of covers. ie. Guests.

217.    As the result of this clause, in the post Tip Pool period, some servers who do the same amount of work on the same functions are paid differently. Some get paid properly while others are shortchanged.

218.    The settlement also exacts punishment by passing authority to the Hotel in establishing work related rules that had been within the Union's domain.

219.    On June 7, 2007, Plaintiffs objected to the Union to the Tip Pool settlement.

220.    The Hotel announced it would disband the Tip Pool on July 1, 2007.

221.    On June 27, 2007, Plaintiffs advised the Hotel, in writing, as follows:

> Reference is made to a purported settlement agreement between St. Regis New York Operating LLC d/b/a The St. Regis Hotel (the "Hotel") on the one hand and the New York Hotel & Motel Trades Council, AFL-CIO ("Local 6") on the other, dated May 29, 2007.

> Please be advised that it is the position of the undersigned that Local 6, in negotiating and signing the aforementioned agreement, acted in violation of its duty of fair representation to the undersigned. Accordingly, we do not recognize the legitimacy or efficacy of that agreement, and we are presently exploring all our legal rights and remedies.

> It is our understanding that the Hotel intends to implement the foregoing agreement on or about July 1, 2007. Should it do so, it does so at its own risk.

> We are also aware that Local 6 is negotiating, or has negotiated, several other so called settlement agreements, all dated late May, 2007, relating to grievances #U05-530, #U05-531, #U05-541 and other matters relating to banquet waiters. We maintain the same position with respect to those proposed agreements as we do to the aforementioned May 29, 2007 settlement agreement.

222. On June 28, 2007, Plaintiffs reiterated in writing their objections to the Union regarding the purported settlement.

223. The plaintiffs stated:

> We maintain that the [Tip Pool] should be disbanded as it violates the law. The Hotel should arbitrate or withdraw its case. We reject the Union's counterclaim [Tip Pool] case designed to arguably justify the [Tip Pool] settlement agreement and ask that it be withdrawn. We reject any [Tip Pool] settlement on its own that does not also settle in the same document the related issues being settled separately. We reject all and every condition imposed on us because of this disbanding of the [Tip Pool]. We reject all and every agreement or imposition made on us resulting in any loss of income or quality of life because of this disbanding. We expect our income to rise as the result of this disbanding as the [Tip Pool] has been a tool successfully used to dilute our contractual income. We object to the fact that back pay has not been addressed. Back pay was discussed several times in our meetings with Mr. Farelli.

224. On July 23, 2007, plaintiffs reiterated their position in writing to the Hotel stating in pertinent part as follows:

> Servers have repetitively expressed and do now again clarify in writing that the [June 27, 2007] objection is aimed solely at the purported settlements imposing adverse conditions for disbanding the [Tip Pool]. Servers continue to invoke their right to exit the [Tip Pool].

225. After the aforementioned letters, the settlement was not implemented until March 16, 2008 after the institution of this lawsuit.

226. On that same date, the Hotel disbanded the Tip Pool.

227. The settlement is not enforceable because it was negotiated by collusion between the Hotel and the Union and it was implemented more than six months after it was executed.

**Access to IC Decisions**

228. The Union has denied Plaintiffs full access to IC decisions.

229. The Union has attempted to retaliate against Plaintiffs' right to access to IC decisions by threatening to withhold full Union representation unless they remove their elected delegate.

230. On November 27, 2007, Plaintiffs' delegates advised the Union in writing that following the delegate's request of October 19, 2007 for a copy of the Hilton's Room Rental decision, "a sudden series of events unfolded and continue to unfold clearly aim[ed] at neutralizing our elected Delegate and weakening the [Hilton] decision." The request added that "[a]lthough all these attempts have failed so far, we remain[ed] fearful of the unveiling of the Union's and/or the Hotels' next plan".

231. Plaintiffs took the "position that every Union Member is legally entitled to read the Contract without fear…. All arbitration decisions addressing any part of the Contract at any establishment covered by the Contract, are an extension of the Contract, and are therefore rightfully [Union members'] to read privately when we wish, and as we wish, without being watched, or having to divulge what we are reading, or intend to read or act upon".

232. Plaintiffs requested the immediate establishment and implementation of a procedure whereby they "are given unconditional and unrestrictive access to all and every decision handed down [through] the years and addressing any part of the Contract".

233. In its response, the Union denied plaintiffs' "unconditional and unrestrictive" access to the arbitration awards interpreting the contract requiring that they first identify the "particular issue or contract clause" of interest. The Union further stated that a system already exists where Grievants involved in arbitration hearings are forwarded copies of the resultant awards.

234.    The Union's response makes false and/or misleading statements.  The Union is selective in what decisions are mailed out to the Grievants.  For example, the initial Hilton decision was not forwarded to the Grievants.

235.    While waiting for the so-called emergency hearing on the morning of October 30, 2007, Plaintiffs learned that none of the industry-wide delegates present to attend the hearing had ever seen the August 23, 2007 Hilton decision.  This is also true for the Hilton delegates themselves.  Plaintiffs made and distributed copies at the Impartial Chairperson's office that morning in response to these delegates' requests for copies.

236.    All impartial Chairperson decisions have industry-wide application.  This vests every Union Member with interest in every decision.

237.    The Union hides these decisions and behaves as if they do not exist until they are invoked specifically, and even then, the Union continues to ignore these decisions as it negotiates settlements that compromise contract guarantees.

238.    Access to the IC decisions is necessary so that Union members can understand their contractual rights and how the IWA has been interpreted by the IC.

239.    Limited conditional access to the IC decisions denies Union members information about their contract and deprives members of their rights.

**Unresolved Contract Issues**

240.    There are specific issues that have gone unresolved for many years such as issues relating to overstaffing, bartending, meetings, breakfasts, receptions and coffee breaks.

241.    These issues remain unresolved due to collusion between the Union and the Hotel.

242.    These issues have been in collusive negotiation for many years. e.g. the coffee break issue has been in negotiation since 1998.

243.   All the issues relate to underpayment on the part of the Hotel.  Many are based on contractual language already existing in Awards interpreting the contract.

244.   On June 7, 2007, the Union gave the banquet servers proposals to resolve most of these issues.  The proposals would dilute the servers' income. The servers rejected the offers and their delegates met with the Union extensively on June 27, 2007 where the Union promised to draft new proposals based on the discussions with them.

245.   Throughout the summer of 2007, the Union kept making promises in response to the servers' requests for the new drafts, and on November 8, 2007, their delegates once again discussed these issues with the Union, and they once again continued to make promises regarding drafting new proposals.

246.   On January 10, 2008, Plaintiffs learned that the Union was aware of the initial complaint filed in this action.

247.   On January 12, 2008, Plaintiffs learned that the Hotel was aware of the initial complaint filed in this action.

248.   In the afternoon on January 10, 2007, the Union finally began distributing to servers 'new' proposals regarding various pending issues.

249.   The distribution continued until January 17, 2007 until most of the servers received copies of these new proposals.

250.   An accompanying letter stated that the proposals were the result of ongoing negotiations with the Hotel.

251.   On January 12 and 15, 2008, the Hotel stated that there had been no recent negotiations with the Union.

252.   The proposals presented by the Union were identical to those of June 8, 2007, except for the Hotel's signature being omitted.

253.    Plaintiffs wrote to the Union rejecting again the offers, pointing out their deceptive actions and statements.

254.    The initial complaint in this action was served on February 19, 2007.

255.    On February 27, 2008, the Union's business agent handed to one of the banquet servers a stack of papers to distribute to each of the other servers.  It was a one-page letter dated February 21, 2008 addressed to the Hotel's Manager requesting to set up an appointment between the Union and the Hotel and asking servers to be present in order to resolve  pending issues.

256.    All the pending issues remain unresolved and will continue to remain so as long as the Union and the Hotel continue their collusive actions.

## FIRST CLAIM FOR RELIEF UNDER FEDERAL LAW

257.    Plaintiffs reallege each of the allegations set forth in all prior paragraphs as if fully set forth here.

258.    Plaintiffs seek the right, pursuant to Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185(a), to have this court confirm the Ross Award regarding room rentals.

259.    Plaintiffs seek to have the court order the Hotel to compensate Plaintiffs for all losses incurred regarding the Hotel's failure to pay gratuities, with interest, out of the room rental and other charges collected by the Hotel that were billed by the Hotel in conjunction with banquet functions and to declare that such payments must be continued in the future, along with the costs and reasonable attorney fees of this action.

## SECOND  CLAIM FOR RELIEF UNDER FEDERAL LAW

260.    Plaintiffs reallege each of the allegations set forth in all prior paragraphs as if fully set forth here.

261.    Plaintiffs seek the right, pursuant to Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185(a), to have this court declare that the Union has violated its duty of fair representation and the Hotel has violated the IWA between the Union and the Hotel regarding the fact that by contract the Hotel was obligated to pay full contract gratuities on room rental and other charges.

262.    The Union has failed to take appropriate actions to confirm the Ross Award regarding room rentals and has attempted to weaken that Award to the detriment of Plaintiffs.

263.    Plaintiffs seek to have the court order the Hotel and Union to jointly and severally compensate Plaintiffs for all losses incurred regarding the Hotel's failure to pay gratuities, with interest, out of the room rental and other charges collected by the Hotel that were billed by the Hotel in conjunction with banquet functions and to declare that such payments must be continued in the future, along with the costs and reasonable attorney fees of this action.

## THIRD CLAIM FOR RELIEF UNDER FEDERAL LAW

264.    Plaintiffs reallege each of the allegations set forth in all prior paragraphs as if fully set forth here.

265.    Plaintiffs seek the right, pursuant to Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), as amended,  29 U.S.C. § 185(a), to have this court declare that the Union has violated its duty of fair representation and the Hotel has violated the IWA between the Union and the Hotel regarding the fact that by contract the Hotel was obligated to pay full contract gratuities on all banquet functions and not dilute Plaintiff's gratuities through the maintenance of an illegal Tip Pool.

266.    The Union has failed to take appropriate actions to represent its members regarding the illegal Tip Pool and has colluded with the Hotel and acted against the interests of its members by fraudulently claiming that the Tip Pool system was a stipulated practice and failing to honestly and in good faith represent its members at the arbitration hearing(s) held on the Tip Pool Issue.

267.    Plaintiffs seek to have the court order the Hotel and Union to jointly and severally compensate Plaintiffs for all losses incurred regarding the Hotel's failure to pay proper gratuities, with interest, out of the illegal Tip Pool system and thereafter and declare that the now disbanded Tip Pool was illegal.

268.    Plaintiffs seek the costs and reasonable attorney fees of this action relating to the Tip Pool issue.

### FOURTH CLAIM FOR RELIEF UNDER FEDERAL LAW

269.    Plaintiffs reallege each of the allegations set forth in all prior paragraphs as if fully set forth here.

270.    Plaintiffs seek the right, pursuant to Section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185(a), to have this court declare that the Union has violated its duty of fair representation and the Hotel has violated the IWA between the Union and the Hotel regarding the fact that by contract the Hotel was obligated to pay full contract gratuities on all banquet functions and not dilute Plaintiff's gratuities through the manipulation of the IWA in the way payments are made for overstaffing, bartending, meetings, breakfasts, receptions and coffee breaks.

271.    The Union has failed to take appropriate actions to represent its members regarding overstaffing, bartending, meetings, breakfasts, receptions and coffee breaks and has

colluded with the Hotel and acted against the interests of its members by proposing settlements that are not in the interest of its members.

272.    Plaintiffs seek to have the court order the Hotel and Union to jointly and severally compensate Plaintiffs for all losses incurred regarding the Hotel's failure to pay proper gratuities, with interest, regarding overstaffing, bartending, meetings, breakfasts, receptions and coffee breaks. Plaintiffs seek the costs and reasonable attorney fees of this action relating to the overstaffing, bartending, meetings, breakfasts, receptions and coffee breaks issues.

## FIFTH CLAIM FOR RELIEF UNDER FEDERAL LAW

273.    Plaintiffs reallege each of the allegations set forth in all prior paragraphs as if fully set forth here.

274.    Plaintiffs seek the right, pursuant to the provisions of Section 102 of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") (Title I), 29 U.S.C. §§412, 414, and pursuant to the Union's duty of fair representation to have unfettered access to all IC decisions and to have the court order the Union to provide such access so that Plaintiffs will have the ability to understand their contract and know whether the Union is protecting their contractual interests.

275.    Plaintiffs seek an order directing transcriptions or tape recording of arbitrations, or at minimum allowing arbitrations to be transcribed or tape recorded upon the members' request.

276.    Plaintiffs seek the costs and reasonable attorney fees of this action relating to the issue of gaining access to all IC decisions.

## SIXTH CLAIM FOR RELIEF UNDER NYS LABOR LAW

277.    Plaintiffs reallege each of the allegations set forth in all prior paragraphs as if fully set forth here.

278.    Plaintiffs seek the right, pursuant to Section 196(d) of the New York State Labor Law to have this court declare that the Union has violated its duty of fair representation and the Hotel has violated the IWA between the Union and the Hotel regarding the fact that by contract the Hotel was obligated to pay full contract gratuities on all banquet functions and not dilute Plaintiff's gratuities through the maintenance of an illegal Tip Pool.

279.    Plaintiffs seek to have the court order the Hotel and Union to jointly and severally compensate Plaintiffs for all losses incurred regarding the Hotel's failure to pay proper gratuities, with interest, out of the illegal Tip Pool system and thereafter and declare that said Tip Pool was illegal.

280.    Plaintiffs seek the costs and reasonable attorney fees of this action relating to the Tip Pool issue under State Law.

## JURY DEMAND

281.    Plaintiffs demand a trial by jury of all issues in this action.

**WHEREFORE** plaintiffs pray that the Court:

a.    Assumes jurisdiction over this action;

b.    Confirms and enforces the Ross Award dated August 23, 2007;

c.    Awards Plaintiffs and enters judgment for any and all damages, with interest, plus compensatory damages, caused by the Employer's violation of the IWA between the Employer and the Union;

d.    Awards Plaintiffs and enters judgment for any and all damages, with interest, caused by the Employer's willful violation of the New York State Labor Law;

e.     Awards Plaintiffs and enters judgment for any and all damages, with interest, plus compensatory damages, caused by the Union's violation of its duty of fair representation to the Plaintiffs;

f.     Grants Plaintiffs relief in the form of reasonable attorney's fees and costs for the prosecution of this civil action; and

g.     Awards Plaintiffs such other and further equitable relief as this Court deems just and proper.

Dated: New York, New York
       April 7, 2008

Robert N. Felix (**RF-4229**)
Attorney for Plaintiffs
11 Broadway, Suite 715
New York, New York 10004
212-747-1433

# Exhibit B
# (Part 1 of 4)

AGREEMENT entered into so as to be effective July 1, 2006 between the HOTEL ASSOCIATION OF NEW YORK CITY, INC., in its own behalf and in behalf of the HANYC BARGAINING GROUP HOTELS* (hereinafter collectively referred to as the EMPLOYER or the ASSOCIATION), and the operators of hotels and motels who are active members of the ASSOCIATION and with respect to whom the UNION (as herein below described) presently has contractual relations, and the operators of hotels, motels, and concessionaires with respect to whom the UNION may be hereafter designated as sole collective bargaining agent for the employees of such hotels, motels, and concessionaires, and who shall become parties hereto by agreeing to this Agreement, each and every such hotel, motel, and concessionaire being hereinafter referred to as the EMPLOYER, and the NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO, hereinafter called the UNION, in its own behalf and in behalf of its members, now employed or hereafter to be employed by the EMPLOYER.

WITNESSETH:

WHEREAS, the ASSOCIATION is an organization whose active members are engaged in the hotel business in the City of New York and one of whose objects is to promote fair and harmonious labor relations between hotel keepers and their employees, and

WHEREAS, the parties hereto were signatories to a Collective Bargaining Agreement signed June 26, 1985, as amended by a Memorandum of Understanding signed January 30, 1990 (hereinafter collectively referred to as the "1990 Agreement"), which 1990 Agreement, by its terms, expired on June 30, 1995, and was extended by the parties to midnight July 4, 1995, and further amended by a Memorandum of Understanding signed July 5, 1995 (hereinafter referred to as the "1995 Agreement"), which Agreement, by its terms, expired on June 30, 2001, and was replaced by a Collective Bargaining Agreement effective July 1, 2001 (hereinafter referred to as the "2001 Agreement") which Agreement, by its terms, expired on June 30, 2006;

---

* A list of HANYC Bargaining Group Hotels has been provided by the ASSOCIATION. The aforesaid list is current as of June 15, 2006 and is expected to increase on a continuing basis.

WHEREAS, the parties hereto, desiring to cooperate to stabilize such labor relations by establishing general standards of wages, hours of service and other conditions of employment, and providing arbitral machinery whereby disputes and grievances between employers and employees may be adjusted without resort to strikes, lockouts or other interferences with the continued and smooth operation of the hotel business, have agreed, pursuant to the provisions of a Memorandum of Understanding dated June 16, 2006 (hereinafter referred to as the "2006 MOU"), to enter into an agreement so as to be effective July 1, 2006 (except as otherwise stated herein), on the terms and conditions hereinafter stated:

NOW, THEREFORE, the parties hereto agree as follows:

1.    (A)    (1) The term HOTEL as used throughout this Agreement shall include hotels, motels and affiliated facilities.

(2) The term CONCESSIONAIRE as used throughout this Agreement shall include all restaurants, lessees, and contractors operating within HOTELS that employ employees in job classifications covered by this Agreement.

(3) The term EMPLOYER as used throughout this Agreement shall, unless expressly distinguished elsewhere, include all HOTELS, whether or not members of the ASSOCIATION, and all CONCESSIONAIRES operating within HOTELS.

(B) The UNION represents to the EMPLOYER that it represents a majority of the employees covered by this Agreement in each EMPLOYER'S hotel, motel and concessionaire.

(C) The UNION represents to the ASSOCIATION that it represents a majority of all the employees covered by this Agreement in the hotels comprising the Bargaining Group Hotels of the ASSOCIATION.

(D) The UNION is duly empowered to enter into this Agreement.

(E) The ASSOCIATION and the EMPLOYER hereby recognize the UNION as the sole collective bargaining agency for the employees covered by this Agreement.

(F) The UNION agrees that the employees of the EMPLOYER shall work for the EMPLOYER upon the terms and conditions set forth in this Agreement.

EXCLUDED CATEGORIES

2.    All employees (including bell captains, floor housekeepers and all white-collar administrative employees included in Schedule A for whom the UNION has been heretofore or shall be hereafter designated as the collective bargaining representative) shall be covered by this Agreement except the following classes of employees which shall be excluded from the provisions of this Agreement: executives, superintendents, department managers, assistant department managers, supervisors, assistant supervisors with executive status having the right to hire or fire or effectively to recommend hiring or firing, buyers, assistant buyers, and confidential secretaries. Also excluded are hotel house officers, bell captains, floor housekeepers and all white-collar employees included in Schedule A for whom the UNION has not been heretofore or is not hereafter designated as the collective bargaining representative. In hotels which have heretofore entered into collective bargaining agreements covering any white-collar employees the coverage and exclusion from coverage provided in such agreement shall continue in effect.

UNION MEMBERSHIP

3.    (A) It shall be a condition of employment that all employees of the EMPLOYER covered by this Agreement who are members of the UNION in good standing on the date of this Agreement shall remain members in good standing and those who are not members on the date of this Agreement shall, on the thirtieth (30th) calendar day following the date of this Agreement, become and thereafter remain members in good standing in the UNION. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its date shall, on the thirtieth (30th) calendar day following the beginning of such employment, become and thereafter remain members in good standing. The UNION agrees to permit all employees to become and remain members of the UNION upon payment by them of initiation fees and periodic dues uniformly required as a condition of membership.

    (B) Upon notice in writing from the UNION to the effect that an employee is not a member of the UNION in good standing, i.e., s/he has failed to pay the initiation fees and dues to the UNION required herein, the EMPLOYER shall, within five (5) days, discontinue its employment of such employee. The EMPLOYER and the UNION agree the foregoing discharge requirement shall only be applicable to the failure to pay dues

and initiation fees uniformly required as a condition to acquiring or retaining membership in the UNION and shall have no applicability to the failure of an employee to pay authorized regular and/or special assessments which may from time to time be levied by the UNION in accordance with its Constitution and By-Laws.

(C) In the case of casual employees, the first date of employment shall be the date a casual employee is employed by a signatory or party to this Agreement and said employee shall, as a condition of employment by any EMPLOYER signatory or party to this Agreement, on the thirtieth (30th) working day following the beginning of such employment, become and thereafter remain a member in good standing in the UNION.

(D) This Article and the following Article "Union Dues" shall be construed and applied to effectuate the parties' written terms subject to applicable law.

UNION DUES

4.    UNION dues, assessments, initiation and service fees, and defense fund assessments, during the term of this Agreement, shall not exceed the sums set forth in the memorandum to be furnished by the UNION to the ASSOCIATION and/or the EMPLOYER at the time of the execution of this Agreement. Notwithstanding the foregoing, the amount of UNION dues, assessments, initiation and service fees, and defense fund assessments is subject to change at the prerogative of the UNION. The UNION agrees to give the ASSOCIATION and/or the EMPLOYER thirty (30) days' written notice prior to the effective date of any such change.

5.    The UNION agrees to furnish the EMPLOYER with a memorandum showing the amount of dues, assessments, initiation and service fees, and defense fund assessments payable as members of the UNION and service fees payable as non-members of the UNION by each of the employees of the EMPLOYER covered by this Agreement. Upon receipt of written authorization, the EMPLOYER agrees to deduct such dues, assessments, initiation and service fees, and defense fund assessments from the wages or salaries of the respective employees weekly (initiation fees and defense fund assessments are to be deducted in two (2) monthly installments) and the EMPLOYER agrees to transmit on a monthly basis such sums collected by the EMPLOYER to the UNION in the month of collection. The EMPLOYER will retain in its file the dues authorization

card of each employee from whom it makes such deductions. The EMPLOYER agrees to furnish to the UNION a list of the employees in its hotel covered by the Agreement and will from time to time furnish to the UNION the names of all such new employees who are to be covered by this Agreement, and also will notify the UNION of employees who have left the employ of the EMPLOYER. The EMPLOYER agrees that the UNION may examine the EMPLOYER'S payroll records for the purpose of checking compliance with this provision.

NEW EMPLOYEES

6.    (A) Probationary Period

A new employee shall work under the provisions of this Agreement, but shall be employed on a trial or "probationary" basis. The probationary period for new employees shall be sixty (60) days of work.

(B) Termination

(1) During the probationary period, the employee may be terminated with or without cause and without recourse to the grievance and arbitration machinery set forth in this Agreement; provided, however, that the EMPLOYER may not terminate the employee for the purpose of evading the Agreement or discriminating against UNION members. In the event the UNION claims a pattern exists that establishes that the turnover rate of employees of the EMPLOYER exceeds normal turnover rate from and after the thirty-first (31st) calendar day of employment and claims that such turnover is for the purposes of evading the Agreement or discriminating against UNION members, the UNION may grieve such termination in accordance with the grievance and arbitration machinery set forth in this Agreement.

(2) Probationary employees shall be paid not less than the new hire rate of pay during the probationary period. If, however, it is determined by the Impartial Chairperson that a probationary employee has been terminated by an EMPLOYER for purposes of evading the Agreement or discriminating against UNION members, the Impartial Chairperson shall reinstate such probationary employee with full back pay computed at the appropriate full contract rate of pay for all lost days retroactive to the employee's day of discharge up to and until the employee's reinstatement date. If upon reinstatement an

employee is still in the probationary period, s/he shall be paid the applicable contract wage for probationary employees, as set forth in Article 6(C) below.

(C) Wages and Benefits

(1) New employees hired prior to July 1, 2006

(a) New employees hired prior to July 1, 2006 shall be paid not less than seventy-five percent (75%) of the wage rate for their job classification set forth in Schedule A, and as set forth in Article 14(B). This rate, as amended by subsequent wage increases during said employees' first year of employment, shall continue for one (1) year from the date of hire, after which time it shall be increased in accordance with Article 6(C)(1)(b). This paragraph shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

(b) New employees hired prior to July 1, 2006 shall receive not less than eighty-five percent (85%) of the wage rate set forth in Schedule A of this Agreement as amended by subsequent wage increases during said employees' second year of employment. This rate shall continue for one (1) year, after which time the rate shall be increased to the full rate then in effect for the job classification. This paragraph shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

(2) New employees hired on or after July 1, 2006

(a) New employees hired on or after July 1, 2006 shall be paid not less than seventy-five percent (75%) of the wage rate for their job classification set forth in Schedule A, and as set forth in Article 14(B). This rate, as amended by subsequent wage increases during said employees' first and second years of employment, shall continue for two (2) years from the date of hire, after which time it shall be increased in accordance with Article 6(C)(2)(b). This paragraph shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

(b) New employees hired on or after July 1, 2006 shall receive not less than eighty-five percent (85%) of the wage rate set forth in Schedule A of this Agreement as amended by

subsequent wage increases during said employees' third and fourth years of employment from the date of hire, after which the rate shall be increased to the full rate then in effect for the job classification. This paragraph shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

(D) Contributions to Funds

No contributions shall be made to the Pension Fund, Prepaid Legal Fund or Training Fund or for the dental component of the Health Benefits Fund on behalf of any new employee until nine (9) months after the date of employment. This provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement.

HOTEL CLASSIFICATION

7.      For the purposes of this Agreement, the hotels in the City of New York have been grouped as follows:

Transient

Semi-Transient

Residential

The EMPLOYER and the UNION agree that the grouping of the EMPLOYER'S hotel is that set forth opposite its name.

PART-TIME WORK AND PREMIUM PAY;

SUBSTITUTE AND EXTRA EMPLOYEES

8.      (A)      (1) Any EMPLOYER who shall change the hours of the work week of a part-time worker to the hours of the work week of a full-time worker shall pay to the employee, commencing at the time when his/her hours have been so increased, not less than the contractual wage rate for his/her classification (minimum wage rate plus wage increases) at the time of the change as set forth in Schedule A, irrespective of the hourly rate such employee previously received as a part-time employee, anything contained herein to the contrary notwithstanding.

(2) It is understood that where an EMPLOYER, for business reasons (e.g., "business reasons" include, but are not limited to, the elimination of a meal in an a la carte

restaurant or the temporary closing of an a la carte restaurant, club or beverage outlet for a special banquet function), requires the temporary reduction in the work week of employees in any of its departments, it shall first give at least five (5) calendar days' written notice to and obtain the UNION'S written consent to such work week reduction, unless emergency circumstances prevent the EMPLOYER from giving such notice to and obtaining consent from the UNION. The consent of the UNION will not be unreasonably withheld or delayed.

(3) In the event a dispute arises between the UNION and EMPLOYER under the provisions of this Article 8(A), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairperson. In no event, however, shall such expedited arbitration proceeding delay or prevent the performance of the work by the affected employee(s).

(B) Casual employees and part-time employees shall be paid not less than one and one quarter (1-1/4) times the hourly wage rate at which an employee is required to be paid under Articles 12 and 14 for the first twenty (20) hours of work in categories where the regular work week in the industry is forty (40) hours and for the first seventeen and one-half (17-1/2) hours of work in categories where the regular work week in the industry is thirty-five (35) hours, and for the remaining hours of work shall be paid not less than the hourly wage rate an employee is required to be paid pursuant to Articles 12 and 14.

(C) Substitute Employees

(1) New employees hired solely to substitute ("substitute employee") for an employee on leave of absence, illness or injury, shall be considered casual employees and, pursuant to Article 23(A) of this Agreement, such employees will not accrue seniority during the period of their "substitute employment."

(2) At such time as the employee on leave of absence, illness, or injury returns to work, the substitute employee may be laid off by the EMPLOYER, and such layoff shall not prohibit the assignment of work on an overtime basis (or extra rooms in the case of housekeeping employees) to employees working in the same job classification as the substitute employee.

(3) In the event the substitute employee is laid off after the expiration of sixty (60) days of work, s/he shall retain recall rights in his/her classification for the length of his/her actual employment.

(4) In the event the substitute employee is laid off after the expiration of twenty-six (26) weeks, s/he shall have recall and all other rights in accordance with this Agreement.

(D) Extra Housekeeping and Banquet Employees

(1) The EMPLOYER shall be entitled to hire "extra" employees only in the job classifications of A.M. room attendant, P.M. room attendant, housekeeping attendant, and banquet steward and, effective July 1, 2006, banquet housekeeping attendants and banquet cooks.

(2) In the case of A.M. room attendants, P.M. room attendants, housekeeping attendants, and banquet stewards, the number of "extra" employees permitted to be employed hereunder within each of the aforementioned job classifications shall not exceed fifteen percent (15%) of the then current number of full-time employees in each of the aforementioned job classifications or one (1) employee, whichever is greater. In the case of banquet housekeeping attendants and banquet cooks, the number of "extra" employees permitted to be employed as banquet housekeeping attendants or banquet cooks, respectively, shall not exceed fifteen percent (15%) of the then current number of full-time employees who work only as banquet housekeeping attendants or banquet cooks, respectively.

(3) Extra banquet housekeeping attendants may only be utilized after the EMPLOYER has offered the relevant shifts to all regular full and part-time banquet housekeeping attendants, even if it entails overtime work, and after doing so, shifts are still available.

(4) Extra banquet cooks may only be utilized after the EMPLOYER has offered the relevant shifts to all regular full and part-time cooks (including non-banquet cooks) even if it entails overtime work, and after doing so, shifts are still available.

(5) No employee on the EMPLOYER'S payroll on or before the effective date of this provision shall be converted to "extra" status.

(6) All "extra" employees will be subject to all terms and conditions of employment set forth in this Agreement with the following exceptions:

(a) The EMPLOYER shall be permitted to schedule and call in "extra" employees to work without five (5) days' written notice to such "extra" employees as required by Article 11 of this Agreement.

(b) The EMPLOYER will not be required to give such "extra" employees notice of: layoff, recall, reduced work week or schedule change as otherwise required by Article 11(C) and Article 23 of this Agreement.

(c) The EMPLOYER shall be required to pay "extra" employees time and one-quarter (1-1/4) premium pay for all hours worked unless, notwithstanding the provisions of Article 8(D)(6)(b), said employees receive a notice of schedule in accordance with this Agreement to work a full work week and are offered a full work week. In such case, the employees will be paid at straight time for the full work week.

(7) "Extra" employees will not be scheduled for, or called in to, work if any full-time or regular part-time employees in the aforementioned job classifications are on layoff or reduced work week. Notwithstanding the foregoing, "extra" employees may work on a day in a week in which an employee in the aforementioned classification is on reduced work week if: (i) all employees regularly scheduled to work on such day have been properly scheduled, in accordance with Article 11(C), to work on such day, and (ii) any other employee who is on reduced work week during such week is offered, with five (5) days' notice in accordance with Article 11(C), to work on such day.

(8) All "extra" employees shall accrue seniority and shall be scheduled for, and called in to, work on the basis of strict seniority.

(9) "Extra" employees shall be eligible to fill full-time or regular part-time job openings in their job classifications on the basis of strict seniority.

(10) The EMPLOYER will keep a record of all calls made for the purpose of scheduling and calling in "extra" employees to work using the below form entitled "Extra Call-In Sheet".

**Extra Call-In Sheet**

| Hotel: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name: | | | | Date: | | | |
| | Phone | Time Called | Spoke to | Result ("agreed to come to work" or "did not agree to come to work." If no one was home, write what message you left or "no answer") | Delegate Initials | Manager Initials | |
| | | a.m. | | | | | |
| | | p.m. | | | | | |
| | | a.m. | | | | | |
| | | p.m. | | | | | |
| | | a.m. | | | | | |
| | | p.m. | | | | | |
| | | a.m. | | | | | |
| | | p.m. | | | | | |
| | | a.m. | | | | | |
| | | p.m. | | | | | |
| | | a.m. | | | | | |
| | | p.m. | | | | | |
| | | a.m. | | | | | |
| | | p.m. | | | | | |

(11) The EMPLOYER acknowledges that due to the irregularity and uncertainty with which "extra" employees may be scheduled and called in to work, "extra" employees may be frequently unavailable or unable to work when requested to do so by the EMPLOYER. Such employees shall not be disciplined or otherwise suffer a loss of future job opportunities because of such inability or unavailability to work on request by the EMPLOYER. Notwithstanding the foregoing, the EMPLOYER shall be entitled to replace an "extra" employee when such Employee demonstrates his/her unavailability other than on a reasonable basis.

EXTRA PAINTERS

9. (A) An extra painter is one whose employment terminates at any time within eighteen (18) weeks after the probationary period. An extra painter shall be paid not less than the rates established by Article 14 each week and, in addition, when his/her employment is terminated, shall be paid a lump sum equal to fifteen dollars ($15) for each week of his/her employment. An extra painter shall be paid for any of the holidays provided for in Article 29 of this Agreement which may occur during his/her period of employment, and shall receive prorated vacation pay.

(B) A painter who is employed for a period of more than eighteen (18) weeks after the probationary period shall not come within the provisions of Article 9(A) and shall attain the status of a regular permanent employee.

HOUSING-MEALS

10.    (A) In cases where the EMPLOYER furnishes housing accommodations to its employees, it shall be allowed two dollars and fifty cents ($2.50) per week for such housing accommodations.

(B) In cases where the EMPLOYER furnishes meals to its employees, it shall be allowed twenty-five cents ($0.25) per meal.

(C) In cases where the EMPLOYER furnishes housing accommodations and meals by the week, it shall be allowed seven dollars and seventy-five cents ($7.75) per week.

(D) If an EMPLOYER, who has heretofore furnished meals or housing accommodations, or both, as part of compensation, shall desire to discontinue same, it shall be obligated to negotiate with the UNION. Failing an agreement, either party may submit the issue to the Office of the Impartial Chairperson for final and binding resolution.

(E) If an EMPLOYER, who has not heretofore furnished meals and housing accommodations, or either, as part of compensation, shall desire to do so, and the EMPLOYER and the UNION cannot agree, the matter shall be submitted to the Impartial Chairperson for decision.

WORKING HOURS, MEAL PERIOD, OVERTIME, ETC.

11.    (A) Work Week

The working hours per week on which the minimum wage is predicated shall be forty (40) hours within five (5) days of the week for captains, greeters, and all tip classifications covered by this Agreement, and thirty-five (35) hours in five (5) days of the week for all non-tip classifications covered by this Agreement.

(B) Call-in

In the event any employee who normally works a full work day is called in to work on any day, s/he shall be offered a full day of work.

(C) Changes in Working Hours

The EMPLOYER shall be free to fix the daily working hours. The EMPLOYER agrees that it will give the affected employee at least five (5) calendar days' prior written notice of their work schedules, including notice of a change of an employee's work schedule. In the event of a change in schedule of daily working hours, seniority will be

observed insofar as compatible with efficiency. Should the UNION claim that changes in the schedule of hours result in any abuses of the rights of employees, the claim shall be subject to the grievance and arbitration procedures set forth in Article 26.

(D) Split Shifts

It is mutually agreed that the custom existing as of July 1, 2006 among certain EMPLOYERS of maintaining long and short watches and split shifts in certain categories of employees shall be permitted to continue, but shall not be extended. Any changes in the existing custom shall be made only by agreement between the UNION and the EMPLOYER. If they shall fail to agree on a proposed change, the same shall be submitted to the Impartial Chairperson as any other dispute arising under this Agreement.

(E) Meal Period

All employees shall be entitled to one (1) hour per day for meals. Time out for meals shall not be considered working time.

(F) Servers

Servers shall complete service on a guest notwithstanding the fact that the employee has reached his/her quitting time, and the first fifteen (15) minutes of such additional time shall not be deemed to be overtime.

(G) Overtime

(1) Overtime at the rate of time and one-half shall be paid for all hours worked in excess of eight (8) hours per day or forty (40) hours per week in categories where the regular work week under this Agreement is forty (40) hours per week and for all hours worked in excess of seven (7) hours per day or thirty-five (35) hours per week in categories where the regular work week under this Agreement is thirty-five (35) hours per week.

(2) It is agreed that employees will work a reasonable amount of overtime and on the sixth (6th) day when requested to do so at the rates of pay set forth in this Agreement provided, however, that there shall be no scheduled overtime in any job classification if there are laid off employees in that job classification in the hotel and there shall be no scheduled extra rooms for room attendants if there are room attendants laid off in the hotel until available work in the job classification in the hotel has been offered to employees laid off in that job classification, such offer to be made by reasonably available means of communication.

(3) The UNION and EMPLOYER agree that overtime pay shall be paid for all work performed on the sixth (6th) and seventh (7th) consecutive days of work unless such overtime work is occasioned by an EMPLOYER'S business needs and further provided prior written notice of same is given and written consent is obtained from the UNION, which consent will not be unreasonably withheld or delayed, unless emergency circumstances prevent the EMPLOYER from giving such notice to and obtaining consent from the UNION. In the event a dispute arises between the UNION and an EMPLOYER under the provisions of this Article 11(G)(3), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairperson. In no event, however, shall such expedited arbitration proceeding delay or prevent the performance of the work by the affected employee(s).

(4) Unless required by law, overtime shall not be paid where an employee or employees, subject to the written approval by the EMPLOYER, mutually agree in writing to change their schedule(s) or day(s) off under conditions which would otherwise result in overtime. This waiver shall also apply to any scheduling premiums or notice period under this Agreement if the change is mutually agreed upon pursuant to this provision.

(5) If one or more employee(s) refuse(s) to agree to the change in schedule or days off, and said change is nonetheless instituted by the EMPLOYER in accordance with the scheduling provisions of this Agreement, only the employee who did not agree to the change shall be paid overtime.

(6) Effective until July 1, 2006, no employee shall receive overtime pay unless such overtime work has been authorized previously by such employee's department or division manager. Effective July 1, 2006, no employee shall receive overtime pay unless such overtime work has been authorized or was performed with the actual or constructive knowledge of the EMPLOYER.

(7) Any employee who has heretofore been paid time and one-half after a shorter work day or shorter work week than specified under this Agreement shall continue to receive overtime pay after such shorter work day or shorter work week as heretofore.

(8) If the UNION feels that an industry-wide condition of unemployment exists in any job classification covered by this Agreement and that an excessive amount of overtime in such job classification or, in the case of room attendants, an excessive amount of extra

rooms has been scheduled in any hotel, the UNION may raise the matter as a grievance under Article 26 and, if the matter is not satisfactorily resolved, it shall be subject to arbitration thereunder.

MINIMUM WAGE

12.     Each EMPLOYER shall pay not less than the minimum weekly wages for the total number of hours per week as set forth in the attached Schedule A, except as provided in Article 6(C).

WAGES

13.     (A) General

(1) In the case of an ASSOCIATION member hotel, the minimum weekly wage rates set forth herein shall not be changed except by agreement between the ASSOCIATION and the UNION.

(2) In the case of all other EMPLOYERS, the minimum weekly wage rates set forth in this Agreement shall not be changed except by agreement between the EMPLOYER and the UNION.

        (B) Prior Wages and Benefits

(1) No employee shall suffer a reduction in hourly wage rates or fringe benefits previously enjoyed on account of the execution of this Agreement.

(2) The minimum wage rates set forth in this Agreement, payable by the EMPLOYER, are applicable to a forty (40) hour work week for captains, greeters and all tip classifications and to a thirty-five (35) hour week for all other classifications.

(3) When a full-time employee works less than his/her regular work week the wage shall be prorated on an hourly basis for the number of hours or fractions thereof actually worked. However, when a full-time employee is changed to a part-time basis, such employee shall receive his/her wages in accordance with the applicable provisions of Article 8.

WAGE INCREASES

14.     (A) All employees in the employ of the EMPLOYER on the date of the signing of this Agreement shall receive the wage increases as set forth in Schedule 1, attached.

(B) All employees hired after the effective date of this Agreement shall receive the wage increases set forth in Schedule 1, attached, which are effective subsequent to the date of the employee's hiring, as follows:

(1) An employee who, during the twenty-four (24) months prior to his/her employment was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to this Agreement, shall receive the wage increase, as set forth in Schedule 1, for his/her job classification.

(2) The length of time an employee shall receive seventy-five (75%) or eighty-five (85%) percent of the Schedule A minimum wage for his/her job classification shall be governed by Article 6(C).

(C) Extra meal servers shall receive the wage increases per meal and/or per day provided for in Schedule A.

(D) The minimum rates set forth in Schedule A-1 of the 2001 Agreement shall be increased by the wage increases provided for in Schedule 1.

(E) The minimum rates set forth in Schedule A of the 2001 Agreement shall be increased by the wage increases provided for in Schedule 1.

(F) The EMPLOYER and the UNION agree that, in accordance with past practice, the rate of the wage increases provided for in Schedule 1 shall be applicable to all wage-related items contained in this Agreement, e.g., extra room rates, night shift differential rates, banquet rates, etc., and, effective July 1, 2006, porterage and group fees.

EXTRA ROOMS

15.    The EMPLOYER shall have the right to require a room attendant to do extra rooms during the regular daily hours of work and shall pay the following amounts for each such extra room:

Effective July 1, 2005 $9.82 for each extra room

Effective July 1, 2006 $10.21 for each extra room

Effective July 1, 2007 $10.62 for each extra room

Effective July 1, 2008 $11.04 for each extra room

Effective July 1, 2009 $11.43 for each extra room

Effective July 1, 2010 $11.83 for each extra room

Effective July 1, 2011 $12.24 for each extra room

The above provisions are not intended to affect the overtime provisions set forth elsewhere in this Agreement.

COTS

16.    (A) Room attendants shall make up cots when assigned such work by the EMPLOYER and shall be paid the following sums for each cot made up after the room attendant's quota of rooms has been completed:

Effective July 1, 2005 $3.26 for each cot

Effective July 1, 2006 $3.39 for each cot

Effective July 1, 2007 $3.53 for each cot

Effective July 1, 2008 $3.67 for each cot

Effective July 1, 2009 $3.80 for each cot

Effective July 1, 2010 $3.93 for each cot

Effective July 1, 2011 $4.07 for each cot

On any day during which a room attendant makes up cots, three (3) cots shall constitute a room and shall be credited towards the room attendant's quota of rooms for the day.

(B) Room attendants shall clean saunas when assigned such work by the EMPLOYER. On any day during which a room attendant cleans saunas, four (4) saunas shall constitute a room and shall be credited towards the room attendant's quota of rooms for the day.

MAJOR STRUCTURAL ALTERATIONS

17.    (A) Mechanics and maintenance employees shall perform the work heretofore performed by mechanics and maintenance employees in the hotels.

(B) All major structural alteration work on the premises of the EMPLOYER shall be performed by employees covered by this Agreement. Employees required to perform major structural alterations shall be paid the prevailing wages being paid to employees performing similar construction work in the City of New York.

(C) Any dispute as to whether work constitutes mechanical maintenance work or major structural work, or as to the wages to be paid therefor, shall be determined by arbitration, as any other dispute arising under this Agreement.

(D) The UNION shall be given at least thirty (30) days' notice by the EMPLOYER of its intention to effectuate major structural alterations. Upon receipt of said notice, the UNION shall have a right to call for a conference at the ASSOCIATION to discuss the matter. If, as a result of the conference, there is a dispute concerning the proposed major structural alteration, the matter shall be submitted to the Impartial Chairperson for his/her decision. Pending the conference, or if the matter is submitted to the Impartial Chairperson, pending his/her decision, the contract for such major structural alterations shall not be signed, nor shall the EMPLOYER commence said alterations.

EMPLOYER RULES AND REGULATIONS

18.    The EMPLOYER may continue, and from time to time may change, such rules and regulations as it may deem necessary and proper for the conduct of its business, provided that the same are not inconsistent with any of the provisions of this Agreement. All such rules and regulations shall be observed by the employees. The UNION may raise as a grievance any new or changed rule or regulation under Article 26 and, if the matter is not satisfactorily resolved, it shall be subject to arbitration thereunder.

DUTIES OF EXCLUDED CATEGORIES

19.    Nothing herein contained shall prevent employees in the excluded categories from performing the duties that they performed heretofore.

RELIEF EMPLOYEES

20.    Employees may be assigned for no more than one and one-half (1-1/2) hours in any one day to relieve other employees in other positions for meal and rest periods, without additional compensation. An employee relieving other employees for more than one and one-half (1-1/2) hours in any one day shall be paid his/her regular rate of pay or the contractual wage rate (minimum wage rate plus applicable wage increases) for the classification of the employee relieved, as set forth in Schedule A, whichever is higher.

HIRING

21.    (A)    (1) New employees shall be hired in the following manner: A joint UNION-HOTEL ASSOCIATION employment office shall be opened immediately for the hiring of all employees in categories covered by this Agreement, except banquet servers and banquet captains, who are covered by the provisions of Article 47.

(2) The following principles shall govern the operation of the joint employment office:

(a) The UNION and the ASSOCIATION will jointly establish a central registration office. The ASSOCIATION and the UNION will each establish a branch office for the dispatching of job applicants. The central registration office shall be administered jointly by the ASSOCIATION and the UNION.

(b) Any person, whether or not a member of the UNION, and whether or not previously employed in the hotel industry, seeking to obtain employment in any job category covered by this Agreement, shall fill out a registration form at the central registration office. Each registration form shall contain, among other things, the following information: name, address, occupation, personal references, special qualifications, employment history, including the names of hotel EMPLOYERS and periods of employment in the hotel industry, and other such information as may be required. A copy of all registration forms and a master list of all registered applicants shall be maintained at the UNION branch and at the ASSOCIATION branch or the joint employment office.

(c) Each EMPLOYER party to this Agreement desiring to employ a new employee in any job category covered by this Agreement in its hotel or concession, must apply for such employee to either the UNION branch or the ASSOCIATION branch of the joint employment office. The branch applied to shall select, from the file of registered applicants, one or more applicants for the job opening. Preference in referring applicants and in employment shall be given to persons who have been previously employed in the hotel industry in New York City, and among such persons first preference shall be given to employees whose employment was terminated by reason of the closing of hotels covered by this Agreement and thereafter to other hotel employees who are on permanent layoff status from hotels covered by this Agreement.

(d) Unless an applicant satisfactory to the EMPLOYER shall be referred by 4:00 P.M. of the second business day following the day when the request was made, the EMPLOYER shall be free to fill in the vacancy from any source. An EMPLOYER application for an employee filed after 2:00 P.M. shall be considered as placed on the next business day. The foregoing time limitation shall not apply to emergency extras required by the EMPLOYER. In the case of an emergency extra, unless an applicant satisfactory to the EMPLOYER shall be referred within one (1) hour after the request is made, the EMPLOYER shall be free to hire such emergency extra from any source.

(e) The expenses of the ASSOCIATION branch shall be borne by the ASSOCIATION. The expenses of the UNION branch shall be borne by the UNION. The expenses of the central registration office shall be borne equally by the UNION and the ASSOCIATION.

(f) The records of both branches and of the central registration office shall at all times be open to the inspection of both the UNION and the ASSOCIATION, and there shall be a daily interchange of information regarding persons dispatched to jobs and any and all pertinent data.

(g) No charge or fee whatsoever shall be requested of or charged to any registrant, job applicant or hotel.

(h) The service of the joint employment office shall be available to all members of the ASSOCIATION, whether or not they are under contract with the UNION.

(i) It is recognized that an EMPLOYER may fill a vacancy from among its employees, including employees in other hotels of the EMPLOYER'S chain.

(j) Any question or dispute concerning the operation of the joint employment office shall be subject to the grievance and arbitration procedure set forth in Article 26.

(k) The UNION and the ASSOCIATION acknowledge that they have not established the Central Registration Office nor the branch offices for the dispatching of job applicants, as provided in this Article, but have been using the services of the New York State Employment Service.

(l) If at any time during the life of this Agreement either the ASSOCIATION or the UNION requests full compliance with the provisions of this Article 21, such full compliance shall be effectuated by all parties.

(m) Upon the request of either party hereto, the Joint Advisory Committee, consisting of three (3) members appointed by the ASSOCIATION and three (3) members appointed by the UNION, shall convene to promulgate rules for the management of the joint employment office.

(B)    (1) Upon a finding by the Impartial Chairperson that an EMPLOYER has a pattern of intentional and/or bad faith violation of the provisions of the Industry Wide Agreement with respect to the hiring of new employees, by and amongst other things discriminating against members of the UNION, whether they are actively employed or on layoff status, who are otherwise satisfactory to the EMPLOYER, the Impartial

Chairperson may, in addition to ordering the termination of the employee unlawfully hired by the EMPLOYER and the hiring of the employee discriminated against by the EMPLOYER, grant such other remedy or relief as the Impartial Chairperson deems appropriate, including but not limited to the assessment of one (1) week's pay for every day the EMPLOYER is found to be in violation of the Agreement, up to a maximum of five (5) weeks' pay.

(2) In the event it is found that the UNION knew of the EMPLOYER'S violation of the Industry Wide Agreement and intentionally failed or delayed in acting on same, the Impartial Chairperson shall also assess against the UNION, a like penalty.

(3) All monies assessed for a violation of this Agreement shall be paid to the Employee Benefits Funds for distribution in proportionate amounts to the various funds.

(4) The parties agree, notwithstanding the provisions of this Article 21(B) seemingly to the contrary, that the UNION may, in its sole discretion, upon good cause shown by the Hotel Association, agree in writing, to waive, in full or in part, the provisions of this Article 21(B) and the provisions of Article 6(C) and (D) of the Industry Wide Agreement with respect to the wages and benefits of new employees, including contributions made to the industry wide funds on behalf of such new employees having prior work experience in the hotel industry.

(C) The EMPLOYER shall post all permanent job openings in the Hotel in order to permit current employees to apply.

(D) The EMPLOYER shall notify the UNION of the name, date of hire, and position of each person hired when requested and with the monthly submission of electronic information to the UNION.

(E) The EMPLOYER shall promptly notify the UNION of all job openings for any job category covered by this Agreement and of the cancellation of any job openings.

(F) Study Committee

The parties acknowledge their mutual interest in creating a computerized system for all employees where job openings are posted electronically and applicants from closed shops and other EMPLOYERS (as said term is defined in Article 1 of the Agreement) will be able to apply electronically when a job is electronically posted. The parties also acknowledge their mutual interest in establishing a uniform system of

referrals and compliance monitoring. The parties agree to convene, within sixty (60) days of the effective date of this Agreement, a Study Committee consisting of an equal number of representatives of the UNION and of the ASSOCIATION to negotiate over the foregoing. The recommendations of the Study Committee shall only be adopted with the agreement of both the UNION and the ASSOCIATION, and shall not be subject to arbitration.

## MANAGEMENT RIGHTS

22.    (A) The EMPLOYER shall have the right to direct and control its employees. The EMPLOYER shall have the right to lay off, promote, or transfer any employee. Promotions shall not be subject to contest or review. The UNION shall, by representatives designated by it, have the right to confer with the EMPLOYER on behalf of any laid off or transferred employee. If the UNION claims that a layoff or transfer results in any abuse of the rights of employees, the grievance shall be subject to the grievance and arbitration provisions of Article 26 of this Agreement.

(B) The EMPLOYER shall have the right to establish combination jobs within the classifications set forth in Schedule A of this Agreement. Upon the implementation of such job changes, the employee(s) affected shall be paid the rate of the higher rated job as set forth in Schedule A, except that in addition to the rate of the higher rated job, front office, food preparation and engineering and maintenance department employees shall receive ten dollars ($10) per week. No employee currently employed shall be laid off as a result of the job change. Employees shall be paid the combination rate for an entire week, except where the combination job results from an employee having to cover for another employee who fails to report to work as scheduled with no or less than twelve (12) hours' notice prior to the shift, the combination pay shall be the higher rate for the day, in addition to any applicable premium.

## SENIORITY

23.    (A) Layoff – General

In the event of a layoff in any department, departmental seniority will be observed insofar as compatible with efficiency. In general, the last person hired in a job classification within a department will be the first laid off in such classification and the employee with the greatest seniority in the job classification in the department will be the

last laid off in such job classification. The EMPLOYER shall give the UNION not less than five (5) calendar days' prior written notice of layoff of an employee. Each week, the EMPLOYER shall further provide the UNION written notice of any employees who were recalled from layoff in the previous pay week. Except as otherwise provided in this Agreement, casual employees do not have seniority rights.

(B)    Layoff – Recall

(1) The EMPLOYER shall keep a list of names of all employees laid off during the term of this Agreement and shall furnish the UNION with a copy thereof; and in the event of rehiring, it shall give preference to the persons on said list in order of seniority, provided that it shall not be required to rehire any person from said list unless such person, before being laid off, performed identical tasks in the same department from which s/he was laid off.

(2) In the case of an employee who is recalled to work from a layoff by an EMPLOYER, the EMPLOYER shall, if it intends to again lay off the affected employee, give the UNION at least three (3) calendar days' prior written notice of said second layoff. Notwithstanding the previous sentence, when a recall for a particular shift on a given day is occasioned by ten percent (10%) or more of the employees in a classification scheduled to work such shift failing to report to work with no or less than twelve (12) hours notice prior to the shift ("called out"), the EMPLOYER need give two (2) rather than three (3) calendar days' prior written notice of a second layoff for those employees recalled to replace employees who called out. Within three (3) business days of the recall referred to in the previous sentence, the EMPLOYER must provide the UNION, in writing, with the following: the date of the recall, the number of employees scheduled to work such shift, the names of the employees who called out, and the names of the employees recalled. In addition, when ten percent (10%) or more of the employees in a classification scheduled to work a particular shift on a given day call out, the EMPLOYER may use "extra" employees pursuant to Article 8 during such shift, if each employee who is on reduced work week or layoff either works such shift or declines to be recalled and there are still an insufficient number of employees in the classification, provided such "extra" employees must be provided with two (2) consecutive days of work. It is agreed that the

# Exhibit B
# (Part 2 of 4)

requirement to give five (5) days' notice of change of schedule as provided in Article 11(C) shall not apply to recalls covered by this Article 23(B)(2).

(3) The UNION and the EMPLOYER further agree that the EMPLOYER may not lay off an employee more than three (3) times in any one calendar month and further, the EMPLOYER shall, during any such recall, pay premium pay to the affected employee(s) in accordance with the provisions of Article 8.

(4) An employee absent from work because of sickness or injury for not more than twenty-six (26) weeks shall be reinstated to his/her former job with all job rights and seniority, provided the employee is physically capable of performing the duties of the job. The employee shall give the EMPLOYER one (1) week's notice of intention to return to work.

(5) An employee absent from work because of sickness or injury for more than twenty-six (26) weeks but not more than one hundred and four (104) weeks shall be placed upon a rehiring list and shall be offered the first available job opening in his/her job classification, provided that at the time the job opening becomes available the employee is physically capable of performing the duties of the job. Upon rehiring, the employee shall be restored to all his/her job rights and seniority. If not rehired by the expiration of the one hundred and four (104) week period, the employee shall lose his/her seniority.

(6) In either case the EMPLOYER may require satisfactory proof of sickness or injury and recovery. If the employee presents a statement by the Health Center or another appropriate health care professional that the employee is able to return to work and if the EMPLOYER challenges said certification, the dispute may be submitted to an impartial physician designated by the EMPLOYER and the UNION, or if they are unable to agree, designated by the Impartial Chairperson, and the UNION and EMPLOYER agree to be bound by the decision of said physician.

(C) Layoff - Delegates and Assistant Delegates

(1) In the case of ASSOCIATION Labor Relations Group member EMPLOYERS: if a hotel intends to lay off a delegate or assistant delegate the hotel shall, prior to effectuating such layoff, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the hotel shall consult the office of the ASSOCIATION and an immediate conference with the UNION will be arranged at

the office of the ASSOCIATION to discuss the matter. The conference held at the ASSOCIATION will constitute the conference provided for in this Article. Pending the result of the conference at the office of the ASSOCIATION and until a hearing is held at the Office of the Impartial Chairperson, if such hearing is necessary, the delegate or assistant delegate shall remain on the job. In accordance with existing practices, accredited UNION delegates shall have top seniority in their job classifications.

(2) In the case of all other EMPLOYERS: if an EMPLOYER intends to lay off a delegate or assistant delegate, the EMPLOYER shall, prior to effectuating such layoff, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the EMPLOYER shall immediately notify the Office of the Impartial Chairperson and request a hearing. Pending the hearing before the Impartial Chairperson, the delegate or assistant delegate shall remain on the job. In accordance with existing practices, accredited UNION delegates shall have top seniority in their job classifications.

(D) Notification of Delegates

The UNION will furnish a written list of delegates to each hotel upon written request by the hotel, and the UNION will notify the hotel in writing of any change in the list of delegates within ten (10) days of the making of such change.

UNION ACTIVITY

24.     (A) No employee shall be discharged or laid off because of UNION activities. In the event of a claim being made that an employee has been discharged or laid off because of UNION activities, such claim must be filed with the Labor Manager within one (1) week and disposed of by him within three (3) days thereafter. If the controversy cannot be satisfactorily adjusted between the UNION and the Labor Manager, the same shall be promptly referred to the Impartial Chairperson, who shall render his/her decision within a reasonable time after receiving the claim.

(B) In cases involving non-ASSOCIATION EMPLOYERS, all such claims which cannot be satisfactorily adjusted between the EMPLOYER and an officer or business agent of the UNION shall be promptly referred to the Impartial Chairperson for adjustment.

NO DISCRIMINATION

25.    The opportunity to give and obtain employment and maintain employment without discrimination or harassment because of race, color, creed, sex, age, national origin, citizenship status, religion, disability, sexual orientation, union activity or any factor illegal under federal, state or city law is hereby recognized by the parties to this Agreement.

COMPLAINTS, GRIEVANCES AND ARBITRATION

26.    (A) All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be final and binding upon the parties hereto. Any such complaint, dispute or grievance involving an EMPLOYER member of the ASSOCIATION shall, in the first instance, be submitted to the Labor Manager who will be appointed and employed by the ASSOCIATION, to consider and adjust with a duly accredited representative of the UNION, for their joint consideration and adjustment; if they agree, such decision shall be binding on the parties hereto. Should the matter not be resolved by the Labor Manager and the representative of the UNION, it shall then be referred to the Impartial Chairperson as aforesaid.

(B) In the event of a willful default by either party in appearing before the Impartial Chairperson, after due written notice shall have been given to the said party, the Impartial Chairperson is hereby authorized to render a decision upon the testimony of the party appearing.

(C) Non-ASSOCIATION member hotel and concessionaire EMPLOYER complaints, disputes, or grievances are to be taken directly to the Impartial Chairperson.

(D) If any EMPLOYER experiences an unanticipated emergency which justifies relief from the provisions of Article 45(B) the matter—if unresolved between the EMPLOYER and the UNION—may be submitted to the Impartial Chairperson who may grant such relief as s/he deems proper. If relief is granted, the Impartial Chairperson may make such provisions for the employees involved as s/he deems appropriate. The Impartial Chairperson may not grant relief predicated solely upon economic factors.

(E) The parties consent that any papers, notices or process, including subpoenas, necessary or appropriate to initiate or continue an arbitration hereunder or to enforce or confirm an award, may be served by ordinary mail directed to the last known address of the parties or their attorneys, or when authorized by the Impartial Chairperson, by telegram, fax, e-mail or telephone.

(F) The parties consent that all arbitration hearings shall be heard at the Office of the Impartial Chairperson located at 321 West 44th Street in the City of New York, or at such other place as the Impartial Chairperson may designate.

(G) The Impartial Chairperson may call such arbitration hearing on giving five (5) days' notice to all of the interested parties. The Impartial Chairperson, however, may call a hearing on shorter notice if s/he deems it appropriate.

(H) The parties hereby expressly waive the requirements regarding the Arbitrator's oath and the manner and time for the service of notice of hearing contained in the Civil Practice Law and Rules of the State of New York and agree and consent that the Impartial Chairperson may proceed with the hearing.

(I) The compensation of the Impartial Chairperson and his/her proper and necessary expenses shall be shared and paid equally by the ASSOCIATION and the UNION.

(J) Should the Impartial Chairperson resign, refuse to act, or be incapable of acting, or should the office become vacant for any reason, the ASSOCIATION and the UNION shall immediately and within five (5) days after the occurrence of such vacancy, designate another person to act as such Impartial Chairperson. If they fail to agree, the United States District Court, Southern District of New York, shall, upon application of either party, on due notice to the other, summarily make such appointment.

(K) The decision rendered by the Impartial Chairperson shall have the effect of a judgment entered upon an award made, as provided by the Arbitration Laws of the State of New York, entitling the entry of a judgment in a court of competent jurisdiction against the defaulting party who fails to carry out or abide by such decision.

(L) Effective for instances which arise after the effective date of this Agreement, an EMPLOYER found by the Impartial Chairperson to have (1) shown a pattern of repeated violations of a similar type and nature which supports a finding of an intentional

and bad faith contractual violation; or (2) willfully violated a clearly defined contractual provision or hotel-specific established practice relating to scheduling, layoff, recall, wage or a wage-related provision, and that in either case above, i.e., (1) or (2), where such violation has resulted in a monetary award to the affected employees the Impartial Chairperson shall award to such employees an additional amount equal to fifteen percent (15%) of the awarded amount. It is understood that this provision shall not apply to situations where the Impartial Chairperson finds that the EMPLOYER has relied upon a reasonable good faith interpretation of the Agreement(s).

DISCHARGE AND DISCIPLINE

27.    (A) General

(1) The EMPLOYER shall have the right to discharge or discipline any employee. The UNION may question whether an employee's discharge or discipline was for just cause.

(2) In the case of ASSOCIATION Labor Relations Group member EMPLOYERS, the UNION shall submit the matter to the Labor Manager within ten (10) days after a discharge and, should the matter not be adjusted by the Labor Manager under the procedure set forth in Article 26, the UNION may submit the matter to the Impartial Chairperson within ten (10) days after the conference before the Labor Manager for decision as any other dispute under this Agreement. In the case of non-ASSOCIATION Labor Relations Group member EMPLOYERS, the UNION shall submit the matter directly to the Impartial Chairperson. The Impartial Chairperson may uphold the discharge or reinstate the employee with or without back pay.

(3) The Impartial Chairperson shall not require that an employee who is discharged or suspended mitigate his/her damages where said employee registers with the Article 21 job referral office for his/her same or similar position and shift, within seven (7) days following termination or suspension and applies within forty-eight (48) hours for positions referred by the Article 21 job referral office which are the same or similar to the position held by the employee. In the absence of compliance with the foregoing by the employee, the Impartial Chairperson shall require mitigation of the employee. The job referral office and the employee shall provide the EMPLOYER with any relevant information in connection with the foregoing upon request.

(B) Discharges/Suspensions - Delegates and Assistant Delegates

(1) In the case of ASSOCIATION Labor Relations Group member EMPLOYERS: if a hotel intends to suspend or discharge a delegate or assistant delegate the hotel shall, prior to effectuating such suspension or discharge, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the hotel shall consult the office of the ASSOCIATION and an immediate conference with the UNION will be arranged at the office of the ASSOCIATION to discuss the matter. The conference held at the ASSOCIATION will constitute the conference provided for in this Article. Pending the result of the conference at the office of the ASSOCIATION and until a hearing is held at the Office of the Impartial Chairperson, if such hearing is necessary, the delegate or assistant delegate shall remain on the job in all cases except theft, physical fighting, workplace violence or on the job drug/alcohol abuse, or such related charges. The parties agree to request that said hearing be held within forty-eight (48) hours of the conference at the Hotel Association. Unless mutually agreed to by the parties, if there is no meeting at the Hotel Association mediation within fourteen (14) days after requested, the matter may be filed at the Office of the Impartial Chairperson, which shall hear the matter on an expedited basis.

(2) In the case of all other EMPLOYERS: if an EMPLOYER intends to suspend or discharge a delegate or assistant delegate, the EMPLOYER shall, prior to effectuating such suspension or discharge, consult with an officer or business agent of the UNION. If, after twenty-four (24) hours, the parties are unable to resolve the problem, the EMPLOYER shall immediately notify the Office of the Impartial Chairperson and request a hearing. The delegate or assistant delegate shall remain on the job pending the hearing at the Office of the Impartial Chairperson.

(C) Sunset

(1) Discipline Other than Attendance Discipline

Any discipline for a "non-serious offense," i.e., an offense other than a "serious offense" (defined below), shall be deemed null and void for disciplinary purposes after a twenty-four (24) month period, provided the employee has not received any further discipline during such twenty-four (24) month period.

(2) Discipline Related to Attendance, Tardiness, or Absence

Any discipline issued as the result of attendance, tardiness or absence ("Attendance Discipline") shall not be considered discipline for purposes of Article 27(C)(1). Any Attendance Discipline shall be deemed null and void for disciplinary purposes after a twenty-four (24) month period, provided the employee has not received any further Attendance Discipline during such twenty-four (24) month period.

(3) General

(a) "Serious offenses" shall be defined to be fighting, theft, threats of violence, workplace violence, harassment, use or possession of drugs or alcohol on the job.

(b) Discipline for a serious offense shall not be subject to the provisions of Article 27(C)(1).

(c) The failure of the UNION to challenge a warning at the time it is issued shall not preclude it from challenging same if the warning is later relied upon by the EMPLOYER to justify subsequent discipline, provided that the UNION must, within a reasonable time after the issuance of a written warning to the affected employee, notify the EMPLOYER in writing of a basis for its contest of, or disagreement with, said written warning.

VACATIONS

28.    (A) Entitlement - General

(1) All employees covered by this Agreement who shall have been employed continuously for the period specified below shall receive the following annual vacations with pay:

| | |
|---|---|
| One (1) year but less than two (2) years | One (1) week |
| Two (2) years but less than five (5) years | Two (2) weeks |
| Five (5) years but less than seven (7) years | Twelve (12) days |
| Seven (7) years but less than fifteen (15) years | Three (3) weeks |
| Fifteen (15) years but less than twenty (20) years | Four (4) weeks |
| Effective July 1, 2007: Twenty (20) years or more | Five (5) weeks |

(2) Tip employees shall receive the foregoing vacations and their vacation pay shall be twice their regular weekly rate of pay including night shift differential and premium pay, if any.

(3) Banquet employees shall receive their vacations as set forth in Schedule A-1 annexed hereto.

(4) Checkroom employees shall receive their vacations as set forth in Schedule A-2 annexed hereto.

(5) Steady extra banquet bartenders shall receive their vacations as set forth in Schedule A-3 annexed hereto.

(B) Proration

(1) Permanent, regularly scheduled part-time employees shall receive their vacations pro-rated in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Article 8(B) of this Agreement.

(2) In the event an employee is absent due to layoff, illness or injury, closing or excused absence for a period aggregating more than sixty (60) days in any employment year or such longer period as may be granted in writing by the EMPLOYER, the employee's vacation pay shall be prorated in proportion to the number of weeks actually worked during said employment year.

(3) Except as provided in Article 28(B)(2), an employee who has been employed for one (1) year or more whose employment terminates within one hundred eighty (180) days prior to the end of his/her employment year shall receive vacation pay prorated in proportion to the number of weeks the employee actually worked during said year. An employee employed for less than one (1) year shall receive vacation pay prorated in proportion to the number of weeks actually worked since his/her date of employment, provided his/her employment terminated within one hundred twenty (120) days prior to the end of his/her employment year.

Subject to Article 28(B)(2), if an employee's employment is terminated by reason of the closing of a hotel or concessionaire, the employee shall receive vacation pay prorated in proportion to the number of weeks the employee actually worked since the beginning of his/her current employment year.

(4) After service breaks aggregating more than twenty-six (26) weeks in an employment year, accrual of vacation entitlement pursuant to Article 28(A) shall toll.

(C) Payment

Vacations shall be given as soon as practical after the employee's completion of the required continuous employment. If deductions for meals were made during the year from the wages of the employee, the vacation pay shall be the full wages without meal

deductions, providing the employee does not take meals at the hotel during the vacation period. The vacation pay shall be given to the employee at the end of the week preceding the vacation week.

(D) Scheduling

The EMPLOYER shall fix the time or period when such vacation may be taken and it shall give the UNION at least four (4) weeks' notice of the vacation schedule. Such schedule must provide for sufficient vacation periods to accommodate every employee's full vacation entitlement pursuant to the following conditions:

(1) Vacation requests received prior to January 15th of each year will be scheduled in accordance with seniority and approved or denied within two (2) weeks after the January 15th deadline. Employees who have not handed in a request by January 15th will have a final opportunity to turn in a vacation request by May 1st for any remaining weeks available and will be scheduled in accordance with seniority and approved or denied within two (2) weeks after the May 1st deadline. Vacation requests received after the May 1st deadline will be scheduled by the Hotel on a "first come, first served" basis for any remaining vacation weeks available. All vacation requests must be submitted in writing and will be responded to in writing and shall be determined by the Hotel based on business demands.

(2) Any request for unpaid leave shall be made in writing by the employee and will be responded to as soon as practicable.

(E) Termination of Employment

An employee who has completed the required period of employment shall, in the event his/her employment is terminated prior to receiving his/her vacation, be entitled to receive his/her vacation pay.

HOLIDAYS

29.    (A) Entitlement - General

The EMPLOYER shall grant to all non-probationary employees covered by this Agreement the holidays listed below with pay:

New Year's Day        Labor Day

Martin Luther King Jr.'s Birthday        Thanksgiving Day

Presidents' Day        December 24th

Memorial Day Christmas Day

July Fourth

The EMPLOYER shall grant to all employees covered by this Agreement the personal days listed below with pay:

Employee's Birthday

Employee's Anniversary Date of Employment

One (1) personal day in each contract year to be scheduled by arrangement between the employee and the EMPLOYER not less than two (2) weeks prior to said day off.

Permanent, regularly scheduled part-time employees shall receive holidays and personal days prorated in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Article 8(B) of this Agreement.

(B) Layoff

When an employee is laid off because of lack of work on any of the above enumerated holidays, s/he shall be paid for such holiday, provided the holiday occurs within twenty (20) working days following the beginning of such layoff, and also provided the laid off employee does not receive pay for the holiday from another hotel EMPLOYER.

(C) Sickness

When an employee is absent because of sickness or injury on any of the above holidays s/he shall be paid for such holiday provided s/he has not been replaced by another employee who also receives pay for such holiday. The EMPLOYER may require satisfactory proof of sickness.

(D) Payment

(1) Should it be necessary for an employee in a non-tip classification to work on any of the above holidays s/he shall receive his/her regular straight time pay including night shift differential and regular premium overtime pay, if any, in addition to the holiday pay. Employees shall be notified five (5) days in advance as to whether it will be necessary for them to work on the holiday.

(2) An employee in a tip classification (except for banquet servers and banquet bartenders, who shall receive holiday pay as provided in Schedule A-1 or A-3) shall receive twice his/her regular daily rate of pay as holiday pay including night shift

differential and regular premium overtime pay, if any. Notwithstanding the foregoing, should said tip employee work on the holiday, s/he shall receive an additional one-half (1/2) day's pay for a total of two and one-half (2-1/2) days' pay.

(3) All employees shall receive not less than a normal week's pay in any week during which a holiday falls.

(E) Work on Holidays

(1) If the EMPLOYER requires an employee to work on a holiday, the EMPLOYER may not require the employee to take another day off in lieu of the holiday. If a holiday falls on an employee's regular day off, the EMPLOYER may give the employee another day off in lieu of the holiday, which day off shall be the employee's regular work day immediately preceding or immediately following the holiday. Should a holiday fall during an employee's vacation, the EMPLOYER may grant the employee an additional day's vacation in lieu thereof which shall be the day immediately before or the work day immediately following the vacation.

(2) The UNION and the EMPLOYER agree, notwithstanding the provisions of Article 29(E)(1) above, that if a Hotel (i) requires an employee to work on a holiday, or (ii) if a holiday falls on an employee's regular day off or (iii) if a holiday falls during an employee's vacation, an employee may voluntarily take a day off, with pay, in lieu of receiving holiday pay, which day off with pay shall be scheduled within thirty (30) days before or after the holiday, provided prior written notice together with written consent by the employee is given to the UNION, which consent will not be unreasonably withheld or delayed.

In the event a dispute arises between the UNION and an EMPLOYER under the provision of this Article 29(E)(2), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairperson. In no event, however, shall such expedited arbitration cause a delay in the foregoing.

(3) Employees in departments which are closed for the summer shall be paid for any of the above holidays which occur during such closing providing the employee returns to work when recalled to work.

PERSONAL DAYS

30.    (A) Entitlement – New Hires

(1) In order to be eligible for his/her paid personal days, an employee not previously employed in the hotel industry must be in the employ of the hotel for not less than sixty (60) working days.

(2) An employee whose birthday falls within the first fifteen (15) days of his/her employment shall receive his/her birthday personal day between the thirty-first (31st) day of employment and the ninetieth (90th) day of employment. In the event an employee's birthday falls subsequent to the first fifteen (15) days of his/her employment, s/he shall receive same on the day it falls.

(3) An employee who is severed from his/her employment prior to completion of the ninetieth (90th) day of employment but whose birthday occurred prior to his/her severance from employment, shall receive pay for his/her birthday personal day provided the birthday occurred after not less than fifteen (15) days of employment.

(B) Entitlement - Regular Full-Time and Regular Part-Time Employees

(1) Subject to the provisions set forth herein, all regular full-time employees of the EMPLOYER shall be eligible for three (3) personal days off with pay during each year of this Agreement. Permanently regularly scheduled part-time employees shall receive personal days pro rata in relation to the hours they regularly work. The proration shall be based on the wage rate they are paid pursuant to Article 8(B) of this Agreement.

(2) The personal days off to which employees are entitled shall be compensated at the rate of one (1) day's pay at straight time, except for tip employees, who shall be compensated at twice the regular daily rate of pay at straight time.

(3) If a non-tip employee is required by the EMPLOYER to work on any of his/her personal days, s/he shall receive an additional day's pay at regular straight time pay including night shift differential and regular premium overtime pay, if any. In the event a tip employee works on his/her personal day, said employee shall receive one and one-half (1-1/2) days' pay at regular straight time pay, including night shift differential and regular premium overtime pay, if any, in addition to his/her normal daily wages.

(C) Banquet Personnel

(1) Banquet servers, banquet captains and banquet bartenders on a hotel steady rotation list, and checkroom and washroom attendants, shall receive personal days based upon the same eligibility applicable to regular employees. The amount of pay for their personal

days: (i) for the said banquet servers and banquet captains shall be the amount payable to an a la carte server or an a la carte captain under the wage schedule set forth in Schedule A; (ii) for the said checkroom and washroom attendants shall be the amount payable under the wage schedule set forth in Schedule A-2.

(2) Should it be necessary for banquet servers to work on any of the personal days, pay for said personal days shall be at one and one-half (1-1/2) times the amount payable to a la carte servers under the wage schedule set forth in Schedule A, in addition to the wages paid for each banquet function or functions.

(3) Should it be necessary for banquet captains or banquet bartenders to work on any of the personal days, pay for said personal days shall be at the rate of one (1) day's pay for a la carte captains in the case of banquet captains and for service bartenders in the case of banquet bartenders, in addition to the wages paid for each banquet function or functions.

(4) In the event a personal day falls within the summer months during which such banquet and/or checkroom employees are not working, they shall nonetheless receive such personal days, or payment in lieu thereof, in accordance with arrangements to be agreed upon between the Hotel and the said employee.

(D) General

The following rules shall be applicable to the three (3) personal days:

(1) In the event an EMPLOYER has a group of employees whose anniversary date with the EMPLOYER is the same, said employees shall enjoy such personal day off thirty (30) calendar days after their birthdays.

(2) If an employee's authorized personal day off falls on either his/her regular day off, during vacation, or on a holiday, the EMPLOYER shall have the option of granting another day off with pay by arrangement, or paying said employee for the personal day.

(3) If an employee's authorized personal day off falls while s/he is absent due to sickness or injury on the job, said employee shall be paid for such personal day upon return to regular employment or shall receive another day off with pay by arrangement with the EMPLOYER.

(4) Notwithstanding the above, nothing contained herein shall prevent the employee from applying all or a portion of his/her authorized personal days off to other than the reasons specified as a result of an unusual and/or sudden occurrence.

JURY DUTY

31.    All employees who have been employed for not less than one (1) consecutive year and who are summoned to serve jury duty will be paid for every second year of such service by the EMPLOYER the difference between their per diem jury pay and their regular rate of pay, provided that such payment shall be made for a period of no more than two (2) weeks (or such shorter period as the employee shall be on jury duty). To receive pay for jury duty, the employee must present to his/her EMPLOYER written evidence of his/her call to jury service together with a copy of receipt for payment for his/her jury duty. Tip classification employees shall be paid the difference between their per diem jury pay and twice their regular rate of pay.

BEREAVEMENT PAY

32.    (A) Entitlement

(1) All employees who have been employed for not less than one (1) continuous year shall be granted bereavement pay in the event of a death in his/her immediate family.

(2) The term "immediate family" is defined as the employee's father, mother, sister, brother, spouse, domestic partner (as verified by the Health Benefits Fund), or children.

(B) Payment and Calculation

(1) Bereavement pay for the death of the employee's immediate family shall be paid for the day before, the day of, and the day following the funeral providing each of these days falls on days the employee was scheduled to work. In the event any of these three (3) days falls on days when the employee was not scheduled to work, the employee shall receive pay only for those days on which s/he was scheduled to work. No employee, however, shall receive bereavement pay more than once during any twelve (12) month period within the term of this Agreement.

(2) The bereavement days off to which employees are entitled shall be compensated at the rate of one (1) day's pay at straight time except for tip classification employees, who shall be compensated at twice the regular daily rate of pay at straight time including, for both non-tip and tip employees, night shift differential and regular premium overtime pay, if any.

(3) No bereavement pay will be granted unless the employee requests same from the EMPLOYER in advance of taking same. At its sole discretion, the EMPLOYER may require evidence of death and kinship.

HEALTH BENEFITS FUND

33.    (A) The EMPLOYER agrees to contribute sums of money equal to stated percentages of its payroll to the New York Hotel Trades Council and Hotel Association of New York City, Inc., Health Benefits Fund, all as provided herein, in Article 6(D) and Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference. Should government or other funds be appropriated on behalf of the dental program hereunder, the EMPLOYER'S contribution shall be reduced accordingly.

(B) The EMPLOYER and the UNION acknowledge that, effective January 1, 1999, the New York Hotel Trades Council and Hotel Association of New York City, Inc. Insurance Fund, Union Family Medical Fund and Dental Fund were merged to form the "New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund". The EMPLOYER and UNION agree that the Health Benefits Fund is the successor to the Union Family Medical, Insurance and Dental Funds and they also agree that the obligations of any EMPLOYER owed to the Union Family Medical, Insurance and Dental Funds are merged into and are henceforth owed to the Health Benefits Fund.

401(k) PLAN

34.    The parties hereto have agreed to a non-EMPLOYER contributory 401(k) Plan, known as the New York Hotel Trades Council and Hotel Association of New York City, Inc. 401(k) Savings Plan and Trust, which has been established in accordance with applicable law for the benefit of employees covered by this Agreement, all as provided herein and in Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference. Employee contributions into said 401(k) Plan shall be made by employees on a voluntary basis. Any and all costs attendant to the establishment, implementation and administration of said 401(k) Plan, other than costs of deducting and withholding from employee wages and transmitting same to the Plan, shall be paid out of the employee elective deferral contributions.

PENSION FUND

35.    The EMPLOYER agrees to contribute to the New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund, all as provided herein, in Article 6(D) and Schedule B annexed hereto, the terms and provisions of Schedule B being specifically incorporated herein by reference.

TRAINING AND SCHOLARSHIP FUND

36.    (A) The ASSOCIATION and the UNION have established a program to train employees for promotion and advancement. Said program is known as and operated by the New York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund established by an Agreement and Declaration of Trust which provides, among other things, for equal representation upon the Board of Trustees of the Trust Fund of ASSOCIATION and UNION representatives. The Impartial Chairperson designated under this Agreement shall act as Impartial Chairperson of said Trust Fund.

    (B) The EMPLOYER agrees to contribute to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Training and Scholarship Fund, all as provided herein, in Article 6(D) and in Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference.

    (C) No new training programs, other than those organized by the Trustees of the Fund, shall be instituted.

    (D) Should government or other funds be appropriated on behalf of the training program hereunder, the EMPLOYER'S contribution shall be reduced accordingly.

    (E) The parties agree to jointly study the Industry Training Program ("ITP") in order to meet the EMPLOYER'S concerns that the program(s) be revised to (1) more accurately meet the employment needs of hotels, (2) provide training in skills that employees will need in order to fulfill hotel employment requirements and (3) that the ITP's administrative offices, programs and facilities be combined with the joint employment office in order to effectuate savings, if possible, and to more closely align the purposes of ITP's benefit programs with the purpose of the joint employment office to better service EMPLOYERS and their employees and to effectuate the UNION'S request that graduates of the ITP be granted preferential hiring and promotion opportunities on an industry-wide basis.

(F) Culinary Training

(1) The ITP shall establish a training course to help employees/applicants who are eligible to enroll in ITP to acquire the culinary skills necessary to obtain eligibility for employment.

(2) Training opportunities shall be provided in the order of "first come, first served" basis. Applicants who successfully complete the ITP culinary training course and obtain certification shall be permitted to apply for culinary job openings.

(3) The EMPLOYER shall immediately notify the UNION of, and post in a visible location, any culinary job openings.

(4) The UNION shall transmit to the EMPLOYER all applications for its job opening(s) which were submitted by employees/applicants who are ITP-certified as eligible.

(5) The EMPLOYER shall interview every employee/applicant certified as eligible who is referred for a job opening. The EMPLOYER shall decide which applicant to hire and shall notify the UNION in writing of the identity of the person hired three (3) days prior to hiring said applicant. Once an EMPLOYER interviews an employee/applicant ITP-certified as eligible, the EMPLOYER is not required to re-interview said person for future job openings for twelve (12) months.

(6) The ITP shall promptly notify EMPLOYERS of the identity of applicants who are ITP-certified as eligible to be utilized as banquet culinary.

(G) The parties agree to form a joint study committee to review advancement opportunities in the New York City hotel industry for employees in other classifications who attain ITP certification.

LEGAL FUND

37.    The EMPLOYER agrees to contribute to the jointly trusteed New York Hotel Trades Council and Hotel Association of New York City, Inc. Prepaid Legal Services Fund, all as provided herein, in Article 6(D) and Schedule B annexed hereto, the terms and provisions of said Schedule B being specifically incorporated herein by reference.

STRIKES AND LOCKOUTS

38.    (A) Both the UNION and the EMPLOYER recognize the service nature of the hotel business and the duty of the hotel operator to render continuous and hospitable service to the public in the way of lodging, food and other necessary hotel

accommodation. Therefore, the UNION agrees that it will not call, engage in, participate in, or sanction any strike, sympathy strike, stoppage of work, picketing of the hotel, sit-down, sit-in, boycott, refusal to handle merchandise, or any other interference with the conduct of the EMPLOYER'S business, for any reason whatsoever; nor will it interfere with any guest or tenant at the hotel, while s/he is a guest or tenant occupying a room or space, who sells or exhibits non-union-made merchandise or employs non-union help. The EMPLOYER agrees that it shall not lock out its employees or any part of its employees.

(B) The UNION and the employees agree that they will not, at any time, either directly or indirectly, interfere with or prevent the EMPLOYER from purchasing merchandise or any service requirements which it may desire from any source whatsoever because of the employment by the said source of non-members of a union or non-union workers, and the UNION and the employees further agree that they will not refuse to handle, sell, deliver or work on any such merchandise which may be so purchased.

(C) The UNION and the employees further agree that they will not call, participate in or sanction any sympathy strike of the employees because the EMPLOYERS purchase any merchandise manufactured by or any service requirements supplied by non-members of a union or by EMPLOYERS of non-union workers or because it has such merchandise manufactured for it by non-members of a union or employers of non-union workers. Such a strike shall be in violation of this Agreement.

(D) The UNION and the employees further agree that they will not call upon the EMPLOYER to participate or assist in the enforcement of any public or silent boycott against any product sold or offered for sale, or used by the EMPLOYER.

(E) Any such act shall be a violation of this Agreement, and the same, including any and all disputes in reference thereto or with respect to any of the foregoing provisions, shall be submitted to the Impartial Chairperson as any other dispute under this Agreement.

(F) During the term of this Agreement there shall be no lockout, strike or stoppage of any kind pending the determination of any complaint or grievance and for a

period of ten (10) days thereafter, and then only for the refusal of either party to abide by such determination.

CONTRACT WITH NON-MEMBER HOTELS

39.     (A) The UNION obligates itself to enter into no contract whereby any person, firm or corporation operating a hotel in the City of New York shall receive any benefit or aid not accorded to the HANYC Bargaining Group EMPLOYERS pursuant to the terms of this Agreement.

(B) The UNION agrees to insert a clause in all its Agreements with hotel and concessionaire EMPLOYERS who are not HANYC Bargaining Group members or hotel and concessionaire EMPLOYERS which cease to be HANYC Bargaining Group members to the effect that such EMPLOYER shall submit to the plan of adjustment and arbitration herein provided for. Not later than two weeks after the effective date of this Agreement, all non-labor relations member hotel and concessionaire EMPLOYERS shall deposit with the Impartial Chairperson the following sums of money as security for the EMPLOYERS' payment of the assessment of the Office of the Impartial Chairperson:

In the case of a hotel EMPLOYER with less than three hundred (300) rooms - the sum of one thousand dollars ($1,000).

In the case of a hotel EMPLOYER with three hundred (300) or more but less than nine hundred (900) rooms - the sum of one thousand, three hundred and fifty dollars ($1,350).

In the case of a hotel EMPLOYER with nine hundred (900) or more rooms but less than one thousand (1,000) rooms - the sum of two thousand dollars ($2,000).

In the case of a hotel EMPLOYER with one thousand (1,000) or more rooms - the sum of two thousand, five hundred dollars ($2,500).

In the case of a concessionaire EMPLOYER - the sum of one thousand dollars ($1,000).

(C) The UNION and the HANYC reserve the right to jointly increase the above amounts from time to time.

(D) The Impartial Chairperson shall assess each non-labor relations member hotel of the HANYC and concessionaire EMPLOYER on each occasion said EMPLOYER is required to appear for a hearing, whether or not said hearing is held, one-half of its deposit.

(E) In the event a non-labor relations member hotel of the HANYC or concessionaire EMPLOYER fails to pay the assessment levied by the Impartial Chairperson to the arbitration fund as herein above set forth, the monies due the arbitration fund shall be deducted from the monies deposited with the Impartial Chairperson as aforesaid and the said non-labor relations member hotel of the HANYC or concessionaire EMPLOYER shall be required to replace forthwith any monies so deducted. The Impartial Chairperson may institute a lawsuit to recover any monies due hereunder.

(F) Contracts with such other EMPLOYERS, who are not HANYC Hotels, shall not run longer than the period of this Agreement.

STATUS QUO AGREEMENT OF MARCH 23, 1938

40.    (A) Any hotel for whose employees the UNION has been designated as the exclusive collective bargaining agent, and which does not become a party to this Agreement by signing the same, shall not have any of the rights, benefits, or privileges of this Agreement.

(B) Irrespective of any increase in wages made prior to the execution of this Agreement by an EMPLOYER who has not been previously in contractual relationship with the UNION with respect to any appropriate collective bargaining unit, such EMPLOYER shall nevertheless be required to increase the wages of all employees by the amount of increases set forth in Schedule 1 for the respective job classifications (but such increase shall not be retroactive), in order to obtain the benefits and privileges of this Agreement, for such collective bargaining unit.

MODIFICATION OF THIS AGREEMENT

41.    No EMPLOYER and no worker or group of workers shall have the right to modify or waive any provision of this Agreement.

VISITATION CLAUSE

42.    (A) Authorized representatives of the UNION shall have admission to the establishments of the EMPLOYERS but such representatives shall make arrangements with the management as to time of making such visits.

(B) It is further agreed that conferences held between UNION representatives and the employees shall not be held during the employees' working time; and if held on the premises, said conference must be within a place arranged for with the management.

NOTICES

43.     The EMPLOYER shall permit the UNION to post announcements of meetings and functions on bulletin boards to be provided by the EMPLOYER and placed in convenient positions in the hotel to be designated and provided by the EMPLOYER.

COST OF LIVING

44.     Notwithstanding any other provision of this Agreement seemingly to the contrary, the parties agree that in the event the aggregate increases paid by the EMPLOYER for the period ending June 30, 2011 is exceeded by the cost of living (based on New York City Consumer Price Index) for the period ending June 30, 2011, the UNION shall have the right to request that a joint study committee be formed to examine and discuss the impact of said increase on the employees and the need, if any, for a wage review. In the event the parties fail to agree on what action to take, either party may submit the matter to the Impartial Chairperson, who shall be empowered to make a final decision with regard to said matter.

AREA STANDARDS AND WORK PRESERVATION

45.     (A) Any contract, lease or agreement entered into between a hotel and a concessionaire which employs employees in job classifications covered by this Agreement must contain a provision that the concessionaire agrees that the persons employed in the job classifications covered by this Agreement will work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement, including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal, training and scholarship, and/or any other economic benefits required by this Agreement or their equivalent and that said concessionaire or lessee further agrees to submit any question concerning compliance with the foregoing to the Impartial Chairperson designated under Article 26 herein for determination. Any party affected may institute such arbitration.

(B) All work performed on the EMPLOYER'S premises and all products produced on the EMPLOYER'S premises by employees covered by this Agreement as of

the effective date of this Agreement shall not be performed or produced by persons not covered by this Agreement, provided that an EMPLOYER or a group of EMPLOYERS may arrange to have products and/or work presently produced and performed on its premises to be performed by persons employed in job classifications covered by this Agreement provided that such persons work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement, including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal, and training and scholarship, and/or any other economic benefits required by this Agreement or their equivalent and further provided that the employment of those employed by the EMPLOYER or group of EMPLOYERS at the time of the arrangement shall not be adversely affected thereby.

(C) With regard to any contract, lease or agreement entered into on or after July 1, 1995, between an EMPLOYER and a Concessionaire, the EMPLOYER and Concessionaire will be considered a joint EMPLOYER for the purposes of this Agreement. The EMPLOYER shall at all times hold and exercise full control of the terms and conditions of employment of employees of the joint EMPLOYER for labor relations purposes with regard to the schedule of hours, wages and economic benefits provided in this Agreement, including holidays, vacations, premiums, overtime, health and welfare, dental, pension, legal, and training and scholarship, and/or any other economic benefits required by this Agreement. The EMPLOYER'S liability shall be limited as provided for in Article 46 of this Agreement. Employees of the joint EMPLOYER shall be members of the bargaining unit, as set forth in Article 2 of this Agreement.

FURNISHING SECURITY

46.    (A) In order to ensure the faithful performance of the obligations contained in this Agreement, every concessionaire shall be required to furnish security in the form of cash or bond in the amount of three (3) months' wages prior to entering into its operation, or at any time thereafter, upon demand by the UNION or hotel. Failure to demand security shall not be deemed to be a waiver of a concessionaire's obligations hereunder.

(B) The cash or bond shall be deposited with the Impartial Chairperson. In the event the Impartial Chairperson finds that a default has occurred in the payment of wages or economic benefits provided in this Agreement, including vacation, holiday, premiums,

# Exhibit B
# (Part 3 of 4)

overtime, insurance, pension, medical, training and scholarship, legal, dental benefits, severance pay, and/or any other economic benefits required by this Agreement or UNION dues, fees or assessments, s/he shall order said payments to be made from the cash or bond on deposit with him/her and shall further order that the cash or bond be restored to its original amount.

(C) In the event a concessionaire who is required to post cash or bond hereunder fails to do so, the hotel shall be responsible for any defaults.

(D) At the termination of any contract, concession or lease the Impartial Chairperson shall return the cash or bond, upon being satisfied that there are no unpaid wages or economic benefits provided in this Agreement, including vacation, holiday, premiums, overtime, insurance, pension, medical, training and scholarship, legal, dental benefits, severance pay, and/or any other economic benefits required by this Agreement or union dues, fees or assessments.

(E) The form of the bond to be posted shall be subject to the approval of the ASSOCIATION and the UNION, or, in the case of a non-ASSOCIATION hotel, the hotel and the UNION, and if they fail to agree, the form of the bond shall be determined by the Impartial Chairperson.

BANQUET DEPARTMENT

47.    (A) (1) The EMPLOYER shall furnish the UNION with a list of banquet servers now employed by, or on the EMPLOYER'S A and B-Lists for such employment; such servers as are not members of the UNION at the time of the execution of this Agreement by the EMPLOYER shall become members of the UNION within thirty (30) days from the execution of this Agreement by the EMPLOYER, and the UNION shall accept such banquet servers as members upon the same terms and conditions as other members. Banquet servers other than those now employed or on the EMPLOYER'S steady A and B-Lists shall be procured as set forth below.

(2) The UNION agrees that all individuals who register with it as applicants for jobs as banquet servers shall be referred to jobs on a non-discriminatory basis and selection of applicants shall not be based on, or in any way affected by, UNION membership, the UNION'S by-laws, rules or regulations, constitutional provisions, or any other aspect or obligation of UNION membership, policies or requirements.

(3) Notice of the provisions of this Article and the functioning of job referrals and hiring arrangements shall be posted on bulletin boards in hotels and in the UNION where applicants apply for jobs.

(4) The classification of meals, hours, wages and working conditions of banquet servers and banquet captains are contained in Schedule A-1 annexed hereto and made a part of this Agreement.

(5) Each hotel shall establish a B-List, on an individual hotel basis, provided that said B-List shall not exceed sixty percent (60%) of the hotel's A-List.

(B) Extra Banquet Work

(1) Protection of Rights of Current Roll Call Employees

(a) All persons registered with Roll Call on or before July 1, 2001 ("current Roll Call employees") shall continue in such status, subject to annual re-registration, and shall continue to enjoy the same right to be offered extra banquet work.

(b) In order to provide current Roll Call employees with greater opportunity to obtain extra banquet work, as of July 1, 2001, the Roll Call list shall be "frozen" and no other person will be added to the Roll Call list.

(2) Banquet Job Opportunities for Non-Banquet Personnel

(a) In order to provide equal employment opportunity for advancement to all hotel employees working in the industry, the EMPLOYER shall be permitted to establish a banquet C-List.

(b) The banquet C-List shall consist only of employees covered by this Agreement and working for the EMPLOYER in job classifications (other than banquet servers) who desire to work as extra banquet servers.

(c) The number of C-List servers shall not exceed one hundred and twenty-five percent (125%) of the EMPLOYER'S B-List. In the event the number of C-List servers is insufficient, the EMPLOYER shall notify the UNION and the parties shall meet to discuss an increase. In order to seek an increase of the C-List, the EMPLOYER must have a B-List which is sixty percent (60%) of its A-List.

(d) In the event, after the EMPLOYER'S utilization of its A-List, B-List and Roll Call referred servers, there is not a sufficient number of servers to staff a banquet function, all remaining banquet server work for the function shall be staffed from the EMPLOYER'S

C-List. Provided the EMPLOYER has fully staffed A, B, and C-Lists, if the EMPLOYER exhausts its available A-List, B-List, Roll Call, and C-List, where applicable, for a particular function, it may seek additional banquet servers from any source.

(e) Banquet server work shall be offered to the C-List on a rotation basis as is customary and standard in the industry.

(f) The UNION and the EMPLOYER shall mutually agree upon reasonable and fair procedures for notifying C-List servers of available extra banquet work and for offering such work to members of the C-List.

(g) The EMPLOYER shall notify the UNION in writing that an employee has been added to its C-List not less than five (5) business days prior to scheduling said employee to work any banquet function.

(h) No employee of the EMPLOYER shall be compelled to register to work as a C-List employee.

(i) Assignment of C-List servers to work any banquet function shall be voluntary.

(j) The EMPLOYER is not required to offer extra banquet work where overtime or premium pay would be incurred or where the offer conflicts with the employee's regular schedule.

(C) Steady Banquet Job Openings

The following shall pertain to Steady Banquet Job Openings:

(1) Hiring Procedure

All openings for banquet B-List jobs, and in the case of hotels which do not have a banquet B-List, openings for banquet A-List jobs, henceforth to be collectively referred to as "steady banquet job openings," shall be filled in accordance with the following procedure:

(a) Open A-List jobs shall be filled from the B-List in accordance with seniority.

(b) The EMPLOYER shall immediately notify the UNION of and post in visible location any such job openings and the UNION shall post notice of such job openings on a dedicated bulletin board at the UNION'S headquarters.

(c) Employees/applicants who are certified as eligible to apply for such job openings, in accordance with the rules set forth in Article 47(C)(2), shall submit their applications to

the UNION no later than one (1) week after said job opening has been posted by the UNION.

(d) The UNION shall transmit to the EMPLOYER all applications for the job opening which were submitted by employees/applicants who are certified eligible in accordance with the rules set forth in Article 47(C)(2).

(e) The EMPLOYER shall interview every employee/applicant certified as eligible who is referred for a job opening. The EMPLOYER shall decide which applicant to hire and shall notify the UNION in writing of the identity of the person hired three (3) days prior to hiring said applicant. Once an EMPLOYER interviews an employee/applicant certified as eligible, the EMPLOYER is not required to reinterview said person for future job openings for twelve (12) months.

(2) Certification of Eligibility to Apply

(a) All employees registered with Roll Call prior to the effective date of this Agreement shall be deemed certified as eligible to apply for steady banquet job openings.

(b) Except as provided in Article 47(C)(2)(a), any person who (during the five (5) year period prior to the posting of the opening) does not have at least one (1) year of experience working in a position covered by this Agreement for an EMPLOYER signatory to this Agreement, shall not be certified as eligible to apply for any steady banquet job opening.

(c) A list of current Roll Call servers who are deemed certified under this provision has been provided by the UNION.

(d) The Industry Training Program ("ITP") shall certify as eligible all applicants who the ITP determines possess the requisite skills and ability.

(3) Banquet Training

(a) The ITP shall screen, examine and certify applicants in accordance with reasonable, objective, uniformly applied, non-discriminatory criteria, procedures and standards which the ITP shall establish.

(b) The ITP shall establish a training course to help employees/applicants who are eligible to enroll in ITP to acquire the banquet service skills needed to obtain eligibility for employment.

(c) Applicants who have not been certified as eligible to apply for steady banquet job openings in accordance with the rules set forth in Article 47(C)(2) and who are eligible to enroll in ITP may register for said banquet training course.

(d) Training opportunities shall be provided in the order of registration on a "first come, first served" basis. Applicants who successfully complete the ITP banquet training course and obtain certification shall be permitted to apply for steady banquet job openings.

(4) Eligibility Notification

The Industry Training Program shall promptly notify Hotels of the identity of applicants who are certified as eligible to be utilized as banquet servers.

(5) Limitation on Number of Positions Held by Banquet Servers

(a) No banquet server may simultaneously hold in New York City more than two (2) A or B-List banquet server positions. Banquet servers who simultaneously hold two (2) such positions may hold (a) one (1) Banquet A-List and one (1) Banquet B-List position, or (b) two (2) Banquet B-List positions; but may not hold two (2) A-List positions.

(b) Banquet servers who held a greater number of positions than permitted in Article 47(C)(5)(a) as of September 1, 2004 shall be red circled and may retain the positions held as of that date. Such red circled banquet servers may not obtain additional positions or substitute a new position for an existing one, unless s/he can do so in compliance with Article 47(C)(5)(a).

(c) A banquet server who has met the limitations set forth in Article 47(C)(5)(a) may nonetheless apply for a new banquet server position, provided s/he:

(i) Discloses in his/her application to the prospective employer the banquet server positions held at the time of the application;

(ii) After accepting an offer of employment as a banquet server but prior to the first day of work in such position, resigns appropriate banquet server position(s) such that s/he is in compliance with Article 47(C)(5)(a); and

(iii) Provides written notice of such resignation(s) to the new employer prior to commencing such new banquet server position.

(d) EMPLOYERS shall include on applications for any A or B-List server position a section to be completed by the applicant (i) certifying that s/he is eligible for the position in accordance with Article 47(C)(5)(a) ("Representations"), and (ii) informing the

applicant that s/he will be disqualified from continued employment as a banquet server with the employer if s/he fails to remain in compliance with Article 47(C)(5)(a) while employed by the employer. A misrepresentation on the Representation or failure to remain in compliance with Article 47(C)(5)(a) shall constitute just cause for summary termination from the banquet server position(s) most recently obtained with employer(s) signatory to or bound by this Agreement with which continued employment creates a violation of Article 47(C)(5)(a) and for discipline by any employer signatory to or bound by this Agreement with which the offending employee holds other banquet server jobs. The employer(s) signatory to or bound by this Agreement which most recently hired the offending banquet server and with which continued employment creates a violation of Article 47(C)(5)(a) shall be liable for back pay, but only if said employer(s) hired, or continued to employ, the banquet server knowing s/he was not in compliance with Article 47(C)(5)(a).

(e) Notwithstanding anything apparently to the contrary in Articles 47(C)(5)(c) and (d), those Articles shall also apply to internal promotions from B-List to A-List positions, as provided for in Article 47(C)(1)(a).

    (D) Gratuities

(1) Effective July 1, 1995, except as otherwise provided herein, the UNION and the EMPLOYER agree that with respect to banquet functions, a minimum gratuity equal to fifteen percent (15%) shall be paid to tip category employees (banquet servers and captains) working said functions, pursuant to established practice in each hotel as of July 1, 1995.

If, however, any EMPLOYER signatory hereto is currently paying its employees banquet gratuity amounts which would require that EMPLOYER to increase its current gratuity rate by more than one percent (1%) during the first year of this Agreement, the EMPLOYER shall increase the gratuity required hereunder in two (2) equal increases in each of the first two years of this Agreement.

(2) The foregoing notwithstanding, the UNION and EMPLOYER agree that, in the case of hotels (other than the traditional large banquet hotels, such as the New York Hilton, Waldorf=Astoria, Sheraton New York, Plaza, Pierre, St. Regis and other like hotels), which other hotels for purposes of this provision will be called "small banquet hotels," a

minimum gratuity equal to fourteen percent (14%) shall be paid to tip category employees (banquet servers and captains) working said functions, pursuant to established practice in each hotel. The UNION and EMPLOYER also agree, however, that if at any time during the term of this Agreement any such small banquet hotel increases its July 1, 1995 gratuity or service charge to its banquet customers, the aforesaid minimum gratuity payable hereunder to tip category employees (banquet servers and captains) working said functions shall be increased from fourteen percent (14%) to fifteen percent (15%), pursuant to established practice in each such hotel as of July 1, 1995.

(3) The EMPLOYER and UNION agree that where an EMPLOYER does not utilize the services of a captain, all of the gratuity amounts payable hereunder shall be paid to the banquet servers.

RELIEF APPEALS

48.    (A) Whenever, upon a written application of an EMPLOYER, it shall appear to the Impartial Chairperson that the factual situation with respect to a particular EMPLOYER is such that the wage and hour scales provided in this Agreement will work unusual hardship on such EMPLOYER, and affect adversely the interest of the workers therein, such wage and hour scales may be modified, in the case of such EMPLOYER, to the extent approved by the Impartial Chairperson.

(B) An EMPLOYER that intends to make such application in connection with the wage increases under the Collective Bargaining Agreement shall make such application within ninety (90) days before the effective date of each wage increase under this Agreement. In all instances, the wage increase shall go into effect on the scheduled date unless the Impartial Chairperson awards otherwise. If application for relief is not made within the ninety (90) days, the increases shall be put into effect, provided, however, that this shall not preclude an EMPLOYER from making application for relief thereafter.

UNIFORMS AND EMPLOYEE FACILITIES

49.    (A) The EMPLOYER agrees that whenever it requires employees to wear special uniforms, such uniforms shall be supplied and shall be laundered at the expense of the EMPLOYER. The EMPLOYER agrees to supply cooks with uniforms. A cook's uniform is defined as jacket, cap, apron, kerchief and pants.

(B) Uniforms shall be designed and maintained in such a manner as to account for the conditions in which employees work, the tasks they perform, and safety and health issues.

(C) The EMPLOYER agrees to provide adequate locker space for employees customarily provided with locker space. The EMPLOYER shall provide safe, clean and sanitary places for eating and changing clothes and washroom facilities.

GROUPS AND PORTERAGE

50.    (A) For all tour parties and groups ("Groups"), as hereinafter defined, which are booked after the effective date of this Agreement, the EMPLOYER shall be required to pay porterage fees pursuant to Article 50(B) for groups which satisfy all of the following criteria:

(1) The Group includes a minimum of ten (10) room reservations;

(2) There is a common arrival date and time and a common departure date;

(3) The entire Group is a "group booking" on a master account; and

(4) Bellpersons shall be available to receive and take charge of Group luggage and deliver luggage directly to the rooms on arrival.

(B) In case of Groups, bellpersons shall be paid porterage fees in the amount of two dollars ($2) per bag in and two dollars ($2) per bag out and doorpersons shall be paid a porterage fee equal to one dollar ($1) per bag in and one dollar ($1) per bag out, provided that no porterage will be paid on any bags in excess of two (2) for any one guest. Doorpersons will assist in the handling of the baggage and those hotels not employing doorpersons will not be subject to this porterage payment to doorpersons.

(C) Bellpersons shall receive one dollar ($1) for each person coming into a hotel to occupy a room which is one of a block of rooms rented or set aside on a permanent basis to an airline or trucking company. Bellpersons shall receive, in addition, one dollar ($1) for each such person on leaving the hotel.

(D) The rates set forth in this Article shall be subject to annual contractual wage increases.

(E) No existing rates, terms, or conditions shall be reduced as a result of this Article.

(F) In the case of all Groups, where meals are included, adult as well as youth, servers shall receive twenty-five cents ($0.25) per meal per person or fifteen percent (15%) of the price of the meal, whichever is greater.

(G) Where the rooming arrangements for professional athletic teams do not permit bellpersons to earn tips, such rooming shall be considered a Group, except that where other tip arrangements have been in effect, they shall continue.

NIGHT SHIFT DIFFERENTIAL

51.    (A) General

Night shift differential shall apply to all employees covered by this Agreement except those listed in Schedule A-1.

(B) Payment - Rate

The night shift differential shall be paid for all hours worked after 8:00 P.M. in the evening and before 6:00 A.M. the next morning. Each employee employed during the hours stated above shall receive, in addition to his/her regular wages, eighty-seven cents ($0.87) per hour for each hour worked during said period. Effective July 1, 2006, 2007, 2008, 2009, 2010, and 2011 said rate shall be increased to ninety cents ($0.90), ninety-four cents ($0.94), ninety-eight cents ($0.98), one dollar and one cent ($1.01), one dollar and five cents ($1.05), and one dollar and nine cents ($1.09) respectively.

(C) Calculation

(1) The wage rate on the basis of which overtime compensation is to be calculated shall not include the night shift differential. Although the night shift differential shall not be added to the regular rate for the purpose of calculating overtime compensation, the amount of the agreed upon night shift differential shall be paid for each hour of work of an employee during the night hours to which such night shift differential payment is applicable.

(2) Vacation, sick days, personal days, bereavement, jury duty pay and holiday pay shall include the night shift differential, provided, however, that this applies only to regular and full-time employees who are regularly scheduled for work during the hours for which the night shift differential is paid.

SEVERANCE PAY

52.    (A) In the event of termination resulting from the closing of a hotel or a restaurant therein or a department thereof, or a concession, or from (1) the conversion of the elevators to self service elevators or (2) the conversion of telephone department equipment or (3) the conversion of hotels to cooperatives, severance pay shall be paid as a result of any of the foregoing.

(B) For the purpose of calculating severance pay, the EMPLOYER shall pay over to the UNION for distribution by the UNION to the employees affected an amount equal to four (4) days of regular wages for each year of service for each affected employee provided the employee was employed for not less than six (6) months' service. Tip employees shall receive twice the amount of severance pay calculated in accordance with the above formula. Unless otherwise proven, all employees laid off within one (1) year of a permanent closing shall be presumed to have been terminated as a result of the closing and shall be therefore eligible for severance pay. In connection with the foregoing, the EMPLOYER shall issue, and send to the UNION for distribution, checks made payable to the individual employees entitled to severance pay in accordance with the foregoing formula. The EMPLOYER agrees to make all statutory tax withholdings prior to transmittal of the checks to the UNION for distribution. In addition, unless as otherwise agreed by the ASSOCIATION and the UNION, a further payment equal to twenty-five percent (25%) of such amount shall be paid to the New York Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit Funds, and said monies shall be allocated among the Funds in such proportions as the ASSOCIATION and the UNION shall agree. Payment shall be computed to the nearest quarter year.

TECHNOLOGICAL CHANGE

53.    (A) The UNION has long cooperated with EMPLOYERS in the introduction of new equipment, changes in operating techniques and technological improvements (all three (3) herein referred to as "modifications") in the various departments of the hotels. Accordingly, in the event the EMPLOYER intends to introduce modification in its hotel, it shall meet with the UNION at least thirty (30) days in advance of its intention to implement same, to discuss the ramifications.

(B) If the parties agree to said modifications and, as a result, job terminations or job changes occur, the parties shall discuss severance pay for employees who are

terminated. If severance pay is required, the formula set forth in Article 52(B) shall be applied. Such job changes and terminations are not those referred to in Article 22(B).

(C) It is agreed that the introduction of new technology or equipment or certain modifications which may broaden job skills, duties or responsibilities does not automatically require additional compensation or an adjustment in the wage rate of the affected employees.

(D) If the parties fail to agree on the EMPLOYER'S program after meeting to discuss same as provided in Article 53(A) above, the UNION shall have the right to call for a conference at the ASSOCIATION to discuss the matter. If as a result of the conference there is a dispute concerning the proposed modification(s) the matter shall be submitted to the Impartial Chairperson for his/her decision. In no event shall submission to the Impartial Chairperson's office delay implementation of the EMPLOYER'S modification(s).

SICK LEAVE

54.     (A) Entitlement

(1) All employees covered by this Agreement who have been continuously employed by the EMPLOYER for a period of at least one (1) year shall be entitled to seven (7) days' sick leave with pay for each calendar year. Subject to Article 54(A)(6), effective with the second payroll week of December of each year of this Agreement, each eligible employee who has not used all his/her sick leave shall receive one day's pay for each unused sick day.

(2) Effective on July 1, 2010, the number of paid sick days to which employees shall be entitled under the provisions of Article 54(A) shall be increased to eight (8) paid sick days.

(3) Sick leave pay shall be prorated after an employee's first year of continuous employment from his/her date of hire to December 31st in accordance with the number of months worked during that calendar year. Beginning with the first calendar year following thereafter, and for each full year of employment, the employee shall be entitled to full entitlement pursuant to the provisions hereof. Where an employee is hired after January 1st, his/her anniversary date shall control for proration of sick leave pay.

(4) Subject to Article 54(A)(6), sick leave benefits shall accumulate from one year to the next.

(5) Payment of sick leave is intended solely to provide compensation to employees who are absent from work because of illness or injury. An employee who abuses sick leave benefits shall be subject to disciplinary action.

The UNION agrees to cooperate in preventing and correcting abuses of these sick leave benefits.

(6) In lieu of receiving one day's pay for each unused sick day in December of each year, each employee shall have the option to carry over unused sick days from year to year, provided that no employee shall be permitted to accumulate more than fifteen (15) unused sick days at any time. If in January of any calendar year, an employee's entitlement to sick days for that year would result in an accumulation of more than fifteen (15), the EMPLOYER shall pay to the employee in the second payroll week of the preceding December the number of sick days to reduce the accumulation to fifteen (15) in January at the employee's then current rate of pay. An employee may elect to receive a pay-out of his/her accumulated sick days during the second payroll week of December by providing the EMPLOYER with two (2) weeks' advance written notice. Upon an employee's termination of employment, the EMPLOYER shall pay the employee for any unused sick days accrued by the employee, at the employee's then current rate of pay.

(B) Calculation and Payment

(1) Sick leave pay shall be calculated in the same manner as holiday pay.

(2) Sick leave pay shall not be paid on the employee's scheduled day off, holiday, vacations, or any other day on which the employee is drawing pay for time not worked, or would not have otherwise worked.

(C) Absence

An employee absent from work due to illness on a scheduled workday immediately before and/or on the scheduled workday immediately after a holiday or vacation period shall not be eligible for sick pay for said absent workday or workdays.

LEAVE OF ABSENCE

55. (A) An employee who has been employed by an EMPLOYER for five (5) years or more shall be entitled to one (1) leave of absence without pay not to exceed sixty (60)

days upon giving two (2) weeks' written notice of request for leave of absence to the EMPLOYER and the UNION. The EMPLOYER shall not be required to allow more than one (1) employee in a job classification to be on leave of absence at the same time. If more than one (1) employee in a job classification requests a leave of absence at the same time, preference shall be given to the employee with greater seniority.

(B) The EMPLOYER may for good cause defer the time of the commencement of the requested leave of absence.

(C) An employee on leave of absence hereunder shall not take other employment during such leave without the prior written consent of the EMPLOYER.

(D) Leaves of absence under this provision shall not affect seniority rights but the EMPLOYER shall not be obliged to pay the employee on leave of absence for any holidays which fall during the period of such leave.

STUDY COMMITTEE

56.     (A) The 1985 Agreement provided as follows:

The parties agree to convene joint study committees, each consisting of an equal number of members designated by the ASSOCIATION and the UNION, to study and report upon problems relating to the following:

1. Industry-Wide Benefit Programs
2. Industry Training Fund
3. Delayed or Canceled Flights
4. Job Posting and Bidding
5. Grievance Procedures
6. Major Structural Alterations
7. Operating Distinctions Between Hotels
8. Productivity

In the event that any of the foregoing study committees are unable to reach agreement within ninety (90) days or such other time as the parties may agree, either party shall have the right to submit the matter to the Impartial Chairperson for decision.

(1) The parties recognize (i) the need to continue to provide the variety of benefits offered by the Industry-wide pension, welfare and training programs, (hereinafter called "benefit programs"), (ii) the necessity of maintaining the high standards of quality

contained in each of the benefit programs and (iii) the financial pressures on said programs due to inflation. Therefore, the parties will immediately establish a joint study committee to study and formulate the plans required to support, maintain and/or improve each of the benefit programs.

(2) The parties recognize the significant achievements of the Industry Training Program and the need to maintain the program. Accordingly, the parties agree that the trustees of said program shall at their earliest opportunity study the present conditions of the program, the industry needs and the best method of providing upgrading to the employees employed in the industry. Upon completion of the study, the trustees shall adopt a program to meet the needs and requirements of the industry and its employees. In the event the trustees are unable to agree on such a program either party may submit the matter to the Impartial Chairperson for decision.

(3) The UNION contends that the earning capacity of front service employees and a la carte servers has been adversely affected as a result of the problems encountered by hotels in servicing guests who are affected by delayed or canceled flights and that therefore the earnings of these employees have been reduced. The UNION has therefore proposed, and the ASSOCIATION has agreed, to the establishment of a joint study committee to conduct a study of the UNION'S claim and report its finding to the parties. The committee is empowered to make specific proposals as to how to deal with the results of their study.

(4) The parties hereto agree to convene a joint study committee to examine the advisability of, and the best method of, if so agreed, establishing a program whereby all job openings shall be posted for bids. The purpose of such a program, if same is found to be needed, would be to enable employees to bid on such openings. Among the issues to be considered by the committee are seniority, ability, the needs of the hotel, the right of part-time employees to have preference over new hires for full-time jobs within the classification in which they are employed, and the right of the UNION to file a grievance if a bid request is denied.

The parties recognize the great variety of skills by various groups of employees within the hotels and therefore agree that any program adopted shall provide that bidding, and

filling of job openings may, in the EMPLOYER'S discretion, be limited to those employees in the same classification.

(5) The parties agree to meet and revise the grievance machinery in accordance with their mutual agreement, or upon the recommendation of a third party or parties from whom they may request an overall study, review and analysis of this machinery. Pending mutual agreement as to the language, the present machinery shall be continued. In the event the parties fail to agree within one hundred and eighty (180) days, either party shall have the right to submit this matter to the Impartial Chairperson, who shall be empowered to make a final and binding decision on any and all matters not resolved by the parties not later than forty-five (45) days after submission of this matter.

(6) The parties hereto agree to convene a joint study committee to study and report on a revision of Article 17 concerning Major Structural Alterations.

(7) The parties recognize that significant operational distinctions exist between hotels as a result of location, size, market and nature of operation (i.e., cooperatives, residential, proximity to theaters and shopping). Further, they recognize the need to provide suitable programs for all hotels, which will enable said hotels to remain viable in order to ensure their continued operation and employment of members of the UNION. Therefore, the parties agree to forthwith convene a study committee to determine the nature of such relief, if any, as may be required to accomplish the recognized needs set forth above.

(8) The parties, in an effort to ensure the continued growth of the industry, and in recognition of the ever changing needs and services to be provided to clients of the hotels, as well as the continually changing patterns of operations employed by the industry, agree to immediately establish a joint committee to study and formulate such programs as might be required to assist the hotels in attaining greater productivity in order to enable the hotels to offer better services to their guests. Among the areas of study are those of the front service, banquet, housekeeping and front office departments. It is understood, however, that either party may add to the departments to be reviewed by the study committee.

(B) The January 30, 1990 Memorandum of Understanding provided:

The parties shall convene a joint study committee to review the:

1. Utilization by signatory EMPLOYERS of kosher caterers and its effect on the terms and conditions of the Agreement;

2. Impact, if any, on bell persons and door persons as a result of changes in the "tour party" arrangements.

(C) The July 1, 1995 Memorandum of Understanding provided: Article 56 of the 1990 Agreement will be amended to provide for the formation of additional joint study committees which will review and decide within one hundred and eighty (180) days after the effective date of the 1995 Agreement the issues of:

1. Determination of a minimum gratuity payable to tipped category employees for work performed in connection with independent kosher catered functions held on the EMPLOYER'S premises;

2. Front Service Employee gratuity rates and all issues impacting thereon;

3. Modification of the banquet Roll Call job referral system, creation of C-Lists by banquet hotels and review of current practice of pre-plating

4. Establishment of a Credit Union;

5. Technological changes and productivity.

6. In addition to the above study committees, within forty-eight (48) hours after ratification of this Agreement, the parties agree pursuant to Article 56(A)(7) and (8) to jointly convene the study committees, Productivity and Operating Distinctions Between Hotels in and/or job categories set forth in Schedule A and to review the EMPLOYER'S need, if any, for additional flexibility in the combination of jobs, otherwise limited by Article 22(B). The EMPLOYER and the UNION agree that no employee shall be laid off or discharged or suffer a loss of wages and/or benefits as a result of any resolution of these foregoing issues by the study committee. The study committee shall make every effort to resolve the issues set forth in Article 56(C)(6) by September 30, 1995. At the request of the ASSOCIATION, the UNION agrees that it will expeditiously meet with representatives of the ASSOCIATION and representatives of individual HANYC Bargaining Group Hotels or groups of such HANYC Bargaining Group Hotels sharing common operational needs or issues of concern in order to study, review and resolve to the mutual satisfaction of the HANYC Bargaining Group Hotels and the UNION any such productivity or operational issues.

In the event that any of the foregoing study committees are unable to reach agreement within one hundred and eighty (180) days after the effective date of the 1995 Agreement, upon mutual agreement, discussion between the EMPLOYER and the UNION shall continue until a resolution is reached, i.e., none of the foregoing study committee's issues, set forth in Article 56(C)(1) through (6) above, shall be referred to arbitration before the Impartial Chairperson unless both the EMPLOYER and the UNION mutually consent thereto, notwithstanding any of the provisions of the 1990 Agreement seemingly to the contrary.

CONVERSION TO RESIDENTIAL USE

57. (A) If, during the term of this Agreement, a signatory Hotel is converted to residential use (e.g., a condominium or co-operative use of the building, apartment rental units, etc.) the EMPLOYER shall pay to the affected employees, i.e., those who suffer a permanent loss of employment due to such conversion, severance under the following terms: fifteen (15) days for each year of service, calculated and paid under the procedures of Article 52(B). The benefit funds shall receive a payment, calculated in accordance with Article 52(B), for each affected employee.

(B) In the event that the Hotel's entire premises are affected by the conversion to residential use, then employees eligible for the enhanced severance above shall, as a condition of receiving such severance payment, execute a separation document releasing the parties to this Agreement from any liability and future obligations, such as recall rights, under this Agreement.

(C) In cases of a partial conversion of the Hotel's premises to residential use, then the enhanced severance provisions contained herein shall only apply to employees affected by such conversion.

AUTHORITY TO ENFORCE CONTRACT

58. All rights, benefits, privileges and/or immunities granted or secured by this Agreement to the UNION or any of its affiliates or members can be enforced only by or through the New York Hotel and Motel Trades Council, AFL-CIO, the UNION herein.

SUCCESSORS AND ASSIGNS

59.    (A) This Agreement shall be binding upon the successors and assigns of the parties hereto, and no provisions, terms, or obligations herein contained shall be affected, modified, altered, or changed in any respect whatsoever by the consolidation, merger, sale, transfer, or assignment of either party hereto or affected, modified, altered or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party hereto. Any successor EMPLOYER shall assume all of the obligations under this Agreement of the prior operator of the hotel or concession to the employees, the UNION or any of the funds to which EMPLOYERS are required to contribute hereunder.

(B) EMPLOYER shall make it a written material condition of any transaction of any kind whatsoever which transfers majority ownership, management or operational control of the Hotel or Concessionaire such that the party ("transferee") assuming such majority ownership, management or operational control must assume and be bound in writing to this Agreement.

(C) In the event an Owner of a Hotel is not the EMPLOYER of the Hotel's employees nor otherwise bound by the IWA, the Owner shall be bound by the Successor and Assigns provisions of the IWA and the arbitration provisions thereof as they relate to any dispute regarding the Successor and Assigns provisions. Such Owner shall be required to sign an agreement with the UNION reaffirming such, including the obligation to retain all bargaining unit employees, whose employment will continue uninterrupted without loss of seniority, compensation, benefits, or other terms and conditions of employment subject to the IWA and applicable law.

(D) Not less than ten (10) business days prior to the closing of the transaction, the EMPLOYER shall give the UNION notice in writing of the transaction between the EMPLOYER and the transferee and the notice to the UNION will provide the full and complete identity of the transferee, together with a duly executed copy of the pertinent portion of the transaction agreement between the EMPLOYER and the transferee pursuant to which the transferee agrees to assume this Agreement.

(E) Said notice will be held by the UNION in strict confidence and the UNION, upon request of the EMPLOYER, will agree to a confidentiality pledge upon terms mutually acceptable to the EMPLOYER and the UNION, provided, however, that such

confidentiality pledge will be ineffective upon the EMPLOYER'S violation of this Article 59. If the UNION is provided with a signed copy of the portion of the agreement where the transferee agrees to assume this Agreement, the UNION will not contact the transferee prior to the closing.

(F) The EMPLOYER and UNION agree that if a determination is made by the Impartial Chairperson that a violation of Article 59 has occurred, then in such case, the violation will be deemed to be irreparably harmful to the UNION and its members. In such event, the UNION may seek such relief as is necessary to redress and remedy such violation and irreparable harm, including, but not limited to, the award of monetary damages and/or injunctive relief either from the Office of the Impartial Chairperson, the National Labor Relations Board, a court of competent jurisdiction or such other forum as deemed appropriate by the UNION.

ACCRETION AND NEUTRALITY/CARD CHECK

60.    (A) Accretion

(1) EMPLOYER agrees to the accretion of any and all hotel or concessionaire properties which come to be owned and/or managed in the New York City area to the bargaining unit(s) presently or hereafter covered by the Industry Wide Agreement or any successor collective bargaining agreement thereto, and that all of the terms and conditions set forth in the Industry Wide Agreement or its successor shall be immediately applicable to the accreted bargaining unit(s).

(2) The parties acknowledge that they have negotiated and exchanged valuable consideration in reliance upon the lawfulness and validity of their agreement but recognize the complexity and change inherent in the legal doctrine of accretion. Nevertheless, in the event that any accretion at a hotel or concessionaire pursuant to these provisions, applied to the fullest extent of that legal doctrine, should be ruled ineffective, invalid, or unenforceable by competent legal authority, then the parties hereby agree that the neutrality and card count agreement annexed hereto as Addendum IV shall apply to that hotel or concessionaire. For the purposes of this provision, "competent legal authority" shall mean the Office of the Impartial Chairperson, the Regional Director for Region 2 or 29 of the National Labor Relations Board ("NLRB"), the United States

District Courts for the Southern or Eastern Districts of New York, or the United States Court of Appeals for the Second Circuit.

(3) The parties agree that they shall meet to review and discuss such particular facts and circumstances as either party may contend warrants mutually agreed upon revisions to the provisions of the Industry Wide Agreement, or successor collective bargaining agreement as the case may be.

(B) Neutrality/Card Check

In addition to and without limiting the other provisions of this Article 60, EMPLOYERS shall abide and be bound by the neutrality and card check provisions annexed hereto as Addendum IV and incorporated herein by reference.

MAINTENANCE AND ELECTRICAL WORK

61.    It is intended that employees to be classified as in the "Maintenance Department" shall include those engaged in doing plastering, mason work, tile setting, lathing and cement work; carpentry; plumbing and steamfitting; upholstering and mattress making; painting, furniture varnishing and paperhanging; operating and maintaining house radio systems; mechanical work on elevators; machine work, locksmithing and key work; silversmithing, coppersmithing and tinsmithing; and boiler repair work.

The painting, decorating and paperhanging includes the service of painting, decorating, woodfinishing, paperhanging, and preparatory work incidental to each of the aforementioned as follows:

1. The service of painting and decorating means the application of all paint and painting material of every description in and on all parts of the hotel.

2. The service of paperhanging includes the application and/or installation of wallpaper, hangings and decorating materials of every kind or description applied directly to any surface in the hotel.

3. Woodfinishing and polishing. The removal of all wood surfaces, cleaning, refinishing, varnishing and polishing of furniture and wood fixtures in the hotel.

An Electrician is one who installs, adds to, repairs or maintains any electric conduits, equipment, machines, fixtures, or electrical devices, that carry conductors that will or do carry an electrical current.

UNION TRAINING

62.    Each Delegate, Assistant Delegate and a reasonable number of such other employees as may be selected by the UNION shall be granted two (2) days' unpaid leave each year to attend union training, provided that the EMPLOYER is provided with a minimum of ten (10) days' advance written notice and further provided that the absence of such employee(s) shall not cause undue disruption to the operations of the EMPLOYER.

SPOTTERS

63.    (A) In cases where the EMPLOYER'S investigation of an employee's performance or conduct may lead to suspension or discharge based upon a spotter's report, the EMPLOYER shall:

(1) Notify the employee as soon as practicable, but in no event later than seventy-two (72) hours of the close of his/her shift in question, that s/he is the subject of a spotter inspection; or, if the employee is not working during such period, at any time prior to the close of his/her next scheduled shift. The EMPLOYER shall specify the shift which is at issue.

(2) Within fourteen (14) days following the notification set forth in Article 63(A)(1) above, the EMPLOYER shall effectuate the discipline of the employee, if any.

(3) Upon such notice to the employee that s/he is being suspended or discharged based upon a spotter's report, the EMPLOYER shall provide the UNION with all reports, notes, video or audio recordings, or other documents relied upon by the EMPLOYER which relate to the discipline of the employee.

(B) In cases where the EMPLOYER'S investigation of an employee's performance or conduct based upon a spotter's report results in a verbal warning or a written warning, the EMPLOYER shall effectuate the verbal warning or written warning within thirty (30) days of the EMPLOYER'S receipt of the spotter's report and shall provide the UNION with the information specified in Article 63(A)(3) above.

(C) The foregoing times and dates shall be exclusive of Saturdays, Sundays, and Holidays.

(D) The foregoing shall not apply where information obtained from a spotter is used for non-disciplinary purposes (i.e., retraining).

(E) Nothing in this Article shall be construed to restrict the UNION'S right to request relevant information.

## HIDDEN SURVEILLANCE CAMERAS

64.    (A) Under no circumstances shall the EMPLOYER install or use hidden surveillance equipment in employee restrooms; locker rooms; changing rooms; in places when and where, with prior consent of the EMPLOYER, employees have been given access to areas of the Hotel to conduct religious prayer or services or to administer lawful medications; or where and when union meetings are occurring.

(B) Hidden surveillance equipment shall only be used for a limited time not to exceed sixty (60) calendar days. If the EMPLOYER intends to utilize any evidence gathered by use of such equipment as a basis to discipline an employee, the EMPLOYER shall timely notify the UNION in writing of the type of the equipment installed or used, the location of the equipment, the purpose of the installation or use, the duration and dates of the installment and use, and a detailed description of any allegations the EMPLOYER intends to make of employee misconduct based on the evidence gathered.

(C) Every six (6) months, i.e., on January 15th and July 15th of each year, the EMPLOYER shall provide the UNION with the following information relating to the installation and use of hidden surveillance equipment completed during the previous six (6) month period: the type of equipment installed or used, the location of the equipment, the purpose of the installation or use, and the duration and dates of the installment and use.

(D) Evidence gathered by such hidden surveillance equipment shall not be admissible in arbitration to support disciplinary action against an employee under any of the following circumstances:

(1) The equipment was installed or used without a reasonable good faith belief that theft, vandalism, drug or alcohol use, criminal activity, workplace violence or other serious employee misconduct has or would occur in the area surveilled during the period of the installation or use or such reasonable good faith belief was not the sole reason for installation of the camera.

(2) The EMPLOYER failed to preserve all evidence gathered by the equipment, unexpurgated, including exculpatory evidence, relevant to the disciplinary case.

(3) The EMPLOYER shall furnish the UNION, upon request, with any evidence gathered by such hidden surveillance equipment which is relevant to the grievance, or possible grievance, being investigated by the UNION which is connected with the misconduct which is the subject of the hidden surveillance.

(4) Since the EMPLOYER has the right to use the surveillance evidence gathered on issues or instances of misconduct which were not the subject of the original reasonable good faith belief, then, upon timely request, the UNION has the right to view the surveillance evidence for the grievance being investigated or any possible grievance.

(E) For purposes of this Article, the term "hidden surveillance equipment" shall only include cameras or video equipment but shall not include equipment where the camera or video equipment, or a camera "dome" casing is visible to the naked eye.

(F) The above terms and conditions may not be varied except by mutual agreement of the parties.

BANKRUPTCY

65.    The EMPLOYER shall advise the UNION, in writing by electronic mail or fax, as soon as reasonably practicable of, and in any event immediately upon the EMPLOYER'S knowledge or receipt of notice of, the filing of any bankruptcy, state court receivership or similar proceeding which would affect bargaining unit employees or this Agreement. The EMPLOYER shall provide electronic copies of any papers filed in connection with any such proceeding, in addition to any other relevant information requested by the UNION.

ELECTRONIC INFORMATION

66.    (A) The EMPLOYER shall electronically transmit to the UNION any information to which the UNION is entitled in a mutually agreed upon electronically searchable and importable form and format, except where such information is not available in electronic format.

(B) Effective January 1, 2008, such information transmittals shall be in electronic format unless an EMPLOYER has a valid claim that to do so would be unreasonably costly or technologically infeasible. Disagreements as to the application of this Article shall be decided by the Impartial Chairperson.

IMMIGRANTS' RIGHTS

67.    (A) Union Notification

In the event that a post-probationary employee has a problem with his/her right to work in the United States, or in the event the U.S. Citizenship and Immigration Services (USCIS) or other agency specifically notifies the EMPLOYER of its intent to conduct an audit or investigation or serves a warrant relating to employees' authorization to work, the EMPLOYER shall notify the UNION in writing as soon as the problem is known. Upon the UNION'S request, the EMPLOYER shall meet with the UNION to discuss the nature of the problem. Whenever possible, and to the extent permitted by law, the meeting shall take place before any action is taken by the EMPLOYER, but the EMPLOYER shall not be required to postpone such audits or meetings with agencies.

(B) Unpaid Leave

Upon request, employees shall be released for a total of five (5) unpaid working days per each rolling twelve (12) month period, in order to attend USCIS proceedings and any related matters for the employee only. The employee shall submit proof of such proceedings and attendance by the employee to the EMPLOYER.

(C) Reinstatement

(1) A post-probationary employee who is not authorized to work in the United States and whose employment has been terminated for this reason shall be immediately reinstated to the next week's schedule to his/her former classification without loss of prior seniority provided the employee produces proper work authorization within twelve (12) months of the date of termination.  Employees shall not accrue vacation or other benefits during such absence.

(2) If the employee needs additional time, the EMPLOYER will rehire the employee into the next available opening in the employee's former classification, as a new hire without retaining seniority, upon the former employee providing proper work authorization within a maximum of twelve (12) additional months from the time noted in Article 67(C)(1) above. The UNION may grieve and arbitrate any subsequent failure to complete probation if arbitrary or capricious or an abuse of this provision.

(D) No-Match Letters

The EMPLOYER who receives a "No-Match" letter agrees to take any and all reasonable steps necessary to resolve the discrepancy prior to effectuating any adverse

employment action in order to be consistent with applicable federal law, regulations, or enforcement guidelines.

(E) New Legislation

The parties acknowledge that federal legislation, regulations or enforcement guidelines ("law") are currently being considered pertaining to the rights of immigrants. The parties agree that they will meet and negotiate if changes in the law materially impact the rights and obligations outlined in Article 67(A) through (D). If the parties are unable to resolve issues pertaining to any such changes in the federal law, the issue shall then be submitted for resolution to the Office of the Impartial Chairperson. The Impartial Chairperson will have the right to consider expert testimony.

TRANSLATIONS

68. In meetings involving discipline, except in situations where an employee is being suspended pending investigation, an employee who clearly needs language assistance or who cannot fully understand the issues relevant to his/her discipline and requests language assistance shall be provided by the EMPLOYER with an individual capable of assisting in the communication. Any reasonable delay in interviewing or effectuating discipline as a result of the need for such shall not affect the timeliness of any grievance or discipline. In all other matters, the EMPLOYER shall make a good faith effort to provide appropriate language assistance when an employee clearly needs such assistance or when the employee cannot fully understand what is being said and requests language assistance.

SAFETY AND HEALTH

69.     (A) General

The EMPLOYER and UNION agree that the safety and health of employees is of paramount concern.  Accordingly, the EMPLOYER agrees to provide a safe and healthy work environment. The EMPLOYER further agrees to provide such training and equipment, adopt procedures and safeguards, and make repairs or modifications to its facility as required by law or this Article in order to provide a safe and healthy work environment.

(B) Ventilation

The EMPLOYER shall provide sufficient ventilation and air temperature for a safe and healthy working environment.

(C) Safety Equipment

The EMPLOYER shall provide and maintain personal protective equipment and devices required under this Article at the EMPLOYER'S expense (e.g., respirators, goggles, etc.).

(D) Right to Refuse Unsafe Assignment

An employee may refuse a work assignment if s/he has a reasonable good faith belief that such assignment subjects him/her to unusually dangerous conditions which are not normally part of the job. Prior to exercising his/her rights under this Article, the employee shall promptly notify management of the perceived unsafe condition. The EMPLOYER may not discriminate or retaliate against an employee for exercising his/her right hereunder.

(E) Investigation by Expert

(1) If the UNION has a reasonable basis to conclude that a potential specific violation of this Article exists which could endanger employee safety or health and is appropriately subject to investigation by a safety and health consultant ("consultant"), absent agreement by the parties, on the request of the UNION, such a consultant shall be appointed by the Office of the Impartial Chairperson on an expedited basis to investigate and report on the conditions at the Hotel.

(2) Such consultant shall be selected from a list of consultants mutually agreed upon between the ASSOCIATION and the UNION, who will meet within thirty (30) days of the effective date of this Agreement to compile such list. Absent agreement on such list the selection of consultants shall be submitted to the Impartial Chairperson for final and binding resolution.

(3) The expense of such consultant shall be borne by the EMPLOYER.

(4) The consultant's investigation shall be limited to the issue(s) covered in Article 69(E)(1).

(5) The EMPLOYER will fully cooperate with the consultant, providing same with any requested information relevant to the issue(s) covered in Article 69(E)(1) and allow unfettered access to those area(s) of the EMPLOYER'S premises where it is alleged the

potential specific violation(s) exist(s) (subject to Article 69(E)(6) and Article 69(E)(8)) and personnel with relevant information.

(6) The consultant shall follow reasonable security rules maintained by the EMPLOYER regarding access to the premises, but such rules shall not be applied to delay or interfere with the consultant in its review or its unfettered access to those specific area(s) of the EMPLOYER'S premises in accordance with Article 69(E)(5).

(7) UNION and EMPLOYER representatives will be permitted to accompany the consultant during any investigation, provided that EMPLOYER and UNION representatives will not be permitted to attend bargaining unit employee interviews absent mutual agreement. Neither the UNION nor EMPLOYER representatives may delay or interfere with the investigation. Any documents provided by either party to the consultant shall simultaneously be provided to the other party. Any documents provided by the consultant to one party shall be provided simultaneously to the other.

(8) The consultant shall provide the EMPLOYER and UNION with twenty-four (24) hours' notice of its visits, except in the case of an emergency (i.e., an incident or occurrence that presents an imminent or present threat to the safety or health of employees), in which case the consultant shall give the UNION and EMPLOYER as much notice as practicable.

(9) Notwithstanding anything herein to the contrary, the consultant shall have the authority to issue a specific "stop work" order and/or to close areas of the EMPLOYER'S premises if the consultant deems employee working conditions to pose a clear and present danger to the safety or health of employees due to the specific violation(s) or remediation efforts with respect to those specific violation(s) and to rescind such order if it deems the unsafe or unhealthy condition to have been cured. After complying with any such order issued by the consultant, the EMPLOYER shall have the right to contest such order at the Office of the Impartial Chairperson on an expedited basis, with the matter submitted to and heard by the Impartial Chairperson within twenty-four (24) hours. Telephonic hearings conducted by the Office of the Impartial Chairperson are permissible on weekends and holidays.

(10) At the conclusion of the investigation, the consultant shall issue a written report, detailing the results of the investigation and recommendations for correcting violations or hazards, to both the EMPLOYER and UNION.

(11) The EMPLOYER shall promptly comply with any uncontested recommendations made by the consultant. Should the EMPLOYER or UNION disagree with any such recommendation, it must apply for relief before the Impartial Chairperson within forty-eight (48) hours of the issuance of the report or recommendation, and the Impartial Chairperson shall hold a hearing within five (5) business days thereafter.

ADEQUATE SUPPLIES

70.    The EMPLOYER shall provide employees supplies or equipment needed for the timely, safe, efficient and effective performance of their duties.

EXPIRATION AND RENEWAL

71.    (A)    (1) This Agreement shall be effective as of July 1, 2006, except as otherwise specified, and shall continue for a period ending midnight on the 30th day of June, 2012. This Agreement shall be renewed from year to year thereafter unless written notice of termination by certified mail, return receipt requested is given by either party to the other not less than sixty (60) days prior to its expiration.

(2) This Agreement may be executed by hotel and concessionaire EMPLOYERS on separate copies hereof, and all copies hereof, although separately signed, shall be deemed and taken together as constituting one agreement.

(B) Temporary Closing of a Hotel/Concession for Renovations

(1) In the event at any time during the term of this Agreement an EMPLOYER signatory hereto temporarily ceases its business operations in order to undertake a major renovation project which is not completed during the term of this Agreement, the EMPLOYER and UNION agree that in such case, the term of this Agreement shall be automatically extended up to and through the actual completion date of the major renovation project and for an additional one hundred and eighty (180) days thereafter. For example, if this Agreement by its terms expires on June 30, 2012 and the EMPLOYER'S major renovation project will not be completed until September 30, 2012, the term of this Agreement will be automatically extended up to and through March 31, 2013, i.e., one

hundred and eighty (180) days past the September 30, 2012 completion date of the major renovation project.

(2) The UNION and EMPLOYER agree that for purposes of work practices, upon actual completion of the EMPLOYER'S major renovation project, the EMPLOYER shall be treated as a new hotel, motel or concession and none of the EMPLOYER'S prior work practices or industry-wide work practices will be deemed to be applicable to the EMPLOYER'S operations.

(C) It is agreed that the execution of the within Agreement by the ASSOCIATION and the UNION, and by the UNION and ASSOCIATION members who have not authorized the ASSOCIATION to execute the within Agreement on their behalf, shall be deemed to immediately supersede, cancel and annul the 1985, 1990, 1995, and 2001 Agreements. It is further agreed that each Agreement made between the UNION and the members of the ASSOCIATION who became parties to the 1985, 1990, 1995 or 2001 Agreements shall likewise be immediately superseded, canceled and annulled as to those members who become parties to this Agreement by agreeing to the same.

(D) In the case of all other EMPLOYERS, it is agreed that the execution of the within Agreement by the EMPLOYER and the UNION shall be deemed to immediately supersede, cancel and annul the 1985, 1990, 1995, and 2001 Agreements.

SEPARABILITY

72.    Should any part hereof or any provision herein contained be rendered or declared illegal or an unfair labor practice by reason of any existing or subsequently enacted legislation or by any decree of a court of competent jurisdiction or by the decision of any authorized government agency, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof, provided, however, upon such invalidation, the parties agree immediately to meet and negotiate substitute provisions for such parts or provisions rendered or declared illegal or an unfair labor practice. The remaining parts or provisions shall remain in full force and effect.

RATIFICATION OF AGREEMENT

73.    The parties hereto agree that their understanding and agreements as set forth in this Agreement and any attached side letter agreements have been ratified by the Union and by the HANYC Bargaining Group Hotels.

IN WITNESS WHEREOF, the EMPLOYER and the UNION have offered their hands and seals the day and year first above written.


HOTEL ASSOCIATION OF NEW YORK CITY, INC.

in its own behalf and in behalf of the HANYC Bargaining Group Hotels
By: Joseph E. Spinnato, President, ASSOCIATION


NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO
By: Peter Ward, President, UNION



UNION

By _____
          (SIGN NAME AND TITLE)


please print    (NAME AND TITLE)


          (DATE)

EMPLOYER/OPERATOR

_____

please print    (LEGAL NAME)

_____

please print    (TRADE NAME)

_____

please print    (BUSINESS ADDRESS)

_____

please print    (OFFICE ADDRESS IF DIFFERENT)

_____    _____

(TELEPHONE NUMBER)    (FAX NUMBER)

_____

please print    (E-MAIL ADDRESS)

By_____

(SIGN NAME AND TITLE)

_____

(PRINT NAME AND TITLE)


_____

(DATE)

PROPERTY OWNER



_____

please print    (LEGAL NAME)


_____

please print    (TRADE NAME)


_____

please print    (BUSINESS ADDRESS)


_____

please print    (OFFICE ADDRESS IF DIFFERENT)


_____

(TELEPHONE NUMBER)    (FAX NUMBER)

_____

please print    (E-MAIL ADDRESS)


By_____
      (SIGN NAME AND TITLE)


_____

      (PRINT NAME AND TITLE)


_____

      (DATE)


## SCHEDULE 1

The following wage increases shall be granted as provided in Article 14 for employees:

Effective:

July 1, 2006 ...................... 4.0%

July 1, 2007 ...................... 4.0%

July 1, 2008 ...................... 4.0%

July 1, 2009 ...................... 3.5%

# Exhibit B
# (Part 4 of 4)

July 1, 2010 ..................... 3.5%
July 1, 2011 ..................... 3.5%

All increases based on the employees' actual rates of pay in effect on that date.

Banquet rates are shown separately in Schedule A-1.

TIP CLASSIFICATIONS INCLUDE THE FOLLOWING:

Servers (including extra meal servers)*
Banquet Servers
Dining Room Attendants
Turkish Baths – Masseurs/Masseuses
    Attendants
    Steam Room Attendants
    Floor Attendants
Bellpersons and Baggage Porters – T, ST and R
Working Bell Captains
Driver/Bellpersons
Driver/Doorpersons
Doorpersons
Package Room Messengers
Pages
Valet Runners & Deliverers (this does not include pressers who also deliver)

SCHEDULE A

DINING ROOM

| | | | EFFECTIVE DATE | | | | |
|---|---|---|---|---|---|---|---|
| 7/1/05 | 7/1/06 | 7/1/07 | 7/1/08 | 7/1/09 | 7/1/10 | 7/1/11 | |

---

* The parties will study the matter of service charges in lieu of tips for servers.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Captain | 740.57 | 770.19 | 801.00 | 833.04 | 862.20 | 892.38 | 923.61 |
| Scrub Captain | 438.70 | 456.25 | 474.50 | 493.48 | 510.75 | 528.63 | 547.13 |
| Greeter | 731.00 | 760.24 | 790.65 | 822.28 | 851.06 | 880.85 | 911.68 |
| Food Server | 422.43 | 439.33 | 456.90 | 475.18 | 491.81 | 509.02 | 526.84 |
| Bus Attendant | 453.44 | 471.58 | 490.44 | 510.06 | 527.91 | 546.39 | 565.51 |
| Extra Meal Food Server - 1 Meal | 43.26 | 44.99 | 46.79 | 48.66 | 50.36 | 52.12 | 53.94 |
| Extra Meal Food Server - 1 Day | 86.53 | 89.99 | 93.59 | 97.33 | 100.74 | 104.27 | 107.92 |
| Banquet Captain | 740.57 | 770.19 | 801.00 | 833.04 | 862.20 | 892.38 | 923.61 |

**KITCHEN & STEWARD**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sous Chef | 798.11 | 830.03 | 863.23 | 897.76 | 929.18 | 961.70 | 995.36 |
| Night Chef | 785.94 | 817.38 | 850.08 | 884.08 | 915.02 | 947.05 | 980.20 |
| Saucier | 780.71 | 811.94 | 844.42 | 878.20 | 908.94 | 940.75 | 973.68 |
| Garde Manger | 778.97 | 810.13 | 842.54 | 876.24 | 906.91 | 938.65 | 971.50 |
| Tournant | 778.97 | 810.13 | 842.54 | 876.24 | 906.91 | 938.65 | 971.50 |
| Chef de partie & Chef Butcher | 777.25 | 808.34 | 840.67 | 874.30 | 904.90 | 936.57 | 969.35 |
| Banquet Chef | 785.94 | 817.38 | 850.08 | 884.08 | 915.02 | 947.05 | 980.20 |
| First Commis-Garde Manger | 759.86 | 790.25 | 821.86 | 854.73 | 884.65 | 915.61 | 947.66 |
| First Commis-Saucier | 759.86 | 790.25 | 821.86 | 854.73 | 884.65 | 915.61 | 947.66 |
| First Commis-Other | 756.38 | 786.64 | 818.11 | 850.83 | 880.61 | 911.43 | 943.33 |

Hotels that employ special workers for fish, soup and hors d'oeuvres. These workers are to be classified and receive the minimum wage, the same as the first Commis; in other words, they are not to be classified as Chefs de partie.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Working Chef | 777.25 | 808.34 | 840.67 | 874.30 | 904.90 | 936.57 | 969.35 |
| First Assistant | 759.86 | 790.25 | 821.86 | 854.73 | 884.65 | 915.61 | 947.66 |
| All Assistant Cooks-White Jacket | 749.43 | 779.41 | 810.59 | 843.01 | 872.52 | 903.06 | 934.67 |
| Pastry Chef | 789.38 | 820.96 | 853.80 | 887.95 | 919.03 | 951.20 | 984.49 |
| First Assistant | 761.60 | 792.06 | 823.74 | 856.69 | 886.67 | 917.70 | 949.82 |
| All Other Assistants | 749.43 | 779.41 | 810.59 | 843.01 | 872.52 | 903.06 | 934.67 |
| Ice Cream Chef | 772.01 | 802.89 | 835.01 | 868.41 | 898.80 | 930.26 | 962.82 |
| Head Baker | 777.25 | 808.34 | 840.67 | 874.30 | 904.90 | 936.57 | 969.35 |
| Night Baker | 765.07 | 795.67 | 827.50 | 860.60 | 890.72 | 921.90 | 954.17 |
| Baker | 765.07 | 795.67 | 827.50 | 860.60 | 890.72 | 921.90 | 954.17 |
| Head Vegetable Prep | 706.86 | 735.13 | 764.54 | 795.12 | 822.95 | 851.75 | 881.56 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| All Other Vegetable Prep | 700.97 | 729.01 | 758.17 | 788.50 | 816.10 | 844.66 | 874.22 |
| Chicken and Fish Butcher | 749.43 | 779.41 | 810.59 | 843.01 | 872.52 | 903.06 | 934.67 |
| Head Oyster Preparer | 726.86 | 755.93 | 786.17 | 817.62 | 846.24 | 875.86 | 906.52 |
| All Other Oyster Prep | 719.89 | 748.69 | 778.64 | 809.79 | 838.13 | 867.46 | 897.82 |
| Head Pantry Person | 718.17 | 746.90 | 776.78 | 807.85 | 836.12 | 865.38 | 895.67 |
| Pantry, Coffee Person | 708.62 | 736.96 | 766.44 | 797.10 | 825.00 | 853.88 | 883.77 |
| Head Silver Cleaner | 703.35 | 731.48 | 760.74 | 791.17 | 818.86 | 847.52 | 877.18 |
| Regular Silver Cleaner | 694.68 | 722.47 | 751.37 | 781.42 | 808.77 | 837.08 | 866.38 |
| Dishwasher | 694.68 | 722.47 | 751.37 | 781.42 | 808.77 | 837.08 | 866.38 |
| Potwasher | 699.91 | 727.91 | 757.03 | 787.31 | 814.87 | 843.39 | 872.91 |
| Floor Steward | 749.43 | 779.41 | 810.59 | 843.01 | 872.52 | 903.06 | 934.67 |
| Kitchen Runner | 694.69 | 722.48 | 751.38 | 781.44 | 808.79 | 837.10 | 866.40 |

Base wage scales fixed herein for all of the foregoing classifications and for Cooks and Servers in the Employees' Cafeteria shall include meals.

## EMPLOYEES' CAFETERIA

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Head Cook | 749.43 | 779.41 | 810.59 | 843.01 | 872.52 | 903.06 | 934.67 |

## BAR

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Assistant | 719.89 | 748.69 | 778.64 | 809.79 | 838.13 | 867.46 | 897.82 |
| Bartender (Public Bars) | 732.06 | 761.34 | 791.79 | 823.46 | 852.28 | 882.11 | 912.98 |
| Bartender (Service Bars) | 758.12 | 788.44 | 819.98 | 852.78 | 882.63 | 913.52 | 945.49 |
| Bartender's Helper | 694.68 | 722.47 | 751.37 | 781.42 | 808.77 | 837.08 | 866.38 |

## HOUSEKEEPING

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Floor Housekeeper | 748.83 | 778.78 | 809.93 | 842.33 | 871.81 | 902.32 | 933.90 |
| Room Attendant | 714.69 | 743.28 | 773.01 | 803.93 | 832.07 | 861.19 | 891.33 |
| Bath Attendant | 714.69 | 743.28 | 773.01 | 803.93 | 832.07 | 861.19 | 891.33 |
| Housekeeping Attendant** Meaning those employees who do general housekeeping work including Vacuumers, Shade Cleaners, Curtain and Draperies Hangers and Carpet Washers and Night Cleaners. | 714.69 | 743.28 | 773.01 | 803.93 | 832.07 | 861.19 | 891.33 |

**Minimum wage scales do not include compensation for (1) handling and transportation of items in bulk quantity such as mattresses, furniture, carpeting, television sets, etc. from the point of receipt to the point assigned by management and (2) dislodging, removal and transportation of carpeting from hotel guest rooms and/or public areas as required. Housekeeping Attendants required to perform any or all such duties shall receive, in addition to their regular wages, ninety cents ($.90) per hour for all hours worked for three and one-half (3-1/2) or less hours per day or seventeen and one-half (17-1/2) hours per week, or for employees

scheduled to perform these additional duties for seven (7) hours a day or thirty-five (35) hours a week, an additional five dollars ($5.00) per day.  Any inside moves of items listed in (1) above are excluded from this agreement.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Employee who is employed as a Part-Time Window Washer and does work as a Housekeeping Attendant | 723.37 | 752.3 | 782.39 | 813.69 | 842.17 | 871.65 | 902.16 |
| Wall Washer | 723.37 | 752.3 | 782.39 | 813.69 | 842.17 | 871.65 | 902.16 |
| Furniture Polisher | 705.12 | 733.32 | 762.65 | 793.16 | 820.92 | 849.65 | 879.39 |
| **LAUNDRY** | | | | | | | |
| Washer | 708.62 | 736.96 | 766.44 | 797.10 | 825.00 | 853.88 | 883.77 |
| Washroom Helper | 703.35 | 731.48 | 760.74 | 791.17 | 818.86 | 847.52 | 877.18 |
| Guest Marker/Assorter | 703.35 | 731.48 | 760.74 | 791.17 | 818.86 | 847.52 | 877.18 |
| Hand Ironer | 703.35 | 731.48 | 760.74 | 791.17 | 818.86 | 847.52 | 877.18 |
| Operator & Starcher | 701.66 | 729.73 | 758.92 | 789.28 | 816.90 | 845.49 | 875.08 |
| Hand Washer | 701.66 | 729.73 | 758.92 | 789.28 | 816.90 | 845.49 | 875.08 |
| Curtain Processor | 701.66 | 729.73 | 758.92 | 789.28 | 816.90 | 845.49 | 875.08 |
| Flat Worker | 699.91 | 727.91 | 757.03 | 787.31 | 814.87 | 843.39 | 872.91 |
| (Shaker, Feeder, Receiver, Folder) | | | | | | | |
| Miscellaneous Laundry Worker | 699.91 | 727.91 | 757.03 | 787.31 | 814.87 | 843.39 | 872.91 |
| (Linen Exchange, Linen Chute, Bundle Worker, Porter, Sewer) | | | | | | | |
| Mini Laundry Employee | 706.86 | 735.13 | 764.54 | 795.12 | 822.95 | 851.75 | 881.56 |
| **FRONT SERVICE** | | | | | | | |
| Stationary Bell Captain | 752.30 | 782.39 | 813.69 | 846.24 | 875.86 | 906.52 | 938.25 |
| Working Bell Captain | 553.80 | 575.95 | 598.99 | 622.95 | 644.75 | 667.32 | 690.68 |
| Elevator Starter | 718.17 | 746.90 | 776.78 | 807.85 | 836.12 | 865.38 | 895.67 |
| Elevator Operator, Passenger | 715.73 | 744.36 | 774.13 | 805.10 | 833.28 | 862.44 | 892.63 |
| Elevator Operator, Service | 717.65 | 746.36 | 776.21 | 807.26 | 835.51 | 864.75 | 895.02 |
| Bell Person, Porter, T | 426.52 | 443.58 | 461.32 | 479.77 | 496.56 | 513.94 | 531.93 |
| Bell Person, Porter, ST | 426.52 | 443.58 | 461.32 | 479.77 | 496.56 | 513.94 | 531.93 |
| Bell Person, Porter, R | 452.61 | 470.71 | 489.54 | 509.12 | 526.94 | 545.38 | 564.47 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Lobby Porter | 706.00 | 734.24 | 763.61 | 794.15 | 821.95 | 850.72 | 880.50 |
| Door Person | 434.61 | 451.99 | 470.07 | 488.87 | 505.98 | 523.69 | 542.02 |
| Checkroom Attendant | 691.23 | 718.88 | 747.64 | 777.55 | 804.76 | 832.93 | 862.08 |
| Package Room Messenger | 452.81 | 470.92 | 489.76 | 509.35 | 527.18 | 545.63 | 564.73 |
| Package Room Employee | 702.52 | 730.62 | 759.84 | 790.23 | 817.89 | 846.52 | 876.15 |
| Driver-Bell Person | 649.33 | 675.30 | 702.31 | 730.40 | 755.96 | 782.42 | 809.80 |
| Driver-Door Person | 649.33 | 675.30 | 702.31 | 730.40 | 755.96 | 782.42 | 809.80 |
| Chauffeur, Driver (Full-Time) | 745.33 | 775.14 | 806.15 | 838.40 | 867.74 | 898.11 | 929.54 |

**WHITE COLLAR –**
**ADMINISTRATIVE**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Accounting Clerk | 719.89 | 748.69 | 778.64 | 809.79 | 838.13 | 867.46 | 897.82 |
| Circuit Clerk | 711.19 | 739.64 | 769.23 | 800.00 | 828.00 | 856.98 | 886.97 |
| E.F. Typist | 712.95 | 741.47 | 771.13 | 801.98 | 830.05 | 859.10 | 889.17 |
| F&B Checker | 714.69 | 743.28 | 773.01 | 803.93 | 832.07 | 861.19 | 891.33 |
| F&B Control & Card Control | 712.95 | 741.47 | 771.13 | 801.98 | 830.05 | 859.10 | 889.17 |
| File Clerk | 709.49 | 737.87 | 767.38 | 798.08 | 826.01 | 854.92 | 884.84 |
| Floor Clerk | 702.52 | 730.62 | 759.84 | 790.23 | 817.89 | 846.52 | 876.15 |
| Front Office Cashier | 724.22 | 753.19 | 783.32 | 814.65 | 843.16 | 872.67 | 903.21 |
| Front Office Coordinator | 745.96 | 775.80 | 806.83 | 839.10 | 868.47 | 898.87 | 930.33 |
| Guest History Clerk | 709.49 | 737.87 | 767.38 | 798.08 | 826.01 | 854.92 | 884.84 |
| House Officer | 747.95 | 777.87 | 808.98 | 841.34 | 870.79 | 901.27 | 932.81 |
| Key, Mail, Information Clerk | 709.49 | 737.87 | 767.38 | 798.08 | 826.01 | 854.92 | 884.84 |
| Night Auditor | 729.45 | 758.63 | 788.98 | 820.54 | 849.26 | 878.98 | 909.74 |
| Payroll Clerk | 718.17 | 746.90 | 776.78 | 807.85 | 836.12 | 865.38 | 895.67 |
| Reservation Clerk | 712.94 | 741.46 | 771.12 | 801.96 | 830.03 | 859.08 | 889.15 |
| Restaurant Beverage Cashier | 712.95 | 741.47 | 771.13 | 801.98 | 830.05 | 859.10 | 889.17 |
| Room Clerk | 725.11 | 754.11 | 784.27 | 815.64 | 844.19 | 873.74 | 904.32 |
| Stenographer | 716.44 | 745.10 | 774.90 | 805.90 | 834.11 | 863.30 | 893.52 |
| Timekeeper | 712.95 | 741.47 | 771.13 | 801.98 | 830.05 | 859.10 | 889.17 |
| Typist | 712.95 | 741.47 | 771.13 | 801.98 | 830.05 | 859.10 | 889.17 |
| Voucher Clerk | 712.95 | 741.47 | 771.13 | 801.98 | 830.05 | 859.10 | 889.17 |
| Security Guard | 706.86 | 735.13 | 764.54 | 795.12 | 822.95 | 851.75 | 881.56 |
| Telephone Operator | 716.44 | 745.10 | 774.90 | 805.90 | 834.11 | 863.30 | 893.52 |

**ENGINEERING**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Engineer | 772.01 | 802.89 | 835.01 | 868.41 | 898.8 | 930.26 | 962.82 |
| Boiler Room Attendant | 754.62 | 784.80 | 816.19 | 848.84 | 878.55 | 909.30 | 941.13 |
| Oiler | 750.31 | 780.32 | 811.53 | 843.99 | 873.53 | 904.10 | 935.74 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Electrician | 758.12 | 788.44 | 819.98 | 852.78 | 882.63 | 913.52 | 945.49 |
| Electric Switch Board Operator | 744.22 | 773.99 | 804.95 | 837.15 | 866.45 | 896.78 | 928.17 |
| Helper | 733.81 | 763.16 | 793.69 | 825.44 | 854.33 | 884.23 | 915.18 |
| Helper in Engineering Department | 733.81 | 763.16 | 793.69 | 825.44 | 854.33 | 884.23 | 915.18 |
| Air Condition Control Mechanic | 756.38 | 786.64 | 818.11 | 850.83 | 880.61 | 911.43 | 943.33 |
| Refrigeration Mechanic | 759.86 | 790.25 | 821.86 | 854.73 | 884.65 | 915.61 | 947.66 |
| Painter | 756.38 | 786.64 | 818.11 | 850.83 | 880.61 | 911.43 | 943.33 |
| Paper Hanger/Sign Painter | 765.07 | 795.67 | 827.50 | 860.60 | 890.72 | 921.90 | 954.17 |
| Wood Finisher/Polisher | 756.38 | 786.64 | 818.11 | 850.83 | 880.61 | 911.43 | 943.33 |
| Upholsterer | 756.38 | 786.64 | 818.11 | 850.83 | 880.61 | 911.43 | 943.33 |
| Upholsterer Sewer | 747.68 | 777.59 | 808.69 | 841.04 | 870.48 | 900.95 | 932.48 |
| Maintenance Employee | 756.38 | 786.64 | 818.11 | 850.83 | 880.61 | 911.43 | 943.33 |
| Maintenance Helper/Apprentice | 733.80 | 763.15 | 793.68 | 825.43 | 854.32 | 884.22 | 915.17 |
| **VALET DEPARTMENT** | | | | | | | |
| Tailor | 712.06 | 740.54 | 770.16 | 800.97 | 829.00 | 858.02 | 888.05 |
| Presser | 712.06 | 740.54 | 770.16 | 800.97 | 829.00 | 858.02 | 888.05 |
| Dry Cleaner | 719.05 | 747.81 | 777.72 | 808.83 | 837.14 | 866.44 | 896.77 |
| Runner and Delivery Employee | 437.62 | 455.12 | 473.32 | 492.25 | 509.48 | 527.31 | 545.77 |
| **PRINT SHOP DEPARTMENT** | | | | | | | |
| Compositor | 710.34 | 738.75 | 768.30 | 799.03 | 827.00 | 855.95 | 885.91 |
| Press Operator/Linotypist | 727.72 | 756.83 | 787.10 | 818.58 | 847.23 | 876.88 | 907.57 |
| Miscellaneous Employee | 701.66 | 729.73 | 758.92 | 789.28 | 816.90 | 845.49 | 875.08 |
| **TURKISH BATHS** | | | | | | | |
| Masseur/Masseuse | 422.43 | 439.33 | 456.90 | 475.18 | 491.81 | 509.02 | 526.84 |
| Attendant | 425.92 | 442.96 | 460.68 | 479.11 | 495.88 | 513.24 | 531.20 |
| Steam Room Attendant | 420.70 | 437.53 | 455.03 | 473.23 | 489.79 | 506.93 | 524.67 |
| Floor Attendant | 459.75 | 478.14 | 497.27 | 517.16 | 535.26 | 553.99 | 573.38 |
| **MISCELLANEOUS** | | | | | | | |
| Audio Visual Technician | -- | 788.44 | 819.98 | 852.78 | 882.63 | 913.52 | 945.49 |
| Carpet Cleaner | 714.69 | 743.28 | 773.01 | 803.93 | 832.07 | 861.19 | 891.33 |
| Floor Polisher | 714.69 | 743.28 | 773.01 | 803.93 | 832.07 | 861.19 | 891.33 |
| F&B Storeroom Attendant | 706.00 | 734.24 | 763.61 | 794.15 | 821.95 | 850.72 | 880.50 |
| Furniture Polisher (Maintenance) | 735.54 | 764.96 | 795.56 | 827.38 | 856.34 | 886.31 | 917.33 |
| Incinerator Attendant | 712.95 | 741.47 | 771.13 | 801.98 | 830.05 | 859.10 | 889.17 |
| Kitchen Fire Person | 711.19 | 739.64 | 769.23 | 800.00 | 828.00 | 856.98 | 886.97 |
| Linen Handler/Distributor | 699.91 | 727.91 | 757.03 | 787.31 | 814.87 | 843.39 | 872.91 |
| Linen Room Personnel | 692.97 | 720.69 | 749.52 | 779.50 | 806.78 | 835.02 | 864.25 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Linen Room Sewer | 696.45 | 724.31 | 753.28 | 783.41 | 810.83 | 839.21 | 868.58 |
| Locker Room Attendant | 699.97 | 727.97 | 757.09 | 787.37 | 814.93 | 843.45 | 872.97 |
| Minibar Attendant | -- | 743.28 | 773.01 | 803.93 | 832.07 | 861.19 | 891.33 |
| Newspaper Deliverer | 692.97 | 720.69 | 749.52 | 779.50 | 806.78 | 835.02 | 864.25 |
| Page | 566.78 | 589.45 | 613.03 | 637.55 | 659.86 | 682.96 | 706.86 |
| Sidewalk Cleaner | 702.52 | 730.62 | 759.84 | 790.23 | 817.89 | 846.52 | 876.15 |
| Soda Fountain Employee | 711.19 | 739.64 | 769.23 | 800.00 | 828.00 | 856.98 | 886.97 |
| Swimming Pool Attendant | 700.78 | 728.81 | 757.96 | 788.28 | 815.87 | 844.43 | 873.99 |
| Window Cleaners (Full-Time) | 756.65 | 786.92 | 818.4 | 851.14 | 880.93 | 911.76 | 943.67 |
| Yard/Sanitation Employee | 694.68 | 722.47 | 751.37 | 781.42 | 808.77 | 837.08 | 866.38 |

It is agreed that, if any employee shall be engaged in work of any class or kind which has not been included in any of the specific classifications herein, the parties shall negotiate the amount of the minimum wage for such classifications, and if unable to agree, submit the matter to arbitration in accordance with the provisions of Article 26 of the Agreement.  Pending determination by the Impartial Chairperson, the wage and hours and conditions of work for such employee shall continue as heretofore.

SCHEDULE A-1

CLASSIFICATION OF MEALS, HOURS AND WAGES FOR BANQUET SERVERS & BANQUET CAPTAINS

(Wage scales set forth herein shall include meals)

| | 7/1/05 | 7/1/06 | 7/1/07 | 7/1/08 | 7/1/09 | 7/1/10 | 7/1/11 |
|---|---|---|---|---|---|---|---|
| Breakfast – Starting between 7:00 a.m. and 11:00 a.m., consuming | 43.52 | 45.26 | 47.07 | 48.95 | 50.66 | 52.43 | 54.27 |

3 hours

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Luncheon – Starting between 11:00 a.m. and 3:00 p.m., consuming 3-1/2 hours | 44.03 | 45.79 | 47.62 | 49.52 | 51.25 | 53.04 | 54.90 |
| Afternoon Tea or Cocktail Party – Starting between 2:30 p.m. and 5:00 p.m., consuming 3 hours | 43.01 | 44.73 | 46.52 | 48.38 | 50.07 | 51.82 | 53.63 |
| Dinner or Supper – Starting after 6:00 p.m., consuming 4-1/2 hours | 44.98 | 46.78 | 48.65 | 50.60 | 52.37 | 54.20 | 56.10 |
| Dance (no food) – Starting after 8:00 p.m., consuming 5-1/2 hours | 44.03 | 45.79 | 47.62 | 49.52 | 51.25 | 53.04 | 54.90 |
| Additional for each setting up and each clearing off | 28.64 | 29.79 | 30.98 | 32.22 | 33.35 | 34.52 | 35.73 |
| Holidays | 168.99 | 175.75 | 182.78 | 190.09 | 196.74 | 203.63 | 210.76 |

In setting forth the stated hours and the time to be consumed by these various functions, it is the intent that overtime compensation will be paid in the event that service exceeds the hours set forth above, in the following amounts:

| | 7/1/05 | 7/1/06 | 7/1/07 | 7/1/08 | 7/1/09 | 7/1/10 | 7/1/11 |
|---|---|---|---|---|---|---|---|
| Breakfast | 21.72 | 22.59 | 23.49 | 24.43 | 25.29 | 26.18 | 27.10 |
| Luncheon | 18.83 | 19.58 | 20.36 | 21.17 | 21.91 | 22.68 | 23.47 |
| Afternoon | 21.53 | 22.39 | 23.29 | 24.22 | 25.07 | 25.95 | 26.86 |
| Dinner OT | 14.98 | 15.58 | 16.20 | 16.85 | 17.44 | 18.05 | 18.68 |

Overtime compensation for banquet captains shall be paid at one and one-half (1-1/2) times their hourly rate of pay.

It is not the intent of this provision to alter or abrogate any practice now existing that had been agreed upon between the parties hereto.

The hours designated for any function shall be the hours, beginning at the time when the service personnel report on the floor for duty, exclusive of any time consumed for dressing or eating.

Committee reception in connection with a dinner, held in a private room, wherein personnel also serve at the dinner—effective July 1, 2005, in addition to regular wages, $28.06; effective July 1, 2006, $29.18; effective July 1, 2007, $30.35; effective July 1, 2008, $31.56; effective July 1, 2009, $32.66; effective July 1, 2010, $33.80; and effective July 1, 2011, $34.98.

Buffet, starting before 6:00 P.M., to be paid for at Luncheon Prices.

Buffet, starting after 6:00 P.M., to be paid for at Dinner Prices.

## WORKING CONDITIONS

1. Service personnel shall report one (1) hour before the function is scheduled to begin.
2. Set-up personnel shall report for duty one (1) hour before service personnel report.
3. Clear-off personnel shall remain until function terminates.
4. Fifteen (15) covers shall be considered the standard set-up for breakfast and for supper (except in the case of an elaborate supper, in which case the set-up shall be ten (10)). Ten (10) covers shall be considered the standard set-up for luncheon and dinner.
5. Tables of eleven (11) and twelve (12) will be accepted as a regular set-up in exceptional cases, but not as a regular procedure.
6. Thirteen (13) to seventeen (17) covers will be considered a "split" table for which, for breakfast and luncheon, an extra $27.20 shall be paid effective July 1, 2005; $28.29 effective July 1, 2006; $29.42 effective July 1, 2007; $30.60 effective July 1, 2008; $31.67 effective July 1, 2009; $32.78 effective July 1, 2010; and $33.93 effective July 1, 2011. For dinner, an extra $28.11 shall be paid effective July 1, 2005; $29.23 effective July 1, 2006; $30.40 effective July 1, 2007; $31.62 effective July 1, 2008; $32.73 effective July 1, 2009; $33.88 effective July 1, 2010; and $35.07 effective July 1, 2011.

7. Double tables of twenty (20) to twenty-four (24) shall be considered two (2) tables as far as wages are concerned, except for breakfast where double tables shall be considered a "double split."

8. Set-up and clear-off personnel shall follow the general industry practice of servicing forty (40) covers.

9. In cases where no set-up personnel are provided and servers are required to set up their own tables, each shall be paid extra, in addition to his/her regular pay, as follows: July 1, 2005, $7.14; July 1, 2006, $7.43; July 1, 2007, $7.73; July 1, 2008, $8.04; July 1, 2009, $8.32; July 1, 2010, $8.61; and July 1, 2011, $8.91.

10. When food is not provided, due to the late hour or otherwise, servers shall be paid twenty-five cents ($0.25) extra in addition to their regular pay.

11. Payment of wages and gratuities shall be made as soon as possible after the termination of service but in no case later than forty-eight (48) hours after the function, except in exceptional cases.

12. Extra Banquet Captains who work on a daily basis instead of a weekly basis shall be paid for breakfast and luncheon $76.75 effective July 1, 2005; $79.82 effective July 1, 2006; $83.01 effective July 1, 2007; $86.33 effective July 1, 2008; $89.35 effective July 1, 2009; $92.48 effective July 1, 2010; and $95.72 effective July 1, 2011. They shall be paid for dinner $77.30 effective July 1, 2005; $80.39 effective July 1, 2006; $83.61 effective July 1, 2007; $86.95 effective July 1, 2008; $89.99 effective July 1, 2009; $93.14 effective July 1, 2010; and $96.40 effective July 1, 2011. It is understood that they will work during the entire period of the function, including the time required for setting up and clearing off.

13. Banquet clear-off servers at dinner dances who are required to remain more than one (1) hour after the service food terminates shall be paid, in addition to their regular clear-off wages, a flat sum of $29.03 effective July 1, 2005; $30.19 effective July 1, 2006; $31.40 effective July 1, 2007; $32.66 effective July 1, 2008; $33.80 effective July 1, 2009; $34.98 effective July 1, 2010; and $36.20 effective July 1, 2011, and dinner overtime after completion of five and one-half (5-1/2) hours from the time they are called for service of the function. (It is understood that this rule will be uniform in all hotels for dinner dances and the various arrangements now in effect in individual hotels will be

modified to conform with this procedure, except that any existing arrangements providing greater compensation to employees shall not be reduced.)

14. In order to avoid errors and confusion, the UNION shall provide the EMPLOYER with the names of the extra personnel referred for a function at least two (2) hours before they report for work. (This provision can be effective only in cases where the hotel calls the UNION not later than 3:30 P.M. on the day preceding the date of the function.)

15. Under no circumstances shall Banquet personnel or delegates have the privilege or right to discuss working conditions, wages or gratuities with Banquet Committees or guests. All grievances must be referred to the Headwaiter, and by the Delegate only.

16. It is understood that the hours, wages and working conditions for extra banquet servers and captains provide a minimum standard for all hotels. Any hotel that has already granted and put into effect conditions more favorable to the UNION than those listed above will be obligated to continue such practices now existing except as otherwise provided in Paragraph 13 above.

17. Banquet servers, at all functions with music, where the function continues after 2:00 A.M., shall be paid for work performed after 2:00 A.M. at the rate of $18.69 effective July 1, 2005; $19.44 effective July 1, 2006; $20.22 effective July 1, 2007; $21.03 effective July 1, 2008; $21.77 effective July 1, 2009; $22.53 effective July 1, 2010; and $23.32 effective July 1, 2011. This rate shall be paid in addition to the present clear-off rates, as set forth in Paragraph 13 above, for banquet clear-off personnel who are required to remain more than one (1) hour after the service of food terminates. Any hotel which has already granted and put into effect conditions more favorable to banquet servers than those listed above shall continue such more favorable practices.

18. On or before October 1st of each year, a committee of the ASSOCIATION and a committee of the UNION shall meet to determine the wages to be paid employees for the following New Year's Eve. In the event the parties are unable to reach an agreement by November 1st, the matter may be submitted to arbitration.

19. Banquet servers covered by this Schedule shall receive the following vacation and holiday pay:

    A. Eligibility

(1) A banquet server shall be eligible for vacation pay in a hotel in any fiscal year if s/he was on the hotel's steady rotation list for at least six (6) months in the previous fiscal year provided that his/her gross wages earned in the hotel were at least one thousand dollars ($1,000).

For purposes of this provision the fiscal year shall be the period starting September 1, and ending August 31 of the following year. Vacation pay shall be paid to all eligible employees at the beginning of each fiscal year for the preceding year.

(2) The number of weeks of vacation pay for which a banquet server shall be eligible under Paragraph (1) above, shall be based on hotel's steady or rotation list for at least six (6) months, based on the schedule set forth in Article 28(A)(1) of the Agreement.

(3) The amount of vacation pay for employees who have been on the steady or rotation list for six (6) months or more in the preceding year will be calculated by multiplying the amounts arrived at under Paragraph (a) or (b) below by the following fractions:

6 months but less than 6-1/2 months  6/9

6-1/2 months but less than 7-1/2 months     7/9

7-1/2 months but less than 8-1/2 months     8/9

8-1/2 months or more full amount

(a) Gross wages of one thousand dollars ($1,000) but less than three thousand dollars ($3,000):

One point nine percent (1.9%) of gross wages per week of vacation plus one hundred percent (100%).

(b) Gross wages of three thousand dollars ($3,000) or more:

Effective July 1, 2005 – Eight hundred and forty-four dollars and eighty-four cents ($844.84) per week

Effective July 1, 2006 – Eight hundred and seventy-eight dollars and sixty-three cents ($878.63) per week

Effective July 1, 2007 – Nine hundred and thirteen dollars and seventy-eight cents ($913.78) per week

Effective July 1, 2008 – Nine hundred and fifty dollars and thirty-three cents ($950.33) per week

Effective July 1, 2009 – Nine hundred and eighty-three dollars and fifty-nine cents ($983.59) per week

Effective July 1, 2010 – One thousand and eighteen dollars and two cents ($1,018.02) per week

Effective July 1, 2011 – One thousand and fifty-three dollars and sixty-five cents ($1,053.65) per week

Gross wages shall mean the sum of the function rate plus the rate for split tables, set-up and clear-off (exclusive of gratuities).

B. Banquet Captains

Banquet captains on a hotel's steady list shall be eligible for vacations in accordance with the foregoing rules, but gross wages shall mean the banquet captain's total straight-time earnings, exclusive of gratuities, received during the preceding calendar year.

C. Roll Call Banquet Servers

Effective July 1, 2005, Roll Call banquet servers shall be paid $5.23 for each banquet function as vacation and holiday pay. The foregoing payment shall be increased effective July 1, 2006 to $5.44; effective July 1, 2007 to $5.66; effective July 1, 2008 to $5.89; effective July 1, 2009 to $6.10; effective July 1, 2010 to $6.31; and effective July 1, 2011 to $6.53. Said payment shall be paid together with their regular earnings.

In the event Roll Call banquet servers work on a holiday listed in Article 29(A) of the collective bargaining agreement, they shall receive holiday pay in the same amount payable to a la carte servers under the wage scale set forth in Schedule A. Said holiday pay shall be in addition to the wages payable for the banquet function or functions.

D. Banquet servers on a hotel's steady rotation list and banquet captains on a hotel's steady list shall receive holiday pay based upon the same eligibility applicable to regular employees. The amount of pay for a holiday shall be the amount payable to a la carte servers or a la carte captains under the wage scales set forth in Schedule A.

Should it be necessary for such banquet servers or banquet captains to work on any of the holidays listed in Article 29(A) of the collective bargaining agreement, said holiday pay shall be in addition to the wages payable for the banquet function or functions.

SCHEDULE A-2

VACATIONS, CALL-IN PAY AND HOLIDAY PAY FOR CHECKROOM AND WASHROOM ATTENDANTS

Checkroom and Washroom Attendants shall receive vacations, holiday benefits and call-in pay as follows:

A. Vacation Pay

(1) Amount of Vacation Pay:

Upon completion of one (1), two (2), three (3), and four (4) years respectively of continuous employment, each employee shall receive two percent (2%), three percent (3%), four percent (4%), and five percent (5%) respectively of the wages earned during the immediate calendar year preceding the vacation payment.

(2) Eligibility for vacation pay shall be based upon each employee having been employed for not less than six (6) months during the preceding calendar year.

B. Call-in Pay

An employee called in to work on any given day shall be provided with not less than three and one-half (3-1/2) hours of work.

C. Holiday Pay

(1) The following six (6) holidays shall be recognized as paid holidays: Thanksgiving, December 24th, Christmas Day, New Year's Day, President's Day, and Martin Luther King, Jr.'s Birthday.

(2) All questions concerning eligibility and any other related issues shall be determined in accordance with the terms of the Agreement.

(3) An employee who is eligible to receive holiday pay and who is called in to work on any one of the aforementioned holidays, and does so work, shall be paid at the rate of double time.

(4) An employee who is eligible to receive holiday pay and does not work on the holiday shall receive as holiday pay three and one-half (3-1/2) hours pay at straight time.

(5) An employee who is eligible to receive holiday pay and who is called in to work on any one of the following holidays: Memorial Day, July Fourth and Labor Day, and does so work, shall be paid at the rate of double time.

(6) An employee who is eligible to receive holiday pay and who does not work any of the holidays referred to in Paragraph (C)(5) above, shall not be entitled to receive any holiday pay.

SCHEDULE A-3

VACATIONS AND HOLIDAYS FOR STEADY EXTRA BANQUET BARTENDERS

Steady extra banquet bartenders shall be eligible for vacation and holiday pay in accordance with the following provisions:

1. Eligibility

A. A steady extra banquet bartender shall be eligible for vacation pay in a hotel in any calendar year if s/he was on the hotel's steady extra list for at least six (6) months in the previous calendar year, provided that his/her gross wages earned in the hotel, exclusive of gratuities, was at least one thousand dollars ($1,000).

B. The number of weeks of vacation pay for which a steady extra bartender shall be eligible under Paragraph "A" above shall be based on the number of consecutive years, in each of which the employee has been on the hotel's steady extra banquet bartenders list for at least six (6) months and shall be in accordance with the schedule set forth in Article 28(A) of the Agreement.

C. The amount of vacation pay for employees who have been on the hotel's steady extra banquet bartenders list for at least six (6) months or more in the preceding years will be calculated as follows:

Each employee in order to be eligible for vacation pay must earn a minimum of one thousand dollars ($1,000) of wages and a maximum of three thousand dollars ($3,000) of wages.

Each employee receiving three thousand dollars ($3,000) or more in wages excluding gratuities should receive a maximum vacation pay of $765.82 per week, effective July 1, 2005; $796.45 effective July 1, 2006; $828.31 effective July 1, 2007; $861.44 effective July 1, 2008; $891.59 effective July 1, 2009; $922.80 effective July 1, 2010; and $955.10 effective July 1, 2011.

For steady extra banquet bartenders earning more than one thousand dollars ($1,000) but less than three thousand dollars ($3,000), the rate of vacation pay will be prorated on the

percentage of earnings considering three thousand dollars ($3,000) as one hundred percent (100%).

Said proportion to be applied as follows:

The vacation pay above would be subject to the following:

6 months employment but less than 6-1/2 months:    6/9

6-1/2 months employment but less than 7-1/2 months:    7/9

7-1/2 months employment but less than 8-1/2 months:    8/9

8-1/2 months employment or more:    full amount

D. Steady extra banquet bartenders shall receive holiday pay based upon the same eligibility applicable to regular employees. The amount of pay for a holiday shall be the amount payable to a service bartender under the wage scale set forth in Schedule A. Should it be necessary for a steady extra banquet bartender to work on any of the holidays listed in Article 29(A), said holiday pay shall be in addition to the wages payable for the banquet function or functions.

E. Bartenders who are neither on the steady extra banquet payroll nor the regular hotel payroll and are called in to service banquet functions shall receive $4.60 per function as vacation and holiday pay effective July 1, 2005; $4.78 as of July 1, 2006; $4.97 as of July 1, 2007; $5.17 as of July 1, 2008; $5.35 as of July 1, 2009; $5.54 as of July 1, 2010; and $5.73 as of July 1, 2011.

EMPLOYEE BENEFIT FUNDS

SCHEDULE B

SUPPLEMENTAL AGREEMENT dated the 1st day of July, 2006 between the HOTEL ASSOCIATION OF NEW YORK CITY, INC., hereinafter called the ASSOCIATION, and the operators of hotels who are Bargaining Group Hotels of the ASSOCIATION, and with respect to whom the UNION (as hereinafter designated) has been designated as sole collective bargaining agent for the employees in the hotels and concessionaires covered by this Agreement, and who shall become signatories or otherwise parties hereto, each and every such signatory and/or party hotel and concessionaire being hereinafter referred to as the EMPLOYER, and the NEW YORK HOTEL AND MOTEL TRADES

COUNCIL, AFL-CIO, hereinafter called the UNION, in its own behalf and in behalf of its members, now employed or hereinafter to be employed by the EMPLOYER.

WHEREAS, the ASSOCIATION, the EMPLOYER and the UNION have simultaneously herewith executed a Collective Bargaining Agreement; and

WHEREAS, as part of the consideration for the execution of the Collective Bargaining Agreement, the EMPLOYER agreed to contribute sums of money equal to a stated percentage of its payroll or a specific amount to the Funds (as defined below) to be used to provide various medical, accident and sickness, life insurance, pension, legal services and industry training benefits to employees covered by the Collective Bargaining Agreement, and employed by the EMPLOYER, medical and legal services benefits to the families of such employees, health care benefits to the enrolled domestic partners of such employees and scholarship benefits to the children of such employees, all as determined by the Trustees; and

WHEREAS, the Agreement effective July 1, 2001 made between the parties is superseded by the Collective Bargaining Agreement executed simultaneously herewith and it is desired to continue payments to the Funds to provide the benefits hereinafter set forth,

NOW, THEREFORE, in consideration of the promises, the EMPLOYER and the UNION agree that the Collective Bargaining Agreement shall be supplemented by adding hereto the following provisions:

1.      Effective July 1, 2006, the Supplemental Agreement contained in this Schedule B is intended to supercede and replace in its entirety Schedule B of the July 1, 2001 Agreement.

2.      Definitions. For purposes of this Supplemental Agreement, the following terms shall have the following meanings:

The term "employees of the EMPLOYER," means, unless otherwise provided, all of the employees of the EMPLOYER who are covered by and are entitled to the benefits of the Collective Bargaining Agreement, certain employees of the New York Hotel Trades Council and Hotel Association of New York City, Health Center, Inc. and the New York Hotel Trades Council and Hotel Association of New York City, Inc. Employee Benefit

Funds, and certain employees of the UNION and those of its affiliated local unions which have agreed to contribute to the Funds.

The term "family" means an employee's spouse, unmarried children, stepchildren, foster children and adopted children under age nineteen (19), provided they depend on the employee for more than half of their support, and unmarried children, regardless of age, who are unable to support themselves as a result of a physical, developmental or mental illness or condition which incapacitated the child prior to reaching age nineteen (19). The term family will also include full-time students who are dependents of covered employees until the last calendar day of the calendar year in which said dependent reaches twenty-three (23) years of age.

The term "domestic partner" means a person who is living with an employee and sharing financial responsibility with the employee for their joint household. Domestic partners of eligible fund participants will be treated as qualified dependents and eligible for Health Benefits Fund benefits.

The term "wages", for purposes of calculating EMPLOYER contributions equal to a percentage of employee wages, shall be defined as including vacation pay, overtime pay, holiday pay, sick leave pay, personal day pay, jury duty pay, bereavement pay, value of meals and lodgings where such are part of an employee's wages commencing from the first day of employment, whether such employment be permanent, temporary, casual, part-time or extra, and banquet servers' tips. Notwithstanding the foregoing, an employee's wages in excess of the amount of earnings at which the EMPLOYER'S FICA contributions are required shall not be taken into account in calculating EMPLOYER contributions to the Funds. Further, "wages" are limited as set forth in Article 6(D) of the Collective Bargaining Agreement regarding the date as of which contributions must commence to be made to certain of the Funds on behalf of new employees.

The term "Funds" means the New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund, Pension Fund, Prepaid Legal Services Fund and Industry Training and Scholarship Fund.

3.     The Health Benefits Fund

(A) Effective January 1, 1999, the New York Hotel Trades Council and Hotel Association of New York City, Inc. Insurance Fund, Union Family Medical Fund and

Dental Fund were merged into a single fund renamed the "New York Hotel Trades Council and Hotel Association of New York City, Inc. Health Benefits Fund" (the "Health Benefits Fund"). Said merged fund is the successor to the separate Union Family Medical, Insurance and Dental Funds and, as such, provides multiple plans of benefits, including a medical benefits plan (formerly provided by the Union Family Medical Fund), a hospital and insurance benefits plan and an optical benefits plan (formerly provided by the Insurance Fund), and a dental benefits plan (formerly provided by the Dental Fund). Effective July 1, 2006, the EMPLOYER shall make a single, aggregate monthly contribution to the Trustees of the Health Benefits Fund for all benefit plans within that Fund covering the employees of the EMPLOYER equal to the following amounts (or such amounts as may be agreed upon from time to time by the UNION and the ASSOCIATION):

| Contribution Rate | Benefit Coverage |
|---|---|
| (a) 18.5% of employee wages[1] | Combined Medical and Insurance (Hospital Life, Accidental Death and Dismemberment, Short-Term Disability)[2] |
| (b) $1.50 per employee per month | Optical Benefits[3] |
| (c) 2.00% of employee wages | Dental Benefits[4] |

Notwithstanding the foregoing, the Trustees shall maintain the projected liquid assets of the Health Benefits Fund at the end of each calendar year at not less than forty-five

---

[1] The parties acknowledge that the rate in the previous Supplemental Agreement was properly increased by the Trustees to eighteen and one-half percent (18.5%) effective January 1, 2006.

[2] Such contributions will be due with respect to each employee of the EMPLOYER from the employee's initial date of employment.

[3] Such contributions will be due with respect to each employee on the EMPLOYER'S payroll on the fifteenth (15th) day of each month.

[4] Such contributions will be due with respect to each employee of the EMPLOYER immediately after the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement.

percent (45%) of the following year's expenses of the Fund. Those contributions expressed as a percentage of wages shall be computed with respect to wages payable to the employees of the EMPLOYER for the preceding pay period. All contributions to the Health Benefits Fund shall be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of providing medical, accident and sickness and insurance benefits to the employees of the EMPLOYER and medical benefits to the families and enrolled domestic partners of such employees, all as determined by the Trustees.

(B)     In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administered system of medical, life, health and accident, or hospitalization insurance benefits under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period, with the amount of such tax or exaction payable by it for such pay period.

(C)     The Health Benefits Fund will provide up to thirty (30) days of in-patient psychiatric coverage. It is understood that in the event legislation is enacted which requires modification of this benefit, the parties agree to meet to discuss the impact of such mandated modification of this benefit in order to maintain the then current contribution rate.


4.     The Pension Fund

(A) Effective July 1, 2006 the EMPLOYER shall increase its rate of contribution to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund from seven percent (7%) to nine percent (9%) (or such percentage as may be agreed upon from time to time by the UNION and the ASSOCIATION) of the wages payable to the employees of the EMPLOYER for the preceding pay period, to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of providing pensions to the employees employed by the EMPLOYER. Such contributions will be due

with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B)  The EMPLOYER and the UNION agree that, subject to all of the terms and conditions set forth in the Pension Fund's Rules and Regulations, the following increases in monthly pension benefit payments will be implemented in accordance with the following table for employees in active covered employment who are not Pensioners as of the effective dates set forth below:

| Effective Date | Regular Maximum Monthly Benefit | Age and Service Pension (25 years of service and age 55) |
|---|---|---|
| July 1, 2003 | $850 per month | $800 per month |
| July 1, 2004 | $950 per month | $850 per month |
| July1, 2005 | $1,000 per month | $875 per month |

In addition, effective July 1, 2001, as approved by the Trustees, Participants in Covered Employment on June 30, 2001 whose Pension Effective Date occurs thereafter shall accrue an additional Regular Pension benefit of twenty dollars ($20) per Pension Credit for each Pension Credit in excess of twenty-five (25), up to a maximum of forty (40)

Pension Credits. This additional accrual does not apply to Participants retiring on an Age and Service Pension.

It is acknowledged and agreed that the Trustees of the Pension Fund shall have the authority to determine when, and to what extent, the Regular Maximum Monthly Benefit shall be increased. At no time shall the Trustees permit the Pension Fund to subject contributing Employers to excise tax or any other penalties.

(C)  The EMPLOYER and the UNION acknowledge and agree that, subject to all of the terms and conditions set forth in the Pension Fund's Rules and Regulations, the following increases in monthly pension benefit payments will be implemented in accordance with the following table for Pensioners and beneficiaries in pay status on the effective dates set forth below:

| Effective Date | % Increase |
|----------------|------------|
| July 1, 2002 | 2.0% |
| July 1, 2003 | 2.0% |
| July 1, 2004 | 2.0% |
| July 1, 2005 | 2.0% |

(D)  The EMPLOYER agrees to increase its contribution to the Pension Fund in order to meet the requirements of the Employee Retirement Income Security Act of 1974, as amended, by such amount as is finally determined upon completion of an actuarial valuation.

5.    The Prepaid Legal Fund

(A) The EMPLOYER shall continue to contribute to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Prepaid Legal Services Fund one-half of one percent (0.50%) (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) of the wages payable to the employees for the preceding pay period, to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of making available certain legal services benefits to employees of the EMPLOYER and their dependents. Such contributions will be due with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B)    In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administrated system of prepaid legal insurance under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period, with the amount of such tax or exaction payable by it for such pay period.

(C)    Contributions to the Fund shall continue only so long as the Fund retains its tax exempt status.

6.    Industry Training and Scholarship Fund

(A) The EMPLOYER shall continue to pay the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund the sum of one dollar and fifty cents ($1.50) per month for each employee on the EMPLOYER'S payroll on the 15th day of each month (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) to be

administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument (identified below) for the purpose of establishing and maintaining programs to train employees for promotion and advancement. Such contributions will be due with respect to each employee of the EMPLOYER immediately upon the completion of nine (9) months of employment. The foregoing provision shall not apply to any employee who, during the twenty-four (24) months prior to his/her employment, was continuously employed for a period of twelve (12) months by an EMPLOYER signatory or party to the Collective Bargaining Agreement, for whom contributions shall be made from the employee's initial date of employment.

(B) The EMPLOYER shall continue to pay the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. Industry Training and Scholarship Fund the sum of one dollar ($1) per month for each employee on the EMPLOYER'S payroll on the 15th day of each month (or such sums as may be agreed upon from time to time by the UNION and the ASSOCIATION) to be administered and expended by the Trustees pursuant to the provisions of the Fund's trust instrument and to provide educational scholarships and tuition aid to dependents of the EMPLOYER'S employees. Such contributions will be due with respect to each employee of the EMPLOYER from the employee's initial date of employment.

(C)    In the event that legislation is enacted by the Federal, State or Municipal Governments levying a tax or other exaction upon the EMPLOYER for the purpose of establishing a Federally, State or Municipally administered system of job training and scholarship insurance under which the employees of the EMPLOYER are insured, the EMPLOYER shall be credited, against the sums otherwise payable hereunder for each pay period, with the amount of such tax or exaction payable by it for such pay period.

7.    The 401(k) Savings Plan and Trust

The EMPLOYER shall continue remitting employee contributions to the Trustees of the New York Hotel Trades Council and Hotel Association of New York City, Inc. 401(k) Savings Plan and Trust solely on behalf of each of its employees who has elected to defer a portion of his/her wages on a pre-tax basis to such Plan and Trust. The employee contributions remitted by the EMPLOYER shall be the aggregate amount of the wage

deferrals deducted by the EMPLOYER in accordance with employees' elections for each pay period. The EMPLOYER shall, as required by law, remit such contributions to the Trustees as of the earliest date on which such contributions can reasonably be segregated from the EMPLOYER'S general assets. Any and all costs attendant to the establishment, implementation and administration of the 401(k) Plan, other than costs of deducting and withholding from employee wages and transmitting same to the Plan, shall be paid out of the employee elective deferral contributions.

8.    Provisions Common to All Funds

The following provisions shall apply to all of the foregoing Funds:

(A)    The terms and provisions of each Fund's trust instrument are specifically incorporated herein by reference[5].

(B)    If the Trustees shall complain that any EMPLOYER has not made full payment of contributions to the Trustees of any of the foregoing Funds, such complaint shall be filed with the Impartial Chairperson named in the Collective Bargaining Agreement, and the Impartial Chairperson shall make the necessary findings and award, and his/her decision shall be final and binding on the parties. Any EMPLOYER delinquent in contributions shall be required to pay said contributions and any audit or accounting fees in connection therewith if said delinquent contributions are paid prior to the institution of legal or arbitration proceedings. Any EMPLOYER against whom legal or arbitration proceedings are instituted shall be required to pay in addition to the amount of the delinquency,

---

[5]    *Health Benefits Fund* – Agreement and Restated Declaration of Trust dated January 1, 1999.

*Pension Fund* – Restated Agreement and Declaration of Trust dated January 1, 1976 and amended March 1, 1988.

*Prepaid Legal Fund* – Agreement and Declaration of Trust dated November 1, 1987.

*Training and Scholarship Fund* – Restated Agreement and Declaration of Trust dated July 29, 1987.

*401(k) Savings Plan and Trust* – Agreement and Declaration of Trust dated July 1, 2001.

interest at the then legal rate, audit fees, liquidated damages in the amount of twenty percent (20%) of the amount of the delinquency, attorneys' fees and costs.

(C)     No employee of an EMPLOYER and no member of any such employee's family shall have the option to receive instead of the foregoing benefits any part of any contribution of the EMPLOYER. No employee or family member shall have the right to assign the benefits to which s/he may be or become entitled hereunder or under the trust instruments pertaining to each of the foregoing Funds, except as may otherwise be provided by law and the express provisions of a benefit plan, or to receive a cash consideration in lieu of such benefits, either upon termination of the trust therein created or through severance of employment or otherwise.

(D)     During the term of this Supplemental Agreement, the UNION obligates itself to enter into no contract or agreement whereby any EMPLOYER engaged in the hotel business in the City of New York will not be obligated to pay the amount required to be paid to the Trustees as set forth above. During the term of this Supplemental Agreement, the UNION agrees to insert a clause in all of its Collective Bargaining Agreements with hotels employing members of the UNION engaged in the hotel business in the City of New York to the effect that the hotel shall pay to the Trustees under the trust instruments pertaining to each of the Funds the applicable sums set forth above (as the same may from time to time be modified according to the terms hereof), to be applied under the said trust instruments. This Paragraph (D) may be waived by an instrument in writing executed by the Board of Directors of the HOTEL ASSOCIATION OF NEW YORK CITY, INC. and the UNION.

(E)     This Supplemental Agreement and the Collective Bargaining Agreement and each of the trust instruments pertaining to each of the Funds shall be construed as a single document, and all the provisions of the Collective Bargaining Agreement relating to the administration and enforcement thereof (including provisions for arbitration) shall apply to the administration and enforcement of this Supplemental Agreement, provided, however, that any controversy, claim, complaint, grievance or dispute arising out of or relating to the provisions of this Supplemental Agreement or the interpretation, breach, application or performance thereof, shall be referred by the UNION, the Trustees or the

EMPLOYER for arbitration and determination to the Impartial Chairperson provided for in the Collective Bargaining Agreement.

(F)    The Trustees, in their names as Trustees, may institute or intervene in any proceedings at law, in equity, or in bankruptcy for the purpose of effectuating the collection of any sums due to them from the EMPLOYER under the provisions of this Supplemental Agreement.

(G)    The Trustees shall have the right to make such periodic audits of the EMPLOYER'S payroll records as they deem necessary. For purposes of this provision, payroll records shall include, but not be limited to, employee time cards, individual employee earnings records, Federal quarterly withholding and FICA tax returns (Form 941), State unemployment tax returns and EMPLOYER cash disbursement records.

(H)    In the event of a dispute between the Trustees and the EMPLOYER, either party may submit same directly to the Impartial Chairperson for determination.

(I)    The provisions of this Supplemental Agreement shall remain in full force and effect for the full term of the Collective Bargaining Agreement, but shall terminate and come to an end with the Collective Bargaining Agreement, or prior thereto by an instrument in writing executed by the Board of Directors of the HOTEL ASSOCIATION OF NEW YORK CITY, INC. and the UNION or, in the case of a non-ASSOCIATION hotel or concessionaire EMPLOYER, by an instrument in writing executed by the non-ASSOCIATION hotel or concessionaire EMPLOYER and the UNION.

(J)    All contributions made prior to the date of this Supplemental Agreement by the EMPLOYER, or due from the EMPLOYER, under prior collective bargaining agreements and in the hands of the Trustees as of the date of this Supplemental Agreement (and not as of the date of this Supplemental Agreement, already applied to the purchase of insurance benefits for employees) and in whatever form or investments such contributions shall be, shall be deemed to be covered and controlled by, and embraced in and applied under, the terms of the within Supplemental Agreement and the trust instruments pertaining to each of the Funds, free from all rights and claims therein and hereto on the part of any EMPLOYER or of the UNION, with the same force and effect as if such contributions, in whatever form the same may be, had been contributed by the EMPLOYER immediately after the execution of the within Supplemental Agreement.

(K)    The primary purpose of this Supplemental Agreement and the trust instruments pertaining to each of the Funds being to provide a comprehensive range of benefits designed to promote the health and well-being of the employees of the EMPLOYER and their families, it is understood that the form of the benefit plans funded by each of their respective Funds and of this Supplemental Agreement and of each of the trust instruments pertaining to the Funds, shall not give rise to a literal or formal interpretation or construction; such interpretation or construction shall be placed on this Supplemental Agreement and the trust instruments as will assist in the functioning of the plans for the benefit of employees and their families regardless of form.

(L)    In no event will the EMPLOYER be entitled to the return of any part of any contribution hereafter made hereunder, or heretofore made under any prior collective bargaining agreement, provided, however, that an EMPLOYER who has made an overpayment of contributions as the result of mistake or arithmetical error and who notifies the Fund Trustees of such overpayment in writing within sixty (60) days of the due date to which such overpayment relates may receive a credit against future contributions due in the amount of the overpayment. The Fund Trustees shall have the sole discretion to determine the existence and amount of any claimed overpayment and whether, under the circumstances, the EMPLOYER is eligible for such credit.

(M)    Regardless of the date on which the within Supplemental Agreement shall be executed, the within Supplemental Agreement shall be effective as of July 1, 2006 with the same force and effect as if it had been actually executed on that date.

(N)    Neither the execution of this Supplemental Agreement, nor any provisions herein contained or contained in any other agreement affecting the same, shall be deemed to release the EMPLOYER from any contribution or contributions provided for in a prior Supplemental Agreement or any collective bargaining agreement and not yet paid to the Trustees under the terms of the Supplemental Agreement.

(O)    In the event that the obligation of the EMPLOYERS to make EMPLOYER contributions shall terminate, or upon the liquidation of the one or more trust estates, the Trustees shall continue to apply the trust estate affected to the purposes set forth in its related trust instrument and described in the foregoing and none other, and upon the disbursement of the entire trust estate affected, such Trust shall terminate.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Agreement to be executed by their duly authorized representatives on the day and year first written above.

_Peter Ward_

Peter Ward

President, New York Hotel and

Motel Trades Council, AFL-CIO

_Joseph E. Spinnato_

Joseph E. Spinnato

President, Hotel Association

of New York City, Inc.

ADDENDUM I

To Hotel Association of New York City, Inc.:

In consideration of your execution of the agreement (hereinafter referred to as the Hotel Association contract) between Hotel Association of New York City, Inc., on behalf of itself and its HANYC Bargaining Group Hotels, and the New York Hotel and Motel

Trades Council, it is understood and agreed that if the New York Hotel and Motel Trades Council shall make an agreement or other arrangement with another hotel association and/or with an individual hotel owner in the City of New York which does not include the union shop and/or check-off or which contains provisions in lieu thereof or contains other provisions and terms which the Hotel Association, on behalf of itself and on behalf of its HANYC Bargaining Group Hotels, may consider more favorable than the terms of the Hotel Association contract, whether or not such terms and provisions would be construed by the Impartial Chairperson as benefits or aids within the meaning of Section 39 of said contract, then, in such event, the Hotel Association, on behalf of itself and on behalf of its HANYC Bargaining Group Hotels, shall have the right to be released from the Hotel Association contract upon signing such other agreement; or if all EMPLOYERS who shall have signed the Hotel Association contract accept the provisions of such other agreement, then the Hotel Association contract shall be deemed amended so as to conform thereto without further action, and any provisions of the Hotel Association contract inconsistent therewith shall be of no further force and effect. This Addendum shall confer no right or benefit on any party other than the Hotel Association, on behalf of itself and on behalf of its Bargaining Group Hotels, and the New York Hotel and Motel Trades Council.

NEW YORK HOTEL AND MOTEL TRADES COUNCIL, AFL-CIO

Faithfully Yours,

By Vito J. Pitta, President

Dated: June 26, 1985

ADDENDUM II

If the United States Congress promulgates legislation, or the Internal Revenue Service issues a ruling, which, for federal income tax purposes, provides that any portion of EMPLOYER paid benefits be included in the gross income of the EMPLOYER'S employees, and/or if the United States Congress, or the Internal Revenue Service, disallows, for federal income tax purposes, the deductibility of EMPLOYER paid wages

and fringe benefits provided by this Agreement, the UNION and the ASSOCIATION agree that they shall expeditiously convene a study committee to discuss and study the impact of such tax law changes and to propose measures to be implemented by the parties so that no EMPLOYER or employee incurs an increased income tax liability solely as a result of the tax law changes.

It is the parties' intention that the foregoing matters be studied, reviewed, discussed and resolved within ninety (90) days after the passage of such legislation. In the event the parties fail to agree within the aforesaid time period, the parties shall, by mutual agreement, have the right to submit this matter to the Impartial Chairperson, who shall be empowered to make a final and binding decision on any and all matters not resolved by the parties not later than forty-five (45) days after submission of this matter.

In the event that either party fails to agree to submit this matter to the Impartial Chairperson, such party may submit the matter to the United States District Court for the Southern District of New York for resolution by the Court.

ADDENDUM III

Notice to all Contributing Employers of The New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund:

The Multi-Employer Pension Plan Amendments Act of 1980 ("the Act") imposes a potential liability upon an employer who "withdraws" as a contributing employer from a pension fund. "Withdrawals" and the acts/conditions/circumstances occasioning same are defined in the Act. In general, a contributing employer "withdraws" when it ceases to be obligated to make periodic contributions to a pension fund due to a cessation or, in some cases, a diminution of operations or after a sale, transfer of its business, or after a union is decertified as bargaining agent. All contributing employers are urged to obtain legal advice as to the foregoing withdrawal liability.

ADDENDUM IV

Company Name

Address

Dear _____:

This letter agreement will confirm the discussions we have had regarding the procedures to be followed by the New York Hotel & Motel Trades Council ("UNION") to organize

certain employees at hotels and concessionaires at which Company acquires an ownership, management or control interest and the UNION does not have representational rights ("Hotel"), and various other matters, including the resolution of disputes related to such organizational drive and/or the terms of this letter agreement ("Agreement") and any subsequent collective bargaining agreement.

1. Use of Impartial Chairperson

The Impartial Chairperson of the Hotel Industry of New York City ("Impartial Chairperson") will conduct a "card count" to determine whether the UNION has obtained valid cards from a majority of full-time and regular part-time employees of the Hotel, employed in job classifications listed in Schedule A to the Industry Wide Agreement between the UNION and the Hotel Association of New York City, Inc. ("IWA"), designating the UNION as their representative for purposes of collective bargaining (the "Cards") and to certify the result of his/her card count, all in accordance with the procedures set forth in Section 3 below. Full-time and regular part-time employees of the Hotel employed in job classifications listed in Schedule A shall be referred to throughout this Agreement as "Employees".

The Impartial Chairperson also will resolve any and all disputes of any kind whatsoever arising out of this Agreement, or concerning the meaning or interpretation of any and all matters discussed herein, including, but not limited to, the terms and provisions of any collective bargaining agreement entered, or to be entered into, by and between the Hotel and the UNION. Any costs incurred by the parties in instituting proceedings before the Impartial Chairperson, or defending against the same, shall be the responsibility of the respective party. Costs charged by the Impartial Chairperson shall be shared and paid equally by the parties. Any arbitration award or decision issued by the Impartial Chairperson, written or otherwise, shall be final and binding upon the parties, and subject to the provisions of Article 75 of the New York Civil Practice Law and Rules ("CPLR") including, but not limited to, the procedures to vacate or modify an award pursuant to Section 7511 of the CPLR, and shall be enforceable in a court of competent jurisdiction.

2. Union Access to the Hotel

The UNION will begin its organization of the Hotel's employees at any time upon notice to the Hotel's General Manager. The UNION will be permitted to have its organizers or

representatives enter the Hotel to meet with Employees during the Employees' non-working times (for example, before work, after work, and during shift changes, meals and breaks) and/or during such other periods as the parties may mutually agree upon in writing. The UNION may engage in organizing efforts in non-public areas of the Hotel such as the Employee mealrooms and locker rooms or such other non-public areas as the parties may mutually agree upon.

Within three (3) days following receipt of the above described written notice of intent to organize Employees, the EMPLOYER will furnish the UNION with a complete list of such Employees, including both full and part-time Employees, showing their job classifications and departments, work schedules, wages, and benefits, and the home addresses and telephone numbers of all Employees. Thereafter, the EMPLOYER will promptly provide updated lists for the duration of the organizing drive. There shall be no lockouts of the Employees by the Hotel and the UNION shall not cause any disruption of work by the Employees during the organizing activity, nor shall there be any picketing, strikes, slow downs or other work stoppages at the Hotel by or caused by the UNION for any purpose, including organizing, contract negotiations, dispute publication or enforcement of the terms of this Agreement. The "no lockout, no strike" provisions hereof shall not apply in the event either party fails to abide by an award or decision of the Impartial Chairperson within three (3) business days after issuance. Both the Hotel and the UNION agree to respect the National Labor Relations Act ("NLRA") Section 7 rights of employees during the UNION'S organizing drive, and neither party shall, or be required to, act in contravention of those rights. The Hotel specifically agrees that its supervisory employees, its agents and/or its representatives will not act or make any statements that will directly or indirectly imply the Hotel's opinion as to whether or not the employees should support the UNION or as to the reputation of the UNION or any of its officers and affiliate local unions or as to the reputation of any of the officers of the UNION'S affiliate local unions and/or their parent unions.

3. Determination of Majority Status

At any time after the commencement date of the UNION'S organizing effort, the UNION may request that a card count be conducted by the Impartial Chairperson. The UNION shall initiate that process by advising the Hotel's General Manager in writing

("Notification Letter") that it represents a majority of the full-time and regular part-time employees employed by the Hotel in the job classifications set forth in the IWA Schedule A. The date of the UNION'S Notification Letter shall be the date ("Notification Date") used for purposes of determining the composition of the list of the names of the Employees to be furnished by the Hotel to the Impartial Chairperson, so that all full-time and regular part-time Employees of the Hotel employed on or before the Notification Date will be the only Employees whose names will appear on the list.

Within forty-eight (48) hours of the delivery of the Notification Letter by the UNION to the Hotel indicating its majority status, the UNION shall notify the Impartial Chairperson in writing that his/her services are requested for purposes of conducting a card count. The UNION shall immediately confirm to the Hotel's General Manager that the Impartial Chairperson has retained jurisdiction of the card count proceeding. As soon as practicable thereafter, but in any event no later than seven (7) days after the date of the UNION'S written card count request made to the Impartial Chairperson, the UNION shall furnish to the Impartial Chairperson the Cards it has obtained from the Employees, and the Hotel shall furnish the Impartial Chairperson the list containing the names, job classifications and social security numbers of Employees employed as of the date of the UNION'S Notification Letter (with a copy to the UNION) together with copies of official employment documents containing the signatures of each of the Employees (e.g. Forms I-9, Form W4 or similar documents), in care of the Office of the Impartial Chairperson, 321 West 44th Street, New York, New York 10036.

Within forty-eight (48) hours after his/her receipt of the documents described above, the Impartial Chairperson shall conduct a card count by checking the Cards against the list of Employees and by comparing the Employees' names and signatures appearing on the Cards to the names and signatures appearing on the employment documents supplied to the Impartial Chairperson by the Hotel. At the conclusion of the card count, the Impartial Chairperson shall inform the parties of the results of his/her count and shall certify in writing that either the UNION has or has not been selected by a majority of eligible Employees of the Hotel as their collective bargaining representative. Both the Hotel and the UNION agree to abide by the determinations made by the Impartial Chairperson

regarding any challenges either to the validity of the Cards, the eligibility of Employees, the appropriateness of the unit and/or to the majority status of the UNION. If, after the conduct of the card count, the UNION fails to be certified by the Impartial Chairperson as the majority representative of the eligible Employees, this Agreement shall be deemed to continue in full force and effect, unless it is otherwise terminated in writing by mutual agreement of the parties. Notwithstanding any of the foregoing seemingly to the contrary, the Hotel and UNION also agree that the Impartial Chairperson shall be empowered to issue such remedial orders as are consistent with applicable NLRB standards and necessary during and after the pendency of the UNION'S organization drive to ensure the maintenance of the neutral environment and/or to penalize the Hotel or the UNION for violating their obligations hereunder, including an order to bargain in accordance with applicable NLRB standards, and/or monetary or punitive damages to either party.

If the UNION is certified as the majority representative of the Employees, the Hotel must recognize the UNION and the Hotel and the UNION will commence negotiations within seven (7) calendar days of the date of the certification, at a mutually agreeable time and place, for a collective bargaining agreement covering wages, hours and other terms and conditions of employment (the "Agreement").

I believe that the above correctly describes our discussions on these matters. Please signify your concurrence by signing where indicated below and returning one copy to me, the other being for your files.

Very truly yours,

Peter Ward
President

Executed, Agreed and Accepted
on behalf of Hotel/Company

By:_____

Name:_____

Title:_____

Date:_____

ADDENDUM V

Extra Rooms/Wage Equalization Lawsuit

a. Effective August 1, 1990:

(i) Room Attendants shall no longer be assigned to make up extra rooms without being compensated for them at the extra room rates specified in the Agreement.

(ii) The base weekly rates of pay for both bath and night shift room attendants will be equalized to the base weekly rates of pay of day shift room attendants.

b. In consideration of the foregoing, the parties shall immediately enter into a stipulation of settlement, and the Trades Council shall do everything necessary in accordance therewith, withdrawing and terminating the various actions in the United States District Court for the Southern District of New York entitled and referenced as: New York Hotel and Motel Trades Council, AFL-CIO, et al. v. Hotel Association of New York City, Inc. et al., 85 Civ. 0216, 0222, 0223, 0225, 0226, 0227, 0228, 0229, 0239, 0231, 1020 and 9925 and all proceedings relating thereto, including any and all charges or complaints filed with the Equal Employment Opportunity Commission, New York State Division of Human Rights and New York City Commission on Human Rights against any EMPLOYER who is a member of the ASSOCIATION and who is also bound by the terms of the 1990 Memorandum of Understanding and the Agreement as therein modified and extended.

It is agreed that each of the parties thereto hereby release the other from any and all liability arising out of or connected in any way to or with any of the issues associated with the aforesaid actions, proceedings or claims of the Trades Council made, instituted or filed in behalf of itself or its members.



**New York Hotel and Motel Trades Council, AFL-CIO**

707 Eighth Ave., New York, NY 10036  Telephone: (212) 245-8100  Fax: (212) 977-5714

July 1, 2006

Joseph E. Spinnato, President
Hotel Association of New York City, Inc.
437 Madison Avenue
New York, New York

Dear Mr. Spinnato:

This letter shall confirm that the Union, in furtherance of its efforts to maintain stable and harmonious labor relationships with the Hotel Association of New York City, Inc. ("Association") and its member hotels, has historically granted to newly organized hotels owned/operated by members of the Association relief from certain economic and non-economic provisions of the I.W.A. based upon the bona fide business needs of said hotels including, but not limited to, the operational distinctions as between hotels.

In furtherance thereof, the Union agrees upon the request of the Association to meet and negotiate in good faith with respect to any such relief or operational issues which the Association and the Union deem applicable to said newly organized hotels, including any newly organized hotels that are owned and/or operated by Employer signatories to the Industry Wide Agreement and which have been accreted to the collective bargaining unit.

Very truly yours,

Peter Ward



# HOTEL ASSOCIATION OF NEW YORK CITY, INC.

320 PARK AVENUE, NEW YORK, NY 10022-6838
(212) 754-6700   FAX (212) 754-0243

July 1, 2006

Mr. Peter Ward
President
New York Hotel & Motel Trades Council, AFL-CIO
707 Eighth Avenue
New York, New York  10036

Re:  Health Benefits Fund
        First Time Employer Contribution Rate

Dear Mr. Ward:

This is to confirm that in accordance with past practice and the interests of the Fund, its participants and beneficiaries, the 2.75% surcharge for the first six months of contributions for an Employer not previously a party to the collective bargaining agreement shall not be charged except upon written notice from the Hotel Association to the Employer and Union within said six month period.

Kindly sign below to signify your agreement.

Sincerely,

*Joseph E. Spinnato*

Joseph E. Spinnato
President

Agreed:

*Peter Ward*
_____
Peter Ward



# HOTEL ASSOCIATION OF NEW YORK CITY, INC.

### 320 PARK AVENUE, NEW YORK, NY 10022-6838
#### (212) 754-6700    FAX (212) 754-0243

July 1, 2006

Mr. Peter Ward
President
New York Hotel & Motel Trades Council, AFL-CIO
707 Eighth Avenue
New York, New York 10036

Dear Mr. Ward:

Article 39 of the Industry Wide Agreement provides, *inter alia*, that non-Hotel Association of New York City, Inc. Bargaining Group Hotels must agree to the "plan of adjustment and arbitration herein provided for." For purposes of this letter, the phrase "plan of adjustment and arbitration" means the use of the Office of the Impartial Chairperson in whole or in part. The Hotel Association of New York City, Inc., on its own behalf and on behalf of its Bargaining Group Hotels, will not assert a violation thereto, which do not provide for the "plan of adjustment and arbitration" referred to therein.

Sincerely,

Joseph E. Spinnato
President

JES/brc

# EXHIBIT C

**New York Hotel and Motel Trades Council, AFL-CIO** 707 Eighth Ave., New York, NY 10036 (212) 245-8100 Fax (212) 262-1419

8/28/2003

HTC #U03-252

Hotel Association of New York
437 Madison Avenue
New York, New York 10022

Dear Sir:

We herewith file a complaint against the management of the Hotel:

> Ines Cartagena
> Director of Human Resources
> New York Hilton
> 1335 Avenue of the Americas
> New York, NY 10019

for violation of Section

RE: HTC #U03-252/Pat Morgan, BQT Server/Management's unjust and improper raise of the service charge on Banquet functions from 19% to 21% in the last 2 years, rather than raising the prices charged on food and beverage, in an attempts to avoid increasing the Banquet Servers' wages.

We will appreciate a conference with management on this matter at your earliest convenience.

New York Hotel and Motel Trades Council, AFL-CIO

*Peter Ward*

Peter Ward
President
PW/or/opeiu:153

Local 6
Oscar Jirau & Wendy Chu

# EXHIBIT D



**New York Hotel and Motel Trades Council, AFL-CIO** 707 Eighth Ave., New York, NY 10036 (212) 245-8100 Fax (212) 262-1419

3/13/2006

HTC #U05-649

Office of the Impartial Chairman
321 West 44th Street
Suite 400
New York, New York 10036

Dear Sir:

We herewith file a demand for arbitration against the management of the Hotel:
    Maria Murillo
    Director of Human Resources
    St. Regis
    2 East 55th Street
    New York, NY 10022

for violation of Section: 47

RE: HTC #U05-649/Joseph Bejjani, Server/Management's improper and illegal reduction in gratuity to Banquet Servers; management has simultaneously increased the percentage of banquet revenue charged to Room Rental and decreased the percentage of banquet revenue charge to Food & Beverage. (Joseph Bejjani, Edilberto Morcos).

We will appreciate a conference with management on this matter at your earliest convenience.

New York Hotel and Motel Trades Council, AFL-CIO

Peter Ward
President
PW/or/opeiu:153

Local 6
Brian Lysell

c: Maria Murillo, St. Regis
Statutory notice attached.



New York Hotel and Motel Trades Council, AFL-CIO 707 Eighth Ave., New York, NY 10036 (212) 245-8100 Fax (212) 262-1419

3/13/2006

Mr. Joseph Bejjani
433 West 24th Street
New York, NY 10011

RE: St. Regis/HTC #U05-649/Management's improper and illegal reduction in gratuity to Banquet Servers; management has simultaneously increased the percentage of banquet revenue charged to Room Rental and decreased the percentage of banquet revenue charge to Food & Beverage. (Joseph Bejjani, Edilberto Morcos).

Dear Mr. Joseph Bejjani:

Your case was considered by the New York Hotel and Motel Trades Council, AFL-CIO, Grievance Board on 3/13/2006. On the basis of the facts presented at that time the Board has determined that your case will be filed for arbitration. You will be notified as to date, time and place of that hearing once it is scheduled.

PLEASE NOTE: 1. If your address or telephone number changes while your case is being processed, you must promptly notify your business agent or me in writing. Failure to do so may lead to dismissal of your case or a lengthy delay in scheduling your hearing. 2. If you do not appear for each scheduled hearing, your case will not be processed further. Postponements may be requested only for emergency reasons.

Sincerely,

Olga Reccy
Grievance Board Secretary

cc:    Brian Lysell, Business Agent

# EXHIBIT E

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212   FAX: (212) 541-9356

**EMPLOYER:** HILTON NEW YORK

HTC Case #U03-252/Pat Morgan, BQT Server/Management's
unjust and improper raise on the service charge on Banquet
functions from 19% to 21% in the last two (2) years, rather than
raising the prices charged on food and beverage, in an attempt to
avoid increasing the Banquet Servers' wages (Pat Morgan,
Banquet Server, Delegate).

Hearings held at the Office of the Impartial Chairperson on March 4
and June 16, 2004; February 16, 2005; May 1 and September 29,
2006; and, May 16, 2007.

## APPEARANCES:

| | |
|---|---|
| For the Employer: | Chuck Wing, Director of Human Resources |
| | James Pellegrinon |
| | Labor Relations Director |
| | Ines Cartagena, Previous |
| | Director of Human Resources |
| Counsel for the Employer: By: | Kane Kessler PC |
| | David Rothfeld, Esq. |
| | Robert Sacks, Esq. |
| | Theo Gould, Esq. |
| For the New York Hotel & Motel Trades Council, AFL-CIO: | |
| Counsel: | Pitta & Dreier LLP |
| By: | Joseph Farelli, Esq. |
| For the Union: | Peter Ward |
| | Michael Simo |
| | Chris Cusack |
| | Eddie Cedeno, Current Business Agent |
| | Oscar Jirau, Previous Business Agent |

*   *   *

#2007-40
Hilton New York
August 23, 2007
Page 2 of 9

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

This case has a storied life. Whether as a grievance or not, the record discloses that the parties first met on the issue in 2002 and the subject grievance was filed on November 11, 2003. The grievance read: "Pat Morgan, BQT Server/Management's unjust and improper raise of the service charge on Banquet functions from 19% to 21% in the last two (2) years, rather than raising the prices charged on food and beverage, in an attempt to avoid increasing the Banquet Servers' wages (Pat Morgan, Banquet Server, Delegate).

The first scheduled arbitration date at the Office of the Impartial Chairman was February 4, 2004 and after multiple postponements and hearings, a final hearing was held on May 16, 2007. A briefing schedule was established with a terminal date for the Union's rebuttal brief on July 3, 2007. All briefs were submitted timely.

This dispute is centered on the meaning and application of Article 47(D)(1) of the IWA, which reads:

> Effective July 1, 1995, except as otherwise provided herein, the UNION and the EMPLOYER agree that with respect to banquet functions, a minimum gratuity equal to fifteen percent (15%) shall be paid to tip category employees (banquet waiters/waitresses and captains) working said functions, pursuant to established practice in each hotel as of July 1, 1995.

> If, however, any EMPLOYER signatory hereto is currently paying its employees banquet gratuity amounts which would require that EMPLOYER to increase its current gratuity rate by more than one percent (1%) during the first year of this Agreement, the EMPLOYER shall increase the gratuity required hereunder in two (2) equal increases in each of the first two years of this Agreement.

The Union's position in this dispute was set forth in its brief, which opened:

> The facts of this case, which are uncontested, are simple. In 1995, the parties agreed that the Hotel would pay tipped banquet employees ("Banquet Servers") a minimum gratuity equal to 15% of the total banquet bill, in accordance with the practice as it existed at the time. In an effort to avoid paying this gratuity, the Hotel subsequently altered the established practice and began regularly charging banquet customers a "room rental" fee in addition to the customary food and beverage ("F&B") charge. No additional services were provided for this fee -- customers had always been provided a room in which to have the function at no charge. More importantly, no gratuities were paid on this "room rental" fee.

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (212) 541-9356**

Over the years, the percentage of the total banquet bill allocated to room rental fees increased. Over the same period, the percentage of the total banquet bill allocated to F&B charges shrank by an equal amount. In other words, the Hotel has, since 1995, been steadily shifting banquet charges from F&B charges (on which the Hotel was required to pay gratuities) to room rental fees (on which the Hotel paid no gratuities). For each dollar the Hotel so moved, it kept fifteen cents that would have been otherwise paid to the Banquet Servers. This simple ploy robbed millions from the pockets of Banquet Servers.

This change in practice is a clear attempt to subvert the clear understanding the parties reached in 1995 and circumvent the unambiguous language of the Industry Wide Agreement ("IWA"). First, the plain language of the IWA requires that banquet gratuities be paid on the entire banquet bill and does not provide for or allow any "carve outs." Second, even if the IWA allows hotels to exclude room rental fees from the calculation of banquet gratuities as an established practice, the Hotel has failed to establish that such a practice existed in 1995.

The unusual demands of the hotel banquet business impose special hardships and conditions on Banquet Servers. Banquet Servers work on-call, without any of the scheduling rights or notices of layoff or recall which other hotel employees enjoy. Banquet Servers are obliged to work brutally long hours, day after day, during the busy season. During the slow season, however, Banquet Servers are given little or no work, but are expected to put their obligation to the hotel ahead of other employers and make themselves available, as always, to come in to work with no notice, at the hotel's convenience. For these reasons, a separate and complex system of compensation, scheduling, and benefit eligibility and funding has been constructed within the IWA for Banquet Servers (See Schedule A-1). The IWA provides that Banquet Servers have a special stake in the hotel's business. To a much greater degree than other employees, Banquet Servers share with the hotel the risks and rewards associated with the fluctuations in the hotel's business. Under the IWA, banquet gratuities represent the vast majority of the total compensation Banquet Servers receive from the hotel. Banquet gratuities also account for the same percentage of the hotel's total contribution to the benefit funds paid on behalf of its Banquet Servers.

The shifting by the Hotel of banquet charges from F&B to room rental fees has no other business purpose than to reduce the compensation the Hotel pays to its Banquet Servers and the contributions it pays to the benefit funds on their behalf. This is, of course, not a legitimate business purpose. To allow this manipulation of banquet charges to continue would be to give management unbridled discretion to adjust, at its whim, on a sliding scale from zero to one hundred percent, the portion of the banquet bill on which the 15% banquet gratuity would

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

apply, and thereby to take for itself a 15% windfall from the remainder of the bill. In other words, to allow this gimmick would be to change the banquet gratuity from a contractually mandatory commission into a discretionary tip from management.

The Union seeks a make whole remedy from the Impartial Chairperson for the adversely affected Banquet Servers. The Union also seeks an order from the Impartial Chairperson directing the Hotel to cease and desist improperly withholding gratuities.

The Union relies upon two kinds of evidence in support of its thesis on past practice. The first is the testimony of Patrick Morgan, a Banquet Server with 22 years of experience at the Hotel, who testified that prior to July 1, 1995, the Hotel's practice was not to charge a room rental fee and a banquet check was usually comprised of food and beverage charges. There were a very few exceptions to the room rental fee charges. Since 1995, the incidence of room rental charges began to increase, at first gradually and then at an increasing rate. Morgan noted this because the room rental charges, while increasing the guest bill, were not subject to the contractual 15% gratuity tip. The amount of the room rental fee reached astronomical heights as proof of which he introduced copies of twenty-six (26) Banquet Event Orders ("BEO") for 2006, in which the room rental fee was equal to or exceeded the food and beverage charges. (Union Exhibit #4) Supporting this testimony, the Union introduced other exhibits purporting to show that the Hotel had shifted a portion of guest banquet checks from F & B charges into room rental fees so that from the period 2000 to 2006, "the percentage of the Hotel's total banquet revenue derived from room rental fees increased by 5% from 1% to 6%". (Union Exhibits #6 & #7)

The second kind of evidence is negative in nature and is based upon its claim that the "Hotel destroyed all the relevant documentary evidence...the Hotel destroyed every last BEO, every last banquet contract and every last guest bill pre-dating July 1, 1995...The Hotel's destruction of relevant information is conclusive proof that no practice [i.e. Hotel supported practices] existed. Further it is well established that failure to preserve and produce relevant evidence leads to an adverse inference...Accordingly, even if the Union had not proved its case independently, the Hotel's failure to comply with its own document retention policy bolsters, if not proves, the Union's claim."

Further, the Union considers this behavior on room rentals to be a clear contractual violation of the IWA. "...the express language of the IWA requires that gratuities be paid on the ENTIRE bill. More specifically, Article 47(D)(1) provides 'with respect to banquet functions, a minimum gratuity equal to fifteen percent (15%) shall be paid to tip category employees...' Nowhere does it limit this payment to F & B charges. Nowhere does it exclude room rental fees. Indeed, the phrases "F & B" and "room rental" are not to be found anywhere in

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
**321 WEST 44TH STREET, SUITE 400**
**NEW YORK, NY 10036**
**TEL: (212) 541-7212  FAX: (212) 541-9356**

the Article. Instead, Article 47(D)(1) demands that employees be paid 15% of the cost of the "banquet functions."

In support of this argument, the Union relies on the Award in Hillcrest Country Club and HERE, Local 24, 76 LA 437 (Rollins, 1981) where Arbitrator Rollins ruled that, "Had [the parties] desired to exclude some amount for rent, provision therefore could have been made [in the agreement], but obviously this was not done." The Union contends that in the absence of an exemption in Article 47(D)(1) for room rental, gratuities must be paid on the entire guest bill.

The Union's brief concludes on this point:

> Moreover, both logic and industry practice dictate that the Hotel's restrictive definition of F&B charges as excluding room rental was not what the parties' intended when Article 47(D)(1) was negotiated. Historically, the practice throughout the industry has been that hotels charge the entire price for a banquet in the form of a "F&B" charge. This term is shorthand for the price of the whole banquet. It included a myriad of items and services including: food; beverages; the labor costs from wages not only to Banquet Servers, but also to cooks, managers, salespeople, dishwashers, etc.; air conditioning; cleaning; linen; tables; chairs; utensils; dishes; glasses; and also (in all cases) a floor, doors, a ceiling, and walls (commonly known collectively as a "room").

Finally, the Union contends that irrespective of whether the Hotel is correct that gratuities need not be paid on the total banquet check, the Hotel, by creating and incrementally increasing room rental fees since 1995, which have reduced gratuities, has altered the established practice of July 1, 1995. This alteration of the established practice is an open and glaring violation of Article 47(D)(1). In this respect, the Union must insist that, "the undisputed evidence in this case demonstrated conclusively that no established practice of charging room rental fees existed prior to July 1, 1995." It is argued that the reclassification of room rental to 6% of banquet charges in 2006 "translates into a real gratuity of 14.1% in that year – nowhere near the 15% 'minimum' guaranteed by the IWA. And, if the Hotel continues its trend of reclassifying F & B charges as room rental fees at its current rate of approximately 1% per year, on the day the IWA expires, gratuities will be 13.2%."

The Union's conclusion: "If this Office validates the Hotel's subterfuge and gives hotels carte blanche to unilaterally shift charges to room rental fees, this Hotel, and the entire industry, will stop surreptitiously and incrementally shifting charges and openly exercise their new right by re-

#2007-40
Hilton New York
August 23, 2007
Page 6 of 9

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212   FAX: (212) 541-9356

classifying all banquet charges as room rental fees. Without hyperbole, an adverse decision in this case will mark the end of banquet gratuities in the hotel industry in New York City; eliminate Banquet Servers' primary source of income (along as Funds contributions); and invalidate Article 47(D)(1)."

The Hotel contests each element of the Union's argument and its post-Hearing brief summarizes its position by making the following major points:

The IWA does not expressly require that gratuities be paid on the entire banquet bill. In fact, the IWA makes no attempt to define what items comprise the Gratuity Base.

The phrase "pursuant to established practice in each hotel" does not refer to the composition of the Gratuity Base.

Even if "established practice" in Article 47(D)(1) does refer to the composition of the Gratuity Base, the record evidence demonstrates that the Hotel charged room rental fees prior to 1995 without adding them to the Gratuity Base.

Even if the Hotel had never charged separate room rental fees prior to 1995, the absence of a practice is not evidence proving an established practice.

It is well established by this Office that the Hotel has wide latitude to determine the types and amounts of fees it charges its customers, absent evidence that such fees are a sham, and the Union presented no evidence of sham charges.

The Union has failed to introduce any evidence establishing that the separate charges for room rentals have caused a diminution of gratuities.

With reference to the language of Article 47(D)(1), it denies the Union's supposition that the term, "a minimum gratuity of 15%" refers to the banquet bill: "The "express" language of Article 47(D)(1) does not say explicitly what the minimum percentage is applied to, nor does it identify the established practice on July 1, 1995." Moreover, room rental charges are nowhere mentioned in the IWA or elsewhere to be included in the Gratuity Base.

The Hotel further argues that "established practice", as a matter of basic contractual construction, only modifies the distribution of gratuities among tip category employees and has no reference to or provide any limitation on the composition of the Gratuity Base. The Union's reliance on the Hillcrest Country Club case is dismissed as "drawn from outside the IWA

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

hotel industry and turns on facts and contract language that do not provide any useful parallels to the instant case." Moreover, it is pointed out that the contract in Hillcrest specified, "A gratuity of 15% shall be added to all banquet checks." The words "banquet checks" are absent in the IWA and the arbitrator in Hillcrest did not have to decide that the cost of the room is included in the total price.

The Hotel maintains that it charged room rental fees separate from food and beverages prior to 1995, relying upon the testimony of Banquet Captain Pat Morgan. Its brief characterizes his testimony as proving that while "this may not have been done in each and every function, reflecting the negotiations between the Hotel and the guest, does not prove that there was no prior practice of excluding the room rental fee from the Gratuity Base. A hotel may engage in a practice as often or as infrequently as it determines, based on its business judgment."

In attacking the Union's use of the "total banquet price" argument, that is F & B charges, is shorthand for the price of the whole banquet, the Hotel points to Sundries, which are part of the price of the banquet but are not subject to gratuities. If Sundries are excluded, "then there is no rationale for not excluding room rentals as well. The historical exclusion of room rental revenue from the Gratuity Base makes perfect sense. The employees who share in the gratuities are not performing any 'services' in relation to the room (nor, for that matter, are they performing services in relation to the Sundries which are also excluded without Union challenge) nor to room rentals without food and beverages...The only nexus with the employees is that the banquet room is the worksite where they render services by serving the food and beverage items whose prices are the basis for their contractual gratuity. But Sundries are also provided in that worksite, and it is undisputed that Sundries are excluded from the Gratuity Base."

If forced to concede for the sake of argument that "established practice" refers to the Gratuity Base and that the Hotel never charged separate room rental fees prior to 1995, the Hotel maintains that the burden of proof is upon the Union to show a "specific practice existed at the Hotel and that the Hotel has deviated from that specific, established practice. The burden of proof never shifts to the Hotel, even if it declined to offer any proof on the issue of past practice... The Union's argument in this case is nothing more than a claim that prior to 1995, the Hotel did not exclude from the Gratuity Base room rental charges that, according to the Union, did not even exist prior to 1995....This 'negative practice' turns the definition of 'established practice' on its head and leads to the ridiculous result that every new charge of any kind established by the Hotel after July 1, 1995 would be subject to gratuities simply because it was not charged before 1995. It is totally unreasonable to conclude based on the scant language of Article

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212. FAX: (212) 541-9356

#2007-40
Hilton New York
August 23, 2007
Page 8 of 9

47(D)(1) and the evidence in the record that the 'established practice' included the entire universe of all charges which (allegedly) did not even exist."

The Hotel's post-Hearing brief concludes on two points: first, there is a lack of showing of diversion or shifting of revenue from the Gratuity Base to room rental charge and secondly, that the Union "has failed in the two contract negotiations since 1995 to obtain the concessions that it seeks in this arbitration."

As a preliminary matter I must dispose of the parties' arguments which are couched as being exceptional or even conclusive significance. I agree with the Hotel that Hillcrest Country Club does not dispose of the issue primarily because the wording of the contract in that case differs from that of the IWA. On the other hand, I disagree with the Hotel that the phrase in Article 47(D)(1) "pursuant to established practice in each hotel" modifies only the distribution of gratuities. If the parties intended such a construction, they could have said so. As I read the paragraph, as a grammatical matter the wording "established practice" is applicable to its subject that is banquet functions.

Similarly, I find not controlling, as urged by the Union, the Palace Agreement Settlement Agreement. While certainly showing a meaning in favor of the Union position, the Hotel persuasively objects that a Settlement Agreement does not rise to the precedential value of an IC Decision and Award.

After deliberation, I find that the evidence establishes that the Hotel has diverted food & beverage revenue which should have been part of the Gratuity Base, proving that the Union's fears that, if the Union's position is not adopted, the Hotel will be able to render the protections of Article 47(D)(1) meaningless and, therefore, I find that the Union's position is more plausible.

The clear intent of the Article 47(D)(1) is to protect and guarantee a set percentage to be distributed among tip category employees in the Banquet Department. I find merit in the Union's claim that any other reading, carried to its logical conclusion, would allow the Hotel to carve out ever larger portions of the bill as room rental or to create altogether new charges that it could claim as excluded from the Gratuity Base, which would be tantamount to undermining the very protections that the Article affords. Taking this protection and guarantee as the purpose of the paragraph, I find that Article 47(D)(1) requires the Hotel to include room rental in gratuity computations. Therefore, the Hotel's creation and steady increase in room rental fees shows that the Union's concern is valid and I find that the language of Article 47(D)(1) does not permit it.

#2007-40
Hilton New York
August 23, 2007
Page 9 of 9

Of course the Hotel should not take this holding to mean that it may create or maintain a charge called something other than room rental, but having the same effect of diverting revenue. My holding applies to any other fees or charges to banquet guests, regardless of what they may be called or when they were created. However, charges for sundries, which are customarily passed on directly to the client without mark-up, may continue to be excluded from the portion of the banquet bill used to determine the gratuity.

Similarly, gratuities need not be paid on room rental charges for functions in a banquet room that are not banquets, i.e. those in which no food or beverages are served, unless existing practices are otherwise.

I sustain the Union's grievance and direct the Hotel to henceforth pay gratuities in accordance with this Award and make whole all tipped banquet employees for any income lost as a result of the Hotel's violation. I hereby direct the parties to meet and determine this amount and, absent an agreement, I will retain jurisdiction over the matter.

It is so ordered.

Dated:        August 23, 2007
              New York, New York

PHILIP ROSS, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

IMPARTIAL CHAIRPERSON

# EXHIBIT F

KANE KESSLER          Fax:212-262-1766          Sep 25 2007 02:35am P002/002

# KANE KESSLER, P.C.

1350 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-4896
(212) 541-6222
FAX: (212) 245-3009
WWW.KANEKESSLER.COM

NEW JERSEY OFFICE
CONTINENTAL PLAZA
433 HACKENSACK AVENUE
HACKENSACK, N. J. 07601-6319
(201) 487-2828
FAX: (201) 487-3776

WRITER'S DIRECT NUMBER

(212) 519-5154
drothfeld@kanekessler.com

MARK A. KANE (1928-1977)
EY S. KESSLER (1938-1986)

DARREN B. BERGER†
ADAM M. COHEN
STEVEN E. COHEN
JEFFREY H. DAICHMAN
ERIC P. GONCHAR
ARIS HAIGIAN
MITCHELL D. HOLLANDER†
S. REID KAHN**
ROBERT L. LAWRENCE
RONALD L. NURNBERG*
ARTHUR M. ROSENBERG†
DAVID R. ROTHFELD
JUDITH A. STOLL
DANA M. SUSMAN†
JEFFREY S. TULLMAN

JOSEPH NURNBERG (RETIRED)

STEPHEN STEINBRECHER
SENIOR COUNSEL

PETER R. HERMAN
ROBERT KOLODNEY
ROBERT L. SACKS
BRUCE M. SCHLOSS
COUNSEL

MICHAEL A. ZIMMERMAN
OF COUNSEL

JARRETT K. BRATERMAN
GARY E. CONSTABLE†
PIERRE E. DEBBAS
NIKI J. FRANZITTA
MICHAEL R. FUTTERMAN†
ARI M. GAMSS
BRENDAN P. McFEELY
GARY E. OSTROFF
GILLIAN OVERLAND†
MICHAEL J. ROMER
ADAM E. SCHWARTZ†
LOIS M. TRAUB
CHRISTIAN R. WHITE
JONATHAN A. ZALKIN

ALSO ADMITTED
FLA. BAR*
N.J. BAR†
N.J. AND D.C. BAR**

September 25, 2007

**Via Facsimile & E-Mail**

Impartial Chairperson Philip Ross
Office of the Impartial Chairman
321 West 44th Street, Suite 400
New York, New York 10036

Re: Decision No. 2007-40 – New York Hilton

Dear Impartial Chairperson Ross:

We write on behalf of the Hotel Association of New York City, Inc.

We believe that the Hotel Trades Council has notified all Hotels, regardless of size or type, that they are bound to your Decision 2007-40 (New York Hilton). This position which the Union has taken has raised numerous questions, by the Association and its labor relations member hotels, concerning the extent and application of your Decision. Therefore, it is respectfully requested that a clarification hearing be scheduled.

Very truly yours,

David R. Rothfeld

DRR/dg
cc:    Joseph E. Spinnato, Esq.
John Fitzpatrick, Chairman
Peter Ward, Pres.
Joseph Farelli, Esq.
Richard Maroko, Esq.
Lori Pobiner, Office Manager

10/30 @ 9:30
or
10/31 @ 10:30 pm

M07-431

#275505.1

**OFFICE OF THE IMPARTIAL CHAIRPERSON**

321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036

TEL: (212) 541-7212   FAX: (212) 541-9356

HOTEL ASSOCIATION OF NEW YORK CITY, INC.                NEW YORK HOTEL & MOTEL TRADES COUNCIL

10/2/2007

Richard Amato                                            Mr. Peter Ward
Vice President                                           New York Hotel & Motel Trades Council
Hotel Association of New York City, Inc.                 707 Eighth Avenue
320 Park Avenue                                          New York, NY 10036
New York, NY 10022

<u>Sent Via Facsimile to All Parties</u>

A hearing will be held in this office (321 West 44th Street, Suite 400, New York City) on **Tuesday, October 30, 2007 at 9:30 AM** in the matter of the request of Management concerning:

**#M07-431/The Hotel Association of New York City, Inc. requests a hearing for clarification of IC Decision #2007-40 published on August 23, 2007.**

In order that your interests may be protected, it is essential that you be present or represented at that time.

cc:     David Rothfeld, Esq.
        Stephen Steinbrecher, Esq.
        Niki Franzitta, Esq.
        Christian White, Esq.
        Richard Amato
        Vincent Pitta, Esq.
        Joseph Farelli, Esq.
        Jane Lauer Barker, Esq.
        Michael D'Angelo, Esq.
        Brian Lysell
        Madelyn Rivera
        Susan Gempler
        Peter Ward, Rich Maroko, Esq.

## OFFICE OF THE IMPARTIAL CHAIRPERSON

321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036

TEL: (212) 541-7212   FAX: (212) 541-9356

HOTEL ASSOCIATION OF NEW YORK CITY, INC.

NEW YORK HOTEL & MOTEL TRADES COUNCIL

10/29/2007

Richard Amato
Vice President
Hotel Association of New York City, Inc.
320 Park Avenue
New York, NY 10022

Mr. Peter Ward
New York Hotel & Motel Trades Council
707 Eighth Avenue
New York, NY 10036

### Sent Via Facsimile to All Parties
### Amended Notice*

A hearing will be held in this office (321 West 44th Street, Suite 400, New York City) on **Tuesday, October 30, 2007 at 10:30 AM** in the matter of the request of Management concerning:

**#M07-431/The Hotel Association of New York City, Inc. requests a hearing for clarification of IC Decision #2007-40 published on August 23, 2007.**

In order that your interests may be protected, it is essential that you be present or represented at that time.

cc:   David Rothfeld, Esq.
Stephen Steinbrecher, Esq.
Niki Franzitta, Esq.
Christian White, Esq.
Richard Amato
Vincent Pitta, Esq.
Joseph Farelli, Esq.
Jane Lauer Barker, Esq.
Michael D'Angelo, Esq.
Brian Lysell
Madelyn Rivera
Susan Gempler
Peter Ward, Rich Maroko, Esq.

# OFFICE OF THE IMPARTIAL CHAIRPERSON

### 321 WEST 44TH STREET, SUITE 400
### NEW YORK, NY 10036

### TEL: (212) 541-7212  FAX: (212) 541-9356

HOTEL ASSOCIATION OF NEW YORK CITY, INC.                    NEW YORK HOTEL & MOTEL TRADES COUNCIL

11/13/2007

Richard Amato
Vice President
Hotel Association of New York City, Inc.
320 Park Avenue
New York, NY 10022

Mr. Peter Ward
New York Hotel & Motel Trades Council
707 Eighth Avenue
New York, NY 10036

## <u>Sent Via Facsimile to All Parties</u>

A hearing will be held in this office (321 West 44th Street, Suite 400, New York City) on **Tuesday, November 27, 2007 at 9:30 AM** in the matter of the request of Management concerning:

**#M07-431/The Hotel Association of New York City, Inc. requests a hearing for clarification of IC Decision #2007-40 published on August 23, 2007.**

In order that your interests may be protected, it is essential that you be present or represented at that time.

cc:    David Rothfeld, Esq.
       Stephen Steinbrecher, Esq.
       Niki Franzitta, Esq.
       Christian White, Esq.
       Richard Amato
       Vincent Pitta, Esq.
       Joseph Farelli, Esq.
       Jane Lauer Barker, Esq.
       Michael D'Angelo, Esq.
       Brian Lysell
       Madelyn Rivera
       Susan Gempler
       Peter Ward, Rich Maroko, Esq.

## OFFICE OF THE IMPARTIAL CHAIRPERSON

321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036

TEL: (212) 541-7212  FAX: (212) 541-9356

HOTEL ASSOCIATION OF NEW YORK CITY, INC.

NEW YORK HOTEL & MOTEL TRADES COUNCIL

11/13/2007

Richard Amato
Vice President
Hotel Association of New York City, Inc.
320 Park Avenue
New York, NY 10022

Mr. Peter Ward
New York Hotel & Motel Trades Council
707 Eighth Avenue
New York, NY 10036

### Sent Via Facsimile to All Parties

A hearing will be held in this office (321 West 44th Street, Suite 400, New York City) on **Tuesday, November 27, 2007 at 9:30 AM** in the matter of the request of Management concerning:

**#M07-431/The Hotel Association of New York City, Inc. requests a hearing for clarification of IC Decision #2007-40 published on August 23, 2007.**

In order that your interests may be protected, it is essential that you be present or represented at that time.

cc:    David Rothfeld, Esq.
Stephen Steinbrecher, Esq.
Niki Franzitta, Esq.
Christian White, Esq.
Richard Amato
Vincent Pitta, Esq.
Joseph Farelli, Esq.
Jane Lauer Barker, Esq.
Michael D'Angelo, Esq.
Brian Lysell
Madelyn Rivera
Susan Gempler
Peter Ward, Rich Maroko, Esq.

# EXHIBIT G

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

**EMPLOYER:** HOTEL ASSOCIATION OF NEW YORK CITY, INC.

> HTC Case #M07-431/The Hotel Association of New York, Inc. requests a hearing for clarification of IC Decision #2007-40 published on August 23, 2007.

> Hearing held at the Office of the Impartial Chairperson on November 27, 2007.

## APPEARANCES:

| | |
|---|---|
| For HANYC: | Joseph E. Spinnato<br>President |
| Counsel for HANYC:<br>By: | Kane Kessler PC<br>Stephen Steinbrecher, Esq.<br>David Rothfeld, Esq.<br>Niki Franzitta, Esq.<br>Christian White, Esq. |
| For the New York Hotel & Motel Trades Council, AFL-CIO:<br>Counsel:<br>By: | Pitta & Dreier LLP<br>Joseph Farelli, Esq. |
| For the Union: | Peter Ward, President<br>Rich Maroko, Esq.<br>Hazel Hazzard<br>Vanessa Meade<br>Steve Miller |

\*   \*   \*

On November 27, 2007, I issued an oral order, which is memorialized herein.

As in all Impartial Chairperson decisions, the Hilton Award #2007-40 has industry-wide application and is final and binding on all parties to the Industry-Wide Agreement ("IWA"). There is nothing in its language that limits or restricts its scope. However, the Award is based upon Article 47(D)(1) of the IWA, which was enacted in 1995 as a Union benefit circumscribing each Hotel's established

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

practices which remain the starting point of the Award's individual Hotel application.

It is so ordered.

Dated:    December 4, 2007
          New York, New York

PHILIP ROSS, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

IMPARTIAL CHAIRPERSON

# EXHIBIT H

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-85R
Hotel Association of New York City, Inc.
December 4, 2007
Page 1 of 2

**EMPLOYER:** HOTEL ASSOCIATION OF NEW YORK CITY, INC.

HTC Case #M07-431/The Hotel Association of New York City, Inc. requests a hearing for clarification of IC Decision #2007-40 published on August 23, 2007.

Hearing held at the Office of the Impartial Chairperson on November 27, 2007.

## APPEARANCES:

For HANYC:                     Joseph E. Spinnato
                               President

Counsel for HANYC:            Kane Kessler PC
        By:                    Stephen Steinbrecher, Esq.
                               David Rothfeld, Esq.
                               Niki Franzitta, Esq.
                               Christian White, Esq.

For the New York Hotel & Motel Trades Council, AFL-CIO:
Counsel:                       Pitta & Dreier LLP
        By:                    Joseph Farelli, Esq.

For the Union:                 Peter Ward, President
                               Rich Maroko, Esq.
                               Hazel Hazzard
                               Vanessa Meade
                               Steve Miller

\*   \*   \*

On November 27, 2007, I issued an oral order, which is memorialized herein.

As in all Impartial Chairperson decisions, the Hilton Award #2007-40 has industry-wide application and is final and binding on all parties to the Industry-Wide Agreement ("IWA"). There is nothing in its language that limits or restricts its scope. However, the Award is based upon Article 47(D)(1) of the IWA, which was enacted in 1995 as a Union benefit circumscribing each Hotel's established

OFFICE OF THE IMPARTIAL CHAIRPERSON
· 321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (212) 541-9356

#2007-85R
Hotel Association of New York City, Inc.
December 4, 2007
Page 2 of 2

practices which remain the starting point of the Award's individual Hotel application.

It is so ordered.

Dated:      December 4, 2007
New York, New York

PHILIP ROSS, under the penalties of perjury duly affirms that he is the arbitrator described herein, and that he executed the foregoing instrument.

_Philip Ross_

**IMPARTIAL CHAIRPERSON**