UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOSEPH BEJJANI, et al.                                    07 Civ. 10729 (HB)(DCF)

                        Plaintiffs,

            against -

MANHATTAN SHERATON CORPORATION
d/b/a ST. REGIS HOTEL and NEW YORK HOTEL
and MOTEL TRADES COUNCIL, AFL-CIO,

                        Defendants.
-------------------------------------------------------------------X


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**


                              Kaiser Saurborn & Mair, P.C.
                              111 Broadway, 18th floor
                              New York, New York 10006
                              (212) 338-9100
                              Attorneys for Plaintiffs

*Of Counsel*:
Daniel J. Kaiser
Henry L. Saurborn, Jr.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    The Union Refused to Enforce the Terms of
    the Arbitration Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The Union Refused to Recover Gratuities Taken
    From the Plaintiffs by the Hotel by Virtue of an
    Illegal Tip Pool . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Final and Binding Arbitration Decision
    Held That the IWA Entitled Banquet Servers
    to Full Gratuities on the Entire Banquet Bill,
    Including Room Rentals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Genesis of the Room Rental Dispute at the St. Regis . . . . . . . . . . . . . . . . . . . 5

    The Union Colludes with the Hotel to Maintain
    A Tip Pool That Violates New York State Law . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    The Union Violates its DFR Obligations By
    Denying Plaintiffs Access to IC Decisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Additional Unresolved Contract Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    POINT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    THE COURT SHOULD DENY DEFENDANTS' 12(b)(1)
    AND (6)  MOTION BECAUSE THE COMPLAINT STATES
    A COGNIZABLE CLAIM  IN EACH CASE, AND IT WOULD
    BE IMPROPER FOR THE COURT TO CREDIT ANY
    SUPPLEMENTAL MATERIALS PROFFERED BY DEFENDANTS
    OTHER THAN THOSE FACTS ALLEGED IN THE AMENDED
    COMPLAINT

    A.      The Standard Governing A Motion To Dismiss . . . . . . . . . . . . . . . . . . . . . . 19

B.    Plaintiffs Easily Satisfy the Pleading Requirements
for a Hybrid Section 301/DFR Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.    The Court Should Consider No Documents Other
than Copies of the Arbitration Awards and Arbitration
Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

POINT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
THE UNION'S REFUSAL TO ENFORCE THE TERMS OF
AN ARBITRATION AWARD AGAINST THE HOTEL
CONSTITUTES A DFR VIOLATION AND THEREBY
CONFERS STANDING ON THE PLAINTIFFS TO SEEK
ENFORCEMENT OF THE AWARD IN THIS COURT

A.    The Union's Refusal to Enforce the Arbitration
Award Constitutes a DFR Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B.    Plaintiffs Have Standing to Ask This Court
to Confirm the Ross Arbitration Award . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

POINT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
THE UNION'S REFUSAL TO SEEK REPAYMENT OF
GRATUITIES ILLEGALLY TAKEN FROM PLAINTIFFS
BY THE HOTEL THROUGH THE OPERATION OF A TIP
POOL THAT VIOLATED NEW YORK STATE LAW AND
THE UNION'S COLLUSION IN KEEPING THE TIP POOL
RUNNING VIOLATED THE DFR

POINT IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
THE TIP POOL VIOLATED NEW YORK LABOR LAW §196-d

POINT V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
PLAINTIFFS' CLAIM UNDER NEW YORK LABOR LAW SECTION
196-d CLAIM IS NOT PREEMPTED BY FEDERAL LAW

POINT VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
PLAINTIFFS' HYBRID DFR/ SECTION 301 CLAIMS, AS
SET FORTH IN THE SECOND AND FOURTH CAUSES OF
ACTION ARE TIMELY

POINT VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
THE UNION COMMITTED A SEPARATE DFR VIOLATION
WHEN IT SECRETLY FILED A GRIEVANCE AND THEN
SETTLED WITHOUT AUTHORIZATION THE PLAINTIFFS'
TIP POOL CLAIM UNDER THE NEW YORK LABOR LAW

POINT VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
THE UNION'S FAILURE TO PROVIDE ACCESS TO THE
IC DECISIONS IS A DFR VIOLATION

POINT IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
THE ACTION SHOULD NOT BE DISMISSED FOR FAILURE
TO JOIN NECESSARY PARTIES

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

### Federal Cases

*Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40 (2nd Cir.1991) . . . . . . . . . . . . . . . . . . . . . . .  20

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees v. Lockridge,*
403 U.S. 274 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Barr v. United Parcel Serv., Inc.,* 868 F.2d 36 (2nd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . .  20

*Bell Atlantic Corp. v. Twombly,* ___ U.S. ___, 127 S.Ct. 1955 (2007) . . . . . . . . . . . . . . . .  19

*Carrion v. Enterprise Association, Metal Trades Branch Local Union 638,*
227 F.3d 29 (2nd Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC,* 2008 WL 1710910
(S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Cornhill Insurance PLC v. Valsamis, Inc.,* 106 F.3d 80, 84 (5th Cir.),
*cert. denied,* 522 U.S. 818 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

*DelCostello v. International Broth. of Teamsters,* 462 U.S. 151 (1983) . . . . . . . . . . . . . . . .  27

*Faulkner v. Beer,* 463 F.3d 130 (2nd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Ford v. Air line Pilots Ass'n Intl.,* 268 F.Supp.2d 271 (E.D.N.Y. 2003) . . . . . . . . . . . . . . .  27

*Hines v. Anchor Motor Freight,* 424 U.S. 554 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 32

*Humphrey v. Moore,* 375 U.S. 335 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.,*
182 F.R.D. 512 (N.D. Ohio 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

*IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049 (2nd Cir. 1993) . . . . . . . . . . . . . . .  20

*Katir v. Columbia University,* 15 F. 3d 23 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . .  23 n.6

*Lavidas v. Bradshaw,* 512 U.S. 107 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*Leyse v. Clear Channel Broadcasting, Inc.,* 2006 WL 23480 (S.D.N.Y. 2006) . . . . . . . . . . .  20

*Mack v. Otis Elevator Co.,* 326 F.3d 116 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

iv

*Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96 (2nd Cir. 2005) . . . . . . . . . . . . . . . . . . . 22

*Proodos Marine Carriers Co. v. Overseas Shipping & Logistics,*
578 F.Supp. 207 (S.D.N.Y. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ruotolo v. City of New York,* 514 F.3d 184 (2nd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 19

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774
(2nd Cir. 1984), *cert. denied,* 513 U.S. 822 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Salamea v. Macy's East, Inc.,* 426 F.Supp.2d 149 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . 30

*Scheuer v. Rhodes,* 416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Serrano v. Delmonico's Hotel,* 1992 WL 251447 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . 26

*Sindia Expedition, Inc. v. The Wrecked and Abandoned Vessel Known as the*
*Sindia,* 895 F.2d 116 (3rd Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Sun Micro Medical Technologies Corp. v. Passport Health Comm'ns, Inc.,*
2006 WL 3500702 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Trade & Transp., Inc. v. Natural Petroleum Charterers, Inc.,* 931 F.2d 191
(2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Triestman v. Federal Bureau of Prisons,* 470 F.3d 471 (2nd Cir. 2006) . . . . . . . . . . . . . . 20

*United States v. Bowen,* 172 F.3d 682 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Vallone v. Local Union No. 705,* 755 F.2d 520 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . 32

*Washington v. Daley,* 173 F.3d 1158 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*White v. White Rose Food,* 237 F.3d 174 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Yeiser v. GMAC Mortg. Corp.,* 535 F.Supp.2d 413 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . 20

## State Cases

*Samiento v. World Yacht, Inc.,* 10 N.Y.3d 70 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Statutes and Codes</u>

Fed.R.Civ.P. 19(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34
New York Labor Law § 196-d  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

<u>Other</u>

4 Moore's Federal Practice § 19.03[4][d] (3rd ed.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

## PRELIMINARY STATEMENT

The Plaintiffs[1] contend that their union, defendant New York Hotel and Motel Trades Council, AFL-CIO ("the Union"), through a pattern of lies, deception, collusion and stonewalling, improperly refused to enforce the terms of the collective bargaining agreement otherwise known as the Industry Wide Agreement ("IWA") between the Union and the Hotel Association of New York (the "Association"). The Union's actions or refusal to act have caused the plaintiffs to forfeit without justification – and allowed their employer, defendant Manhattan Sheraton Corp. ("the Hotel") to convert to its own use – millions of dollars in earned wages and compensation.

Despite the generally wide latitude that a union enjoys to determine the parameters and nature of its representation of its membership, the arbitrary and bad faith conduct alleged in the plaintiffs' second amended complaint sufficiently alleges a claim that the Union violated its legal obligations to the plaintiffs by allowing and in fact facilitating the Hotel's flagrant violation of the IWA.

The plaintiffs allege that the Union committed two core DFR violations by refusing: (i) to enforce an arbitration award – applicable to the Hotel – that requires the Hotel to pay the plaintiffs millions of dollars in past-due gratuities; and (ii) to press for the return of millions of

---

[1] The plaintiffs herein are Joseph Bejjani (Bejjani), Henry Bolejszo (Bolejszo), Ahmad Bulla (Bulla), Alain Breda (Breda), Virgil Costache (Costache), Oscar Flores (Flores), Geoffrey Haberer (Haberer), Ruhel Hassan (Hassan), Ricky Garcia (Garcia), Abdelkabir Kahtane (Kahtane), Mohamed Khanfri (Khanfri), Kathy Krinke (Krinke), Stylianos Loukissas (Loukissas), Erich Lunzer (Lunzer) Jairo Martinez (Martinez), Edilberto Morcos (Morcos), John O'Connor (O'Connor), Aart Van Derlaan (Van Derlaan) and Roberto Zegarra (Zegarra). Second Amended Complaint (hereinafter "SAC") at ¶¶ 7-25.

dollars of gratuity compensation stolen from the plaintiffs by the Hotel through an illegal tip pool that violated New York law.

*The Union Refused to Enforce the Terms of
the Arbitration Award*

On August 23, 2007, Arbitrator Philip Ross of the Office of the Impartial Chairperson ("IC Ross") decided a grievance brought by the Union against Hilton Corporation. IC Ross expressly held that the IWA required that gratuities must be paid on the entire hotel's banquet bill, including room rentals. On December 4, 2007, IC Ross issued a written clarification of the August 23 decision, in which he stated that, consistent with established practice, the decision had industry-wide application and was "final and binding" on all parties to the IWA. The Hotel was a member of the Association, which was represented at the clarification hearing, and is a signatory to the IWA, and is therefore plainly bound by IC Ross's decision.

During the three months that followed the award, the Union refused to take any steps to enforce it against the Hotel, despite the plaintiffs' repeated insistence that it do so. After the plaintiffs proceeding *pro se* amended the instant action, to include the room rental claim, the Union continued to refuse to enforce the award but instead re-filed a grievance that it had previously withdrawn, in which grievance the Union sought to re-litigate against the Hotel issues of liability previously decided by IC Ross. Remarkably, then, the Union endeavored to snatch defeat from the jaws of victory. The Union's failure to employ IC Ross's plainly enforceable award against the Hotel is a paradigm for its arbitrary and bad faith actions.

2

*The Union Refused to Recover Gratuities Taken*
*From the Plaintiffs by the Hotel by Virtue of an*
*Illegal Tip Pool*

Plaintiffs maintain that the tip pool violates New York law, and has robbed them of earned gratuities. The Union lied to them, destroyed and suppressed material evidence, and generally collaborated with the Hotel in order to retain the practice of maintaining a tip pool. The practice also allowed the Hotel to divert a portion of the tips to their own coffers as well as the payment of compensation to other non-participants in the tip pool.

In June 2007, the Union announced a "settlement" of the tip pool issue pursuant to a grievance that the Union had never previously told the plaintiffs that it had filed. The settlement disbanded the tip pool and in doing so forfeited every penny of the gratuities taken from the plaintiffs. The abandonment of the entire sum of past earned compensation, without any effort to negotiate a resolution with the Hotel concerning the back pay, knowing that the tip pool violated New York State law, is consummate bad faith and a DFR violation. Further, the settlement agreement implemented a new gratuity practice that itself expressly violated the IWA by depriving the plaintiffs of the minimum contractually-guaranteed gratuity. This IWA violation is expressed in an Impartial Chairperson decision a copy of which was requested several times by the plaintiffs. Plaintiffs have not yet been provided a copy.

*Conclusion*

The Union's repeated DFR violations provides plaintiffs standing to sue in this hybrid action the Union as well as the Hotel for the IWA violations that remain unremedied. The Plaintiffs plead sufficiently both the Union's DFR violations and the Hotel's breach of the IWA

and must be afforded the opportunity to demonstrate through this litigation the bona fides of their allegations.

## STATEMENT OF FACTS

*The Final and Binding Arbitration Decision*
*Held That the IWA Entitled Banquet Servers*
*to Full Gratuities on the Entire Banquet Bill,*
*Including Room Rentals*

All of the plaintiffs began working for the Hotel on August 19, 1991 or shortly thereafter. SAC ¶ 143. At all material times, including July 1, 1995, the defendants were parties to the IWA, representing banquet servers. SAC ¶¶ 28-29. Article 26 of the IWA provides for final and binding arbitration as the means for resolving disputes between the parties before a permanent umpire(s) known as the Impartial Chairperson ("IC"). SAC ¶¶ 30-31.

A dispute, with industry-wide application, between the Union and Hilton New York, another employer-hotel covered by the IWA, was submitted to the IC for binding arbitration. SAC ¶ 35. The industry-wide dispute was whether gratuities had to be paid by hotel(s) to tip-category employees for charges that the hotel(s) billed its customers for room rentals in conjunction with banquet functions under Article 47(D)(1) of the IWA. SAC ¶ 36.

Article 47(D)(1) of the IWA, in pertinent part, reads

> Effective July 1, 1995, except as otherwise provided herein, the UNION and the EMPLOYER agree that with respect to banquet functions, a minimum gratuity equal to fifteen percent (15%)shall be paid to tip category employees (banquet waiters/waitresses and captains) working said functions, pursuant to established practice in each hotel as of July 1, 1995.

SAC ¶ 34.

4

By decision #2007-40, dated August 23, 2007, the IC sustained the Union's grievance

holding  that gratuities must be paid on the entire banquet bill, including room rentals, and issued

an Award (the "Ross Award") which provided, in relevant part:

> I sustain the Union's grievance and direct the Hotel to henceforth
> pay gratuities in accordance with this Award and make whole all
> tipped banquet employees for any income lost as a result of the
> Hotel's violation.

SAC ¶ 38.

The Ross Award has industry-wide application and the IC Ross acted within his authority

in fashioning the Award. SAC ¶¶ 39-40. The St. Regis Hotel continued, however, to charge room

rentals on most banquet functions while still failing to pay gratuities on these new fees.  SAC ¶ 41.

*The Genesis of the Room Rental Dispute at the St. Regis*

Beginning in 1997 or 1998 and thereafter, banquet servers first began complaining to the

Union about room rental charges but the Union refused to take action. SAC ¶¶ 44-46.  On July

27, 2005, the Union informed the servers that there **was an on-going industry wide room rental**

**arbitration claim** and that the Union already possessed room rental records from the St. Regis

hotel covering the period between 1998 and 2003. SAC ¶¶ 47-48.  The Union noted a total of

eight outstanding  grievances with the Hotel: 1) Overstaffing of functions, 2) Bar remaining open

past scheduled hours, 3) Room Rentals displacing Food & Beverage Charges, 4) Grace Period, 5)

Minimum Payments, 6) Meetings without Food, 7) AM Meetings, and 8) Coffee Breaks. SAC ¶

49.

By notice dated February 3, 2006, (eight or nine years after banquet servers first

complained), the Union advised the plaintiffs that a room rental arbitration case specific to their

employer was filed on their behalf under Index No. U05-649. The grievance charged the hotel

with improper and illegal reduction in gratuities to banquet servers, as the Hotel had

simultaneously increased the percentage of banquet revenue charged to Room Rental and

decreased the percentage of banquet revenue charge to Food & Beverage. SAC ¶¶ 50-51.

On March 3, 2006, the plaintiffs' delegates asked the Union not to limit their claim to the

increase in the room rental fee, but rather to seek the entire gratuity on the whole banquet bill.

The Union responded that it could only argue based on Article 47(D)(1) of the IWA limiting the

Hotel to the pre-1995 established practice regarding gratuities. SAC ¶¶ 52-53. **The Union**

**requested records from the Hotel going back to 1995, but the Hotel failed to furnish any**

**before 1998 and admitted that it did not have room rental records going back to 1995**. The

Union stated that it would use the Hotel's records to calculate the rate of increase of the room

rental charges in relation to Food & Beverage charges between 1998 to 2003 and then project the

change backwards to establish what that ratio was prior to the 1995 contract at the Hotel. SAC ¶¶

55-58.[2]

In stark contrast, in the Hilton case, the Union argued that the plain language of Article

47(D)(1) required that banquet gratuities be paid on the entire banquet bill and does not provide

for or allow any carve outs. SAC ¶¶ 54. On an unknown date, the Union removed the Room

Rental issue from the list of grievances. SAC ¶ 60.

---

[2] To prove an established practice of charging room rental fees on banquet events, you
need banquet event orders, banquet contracts and guest bills. In response to a subpoena, the Hotel
stated in writing on August 23, 2005 that it did not have any of these records going back to 1995.
SAC ¶¶ 74-75.

On June 7, 2007, the Union stated that it was awaiting an arbitration decision regarding the Hilton Hotel that will have industry-wide implications. SAC ¶¶ 61-62.

The Ross Award held that Article 47(D)(1) of the IWA required the hotel to include room rental in gratuity computations and even extended its holding to mean [hotel] may [not] create or maintain a charge called something other than that room rental, but having the same effect of diverting revenue. SAC ¶ 76   The holding applies to room rental and any other fees or charges to banquet guests, regardless of what they may be called or when they were created. SAC ¶ 77.

On November 8, 2007, the delegates again adamantly demanded equal and fair treatment from the Union and the enforcement of the industry-wide Hilton decision. SAC ¶¶ 81-85.  On that same day, the Union acknowledged that the industry-wide Hilton decision applied to the Mandarin Oriental Hotel and the Union stated that it was making strenuous efforts to have the Mandarin Oriental Hotel accept the Hilton decision but the Union refused to take similar steps to have the St. Regis Hotel accept the Award. SAC  ¶¶ 86-88.

On November 27, 2007, the Hotel Association challenged the industry-wide applicability of the Hilton decision. The IC ruled verbally that the Hilton decision is applicable industry-wide. At first, it appeared that there would not be a written clarification decision and Union president Ward clearly affirmed this understanding by expressing regret that the IC had not written an additional clarification decision. SAC ¶¶ 89-91.

In its Hotel Voice issue, however, of December 3, 2007, the Union expressly altered this understanding by stating the arbitrator's written decision ha[s] not yet been issued but it expected the decision shortly. In a letter dated December 11, 2007 the Union included a copy of this written decision #2007-85R dated December 4, 2007. SAC ¶¶ 92-93.  The letter provides:

> As in all impartial Chairperson Decisions, the Hilton Award #2007-40 has industry-wide application and is final and binding on all parties to the Industry-Wide Agreement (IWA). There is nothing in its language that limits or restricts its scope.  However, the Award is based  upon Article 47(D)(1) of the IWA, which was enacted in 1995 as a Union benefit circumscribing each Hotel's established practices which remain the starting point of the Awards individual Hotel application.

SAC ¶ 94.

On March 6, 2008, three days after the plaintiffs served their first amended complaint which added a claim based on the room rental claim, the Union reinstated the plaintiffs' room rental arbitration (Case #U05-649) before IC Ross just as if the prior Ross Award did not exist. SAC ¶¶ 95-100. On March 12, 2008, plaintiffs wrote directly to the Union objecting to this sudden maneuver, demanding that the arbitration be withdrawn without prejudice and enforce the Ross Award. SAC ¶¶ 101-104.

On March 18, 2008, the plaintiffs through counsel wrote to the Union's counsel, to the Hotel's counsel and to the IC protesting the proposed arbitration. Id.  The letter provided, in relevant part:

> The union, without any justification, is now seeking again to arbitrate before the IC the room rental/gratuity issue when the IC has already issued a final decision on this issue. Thus, the doctrine of *functus officio* in arbitrations applies, which presumes that an arbitrators final decision on an issue strips him of authority to consider that issue further. . . .  Thus, there is no longer a labor dispute as to the hotel's liability for gratuities on room rentals, only the separate issue of damages.

> [T]he union is not seeking to obtain compliance with the ICs Award, but remarkably it is seeking, instead, to obtain a much less favorable new award for the St. Regis banquet waiters, presenting an issue that presumes that the St. Regis Hotel had an established practice regarding charging room rentals prior to the 1995 contract. Not only is this an issue for the hotel to arguably raise and prove, I

> am informed that the hotel has already conceded that it has no
> proof of such practice and it is appalling that the union would seek
> to dilute the benefits already obtained in the Hilton decision by
> attempting to concede a practice, that not only never existed, but is
> not provable and if provable, that burden rests with the hotel to
> grieve and arbitrate.

The Union consistently and persistently refused to enforce the arbitration award.

*The Union Colludes with the Hotel to Maintain*
*A Tip Pool That Violates New York State Law*

At a meeting held on April 1, 1993, the Hotel and the Union advised banquet servers that the Tip Pool was optional and that it could be exited at anytime by any participant. Union President Peter Ward ("Ward") was present at that meeting which the banquet servers tape recorded.[3] SAC ¶¶ 146-148. Between April 1, 1993 and November 2003, both the Hotel and the Union continued to advocate that the Tip Pool could be exited at any time.[4]

In October 2003, some servers consulted with the NYDOL and learned that the Tip Pool violated some of the provisions of the New York Labor Law. On October 16, 2003, some banquet servers presented management with a petition bearing 14 banquet servers signatures asking to exit the Tip Pool. The Union was also given a copy of this request. The banquet crew consisted of 30 servers/bartenders. SAC ¶¶ 158-160.

---

[3] When Ward was asked to testify at the Tip Pool arbitration, he refused. The banquet servers offered Ward the opportunity to listen to the tape. He ignored the offer and never testified. SAC ¶¶ 149-150.

[4] In January of 2001, the Hotel allowed a banquet server, Andre Coadic ("Coadic"), to exit the Tip Pool. Coadic kept all his earnings from gratuities from every banquet function that he worked and because of this he earned more gratuities than all other servers for performing the same exact duties. Additionally, to facilitate Coadic's greater gratuity earnings, the Hotel unlawfully drew money from the Tip Pool, thereby further draining banquet servers' gratuity earnings. SAC ¶¶ 152-154.

In response, on October 24, 2003, at an emergency meeting of servers, the Union reversed its long standing stated position and opposed the banquet servers exit from the Tip Pool advising them for the first time that it had an agreement with the Hotel binding the servers to the Tip Pool. The Union refused to show the servers this agreement. SAC ¶¶ 161-162.

On October 28, 2003, the Union reiterated this new position. On October 31, 2003, the Hotel advised the servers that they could not leave the Tip Pool because it is a **stipulated practice**. The Hotel claimed that the agreement was in the form of a handshake and added that it had received a phone call from the Union asking it to absolutely not let the banquet servers exit the Tip Pool. SAC ¶¶ 163-166.

On or about November 3, 2003, some servers filed a complaint with the NYDOL invoking Labor Law §196-d. On or about June 17, 2004 the NYDOL declared the Tip Pool illegal. SAC ¶¶ 167-168.

At various times, during the next four months, the Hotel stated it was in the process of disbanding the Tip Pool and was in discussions with the Union about implementation. On October 12, 2004, however, some servers received a Notice of Conference from the DOL set for November 4, 2004. At this conference, the Hotel argued that federal law pre-empted state law, noting that it had recently filed for arbitration and that the grievance had already passed the mediation process. The Hotel stated that it would rely on Article 47(D)(1) of the IWA claiming that the Tip Pool is a pre-existing practice sanctioned by the 1995 amendment to the IWA. SAC ¶¶ 169-172.

The Union never advised any of the servers that the Hotel had filed for arbitration on this matter, or that a mediation conference had taken place. The Hotel asked for a clarification of its obligation under the IWA (re: 196d-NYS Labor Law) to break the Tip Pool. SAC ¶¶ 173-174.

On December 7, 2004, before the first scheduled arbitration date, some plaintiffs requested that the Union grant them a change of venue and representation by an independent attorney on the grounds that the Union had already assumed a fraudulent adversarial position on the matter. SAC ¶¶ 175-176.

The next arbitration date was February 3, 2005, and the Union and its attorney had yet to meet with any of the plaintiffs to prepare for the arbitration. On that date, Ward changed his story and now told some servers that the Union had made a verbal agreement with the Hotel sanctioning the tip pool when the hotel was reopened in 1991. SAC ¶¶ 177-179.

On that same date, plaintiff O'Connor accused Ward of taking a position adversarial to those members wishing to exit the tip pool. Also on that same date, the Union made a statement reiterating that it had made an agreement with the Hotel regarding the Tip Pool, adding that "when [the Union] makes an agreement, [the Union] lives up to it." SAC ¶¶ 180-181.

Thereafter, on each of February 18, 2005, March 28, 2005, April 22, 2005, May 6, 2005 and September 13, 2005, some of the plaintiffs met with Union Attorney Joseph Farelli ("Farelli") to prepare the case. Farelli stated to the banquet servers on many occasions that his allegiance was to the Union, and that he would not subpoena Union officials to assist the banquet servers in this manner. At other times, Farelli indicated that the same Union officials had information that would benefit banquet servers. SAC ¶¶ 183-185.

Farelli stated that he would make legal arguments that the IWA cannot violate Labor Law 196-d, inasmuch as banquet servers are being asked to share gratuities with servers working different functions and with servers who are not even working at all. SAC ¶¶ 189.

On May 6, 2005, some of the plaintiffs told Farelli that they needed records from the Hotel to show that there was a period when a certain banquet server worked outside the Tip Pool. Some asked Farelli to subpoena two years' worth of records (years 2000 and 2001) so that the Hotel would not know that Plaintiffs were looking for records specifically relating to that server. Farelli then asked some plaintiffs to divulge to him the identity of this banquet server and to inform him when that server worked outside the Tip Pool, which they did. The server was identified as Coadic. SAC ¶¶ 192-194. The evidentiary value of the Coadic records was to demonstrate that post 1995 banquet employees were still permitted to leave the tip pool. SAC ¶¶ 187-189.

On May 9, 2005, the Union, through President Ward, claimed now to be in possession of a document that purported to show that banquet waiters had themselves agreed to the Tip Pool after having taken a vote on the matter in 1993. On May 10, 2005, servers wrote to the Union asserting that they never took such a vote on the Tip Pool and objected to any such document, asking for a copy and for preservation of the original for future evidence. The Union ignored their request. SAC ¶¶195-196.

On September 13, 2005, Farelli advised some Plaintiffs that the Hotel had turned over six boxes of documents. Farelli claimed that he had no knowledge as to the information contained in the boxes or why the banquet waiters wanted the documents. The records turned over did not contain Coadic's information, although complete records for 2001 would have shown that Coadic

had left the Tip Pool for several months in 2001. Plaintiffs' delegate learned subsequently (but not until months later on April 28, 2006) that Farelli had disclosed to the Hotel that the records requested would show that Coadic had not been participating in the Tip Pool during a certain period of time. SAC ¶¶ 197-200.

On September 14, 2005, the Hotel stated that Coadic's documents were not available and later changed that to assert that the documents did not exist. On information and belief, the Hotel, with assistance from the Union, destroyed the documents that would show that Coadic worked outside the Tip Pool. Additionally, in preparing the case, the Union <u>actively</u> suppressed all of the plaintiffs' material evidence including Ward's testimony. SAC ¶¶ 201-203.

On August 1, 2006, some of the plaintiffs raised a conflict of interest claim before IC Ross asking him, among other things, to recuse himself because the Union had divulged that it has handpicked the arbitrator and further grant the banquet servers a change of venue to have the case heard before an Arbitrator from the American Arbitration Association. Some of the plaintiffs objected, among other things, to any representation by Farelli or the Union and to the destruction and suppression of material evidence. Some of the plaintiffs also requested, among other things, the use of a stenographer and/or admissible tape recording during the hearing. A tape recorder was used at the banquet servers' previous hearing before the IC in 1994. SAC ¶¶ 206-209.

13

The IC denied some requests and ignored others. The order of the IC was dated August 2, 2006.[5] Banquet servers were not advised of the IC's decision until June or May 2007. SAC ¶¶ 210-212.

On June 1, 2007, the Union handed some Plaintiffs a document purporting to be a settlement between the parties on the Tip Pool bearing the Hotel's signature dated May 29, 2007, and the Union's signature dated May 31, 2007. The purported settlement disbanded the Tip Pool, but declares the Tip Pool lawfully constituted and maintained under the IWA, withdraws the Hotel's grievance and an alleged Union's Tip Pool grievance and any related requests, disavowed admission of any liability or fact giving rise to liability, disclaimed any precedential values the settlement may have at other Hotels, and referred all disputes over the interpretation of this settlement to the Impartial Chairmans Office. SAC ¶¶ 213-214. The settlement provided for zero back pay to the tipped banquet employees. SAC ¶¶ 223.

The alleged Union Tip Pool grievance was filed without plaintiffs' knowledge. Plaintiffs were notified of the Union's grievance only after it had already been withdrawn as a part of the settlement. The settlement provided that all gratuities paid from a function shall be distributed to Servers who work the function, based upon the number of covers assigned to each Server. This clause takes away a contractual guarantee because the IWA guaranteed plaintiffs gratuities based on a minimum number of covers, *i.e.* guests per server. SAC ¶¶ 215-216. The settlement also

---

[5] The IC stated: "I do not and will not knowingly receive ex parte communications. The senders of the communication are not parties to the case and have no standing before me. They may not address me, orally or in writing, except through counsel. I will not recuse myself, and "In accordance with longstanding practice of this Office I will not permit the recording or transcription of proceedings of arbitration hearings."

exacts punishment by passing authority to the Hotel in establishing work related rules that had

previously been within the Union's domain. SAC ¶¶ 217-218.

On June 7, 2007, the plaintiffs objected to the Union to the Tip Pool settlement.  On June

27, 2007, the plaintiffs advised the Hotel, in writing, in pertinent part, as follows:

> [I]t is the position of the undersigned that Local 6, in negotiating
> and signing the aforementioned agreement, acted in violation of its
> duty of fair representation to the undersigned. Accordingly, we do
> not recognize the legitimacy or efficacy of that agreement, and we
> are presently exploring all our legal rights and remedies . . . .
>
> We are also aware that Local 6 is negotiating, or has negotiated,
> several other so called settlement agreements, all dated late May,
> 2007 . . . relating to banquet waiters.  We maintain the same
> position with respect to those proposed agreements as we do to the
> aforementioned May 29, 2007 settlement agreement.

SAC ¶¶ 219-221.

On June 28, 2007, the plaintiffs reiterated in writing their objections to the Union

regarding the purported settlement stating:

> We maintain that the [Tip Pool] should be disbanded as it violates
> the law.  The Hotel should arbitrate or withdraw its case.  We reject
> the Union's counterclaim [Tip Pool] case designed to arguably
> justify the [Tip Pool] settlement agreement and ask that it be
> withdrawn.  We reject any [Tip Pool] settlement on its own that
> does not also settle in the same document the related issues being
> settled separately.  We reject all and every condition imposed on us
> because of this disbanding of the [Tip Pool].  **We reject all and
> every agreement or imposition made on us resulting in any loss
> of income or quality of life because of this disbanding.**  We
> expect our income to rise as the result of this disbanding as the [Tip
> Pool] has been a tool successfully used to dilute our contractual
> income.  We object to the fact that back pay has not been
> addressed.  Back pay was discussed several times in our meetings
> with Mr. Farelli.

SAC  ¶¶ 222-223.

On July 23, 2007, the plaintiffs reiterated their position in writing to the Hotel stating in

pertinent part as follows:

> Servers have repetitively expressed and do now again clarify
> in writing that the [June 27, 2007] objection is aimed solely at the
> purported settlements imposing adverse conditions for disbanding
> the [Tip Pool].  Servers continue to invoke their right to exit the
> [Tip Pool].

SAC ¶ 224.

On March 16, 2008, after this case was filed, the Hotel disbanded the Tip Pool but paid

the plaintiffs nothing for their lost back pay resulting from the Tip Pool. SAC ¶¶ 225-226.

*The Union Violates its DFR Obligations By*
*Denying Plaintiffs Access to IC Decisions*

The Union has denied the plaintiffs full access to IC decisions and has attempted to

retaliate against the plaintiffs' right to access to IC decisions by threatening to withhold full Union

representation, unless they remove their elected delegate. SAC ¶¶ 228-229.

On November 27, 2007, the plaintiffs' delegates advised the Union in writing that

following the delegate's October 19, 2007 request for a copy of the Hilton's Room Rental

decision, a sudden series of events unfolded and continue to unfold clearly aim[ed] at neutralizing

our elected Delegate and weakening the [Hilton] decision."  The request added that [a]lthough all

these attempts have failed so far, we remain[ed] fearful of the unveiling of the Union's and/or the

Hotels' next plan". SAC ¶ 230.

Plaintiffs allege that all arbitration decisions addressing any part of the Contract at any

establishment covered by the Contract, are an extension of the Contract, and are therefore

rightfully [Union members'] to read privately when [they] wish, and as [they] wish, without being

watched, or having to divulge what [they] are reading, or intend to read or act upon.  Plaintiffs

requested the immediate establishment and implementation of a procedure whereby they "are given unconditional and unrestrictive access to all and every decision handed down [through] the years and addressing any part of the Contract". SAC ¶¶ 231-232.

In its response, the Union denied plaintiffs' unconditional and unrestrictive access to the arbitration awards interpreting the contract, requiring that they first identify the particular issue or contract clause of interest. SAC ¶ 233.

The Union has arbitrarily determined which decisions the plaintiffs are allowed to access. The Union hides decisions that are not convenient to their stated position as it negotiates positions that compromise contract guarantees. SAC ¶¶ 234-237.

*Additional Unresolved Contract Issues*

There are three specific issues that have gone unresolved for many years relating to overstaffing [breakfasts, receptions and meetings], bartending, and coffee breaks. These issues remain unresolved due to collusion between the Union and the Hotel. These issues have been in collusive negotiation for many years. *e.g.,* the coffee break issue has been in negotiation since 1998. SAC ¶¶ 240-242.

All the issues relate to underpayment on the part of the Hotel. They are based on contractual language already existing in Awards interpreting the contract. On June 7, 2007, the Union gave the banquet servers proposals to resolve most of these issues. The proposals would **dilute** the servers' income. The servers rejected the offers and their delegates met with the Union extensively on June 27, 2007 where the Union promised to draft new proposals based on the discussions with them. Throughout the summer of 2007, the Union kept making promises in response to the servers' requests for the new drafts, and on November 8, 2007, their delegates

17

once again discussed these issues with the Union, and they once again continued to make promises regarding drafting new proposals. SAC ¶¶ 243-245.

On January 10, 2008, the plaintiffs learned that the Union was aware of the initial complaint filed in this action. On January 12, 2008, the plaintiffs learned that the Hotel was aware of the initial complaint filed in this action. On the afternoon of January 10, 2007, the Union finally began distributing to servers new proposals regarding various pending issues. The distribution continued until January 17, 2007 until most of the servers received copies of these new proposals. SAC ¶¶ 246-249.

An accompanying letter stated that the proposals were the result of ongoing negotiations with the Hotel. On January 12 and 15, 2008, the Hotel stated that there had been no recent ongoing negotiations with the Union. The proposals presented by the Union were in fact identical to those of June 7, 2007, except for the Hotel's signature being omitted. Plaintiffs wrote to the Union rejecting again the offers, pointing out their deceptive actions and statements. SAC ¶¶ 250-253.

**ARGUMENT**

**POINT I**

**THE COURT SHOULD DENY DEFENDANTS' 12(b)(1) AND (6) MOTION BECAUSE THE COMPLAINT STATES A COGNIZABLE CLAIM IN EACH CASE, AND IT WOULD BE IMPROPER FOR THE COURT TO CREDIT ANY SUPPLEMENTAL MATERIALS PROFFERED BY DEFENDANTS OTHER THAN THOSE FACTS ALLEGED IN THE AMENDED COMPLAINT**

A.    **The Standard Governing A Motion To Dismiss**

When deciding a motion to dismiss under Rule 12(b)(6), a court must accept all the well-pleaded allegations of the claim as true, even if doubtful in fact, and must draw all reasonable inferences in the claimant's favor. *Bell Atlantic Corp. v. Twombly,* ___ U.S. ___ , 127 S.Ct. 1955, 1965 (2007); *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2nd Cir. 2008); *Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*, 2008 WL 1710910, *2 (S.D.N.Y. 2008) (Baer, J.)

The Court's role in deciding a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assess the weight of the evidence which might be offered in support thereof. *Leyse v. Clear Channel Broadcasting, Inc.*, 2006 WL 23480, *1 (S.D.N.Y. 2006) (Baer, J.)

"[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 476 (2nd Cir. 2006); *Yeiser v. GMAC Mortg. Corp.*, 535 F.Supp.2d 413, 420 (S.D.N.Y. 2008).  And so, a district court should deny a Rule 12(b)(6) motion to dismiss "unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2nd

Cir. 1993) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d

774, 779 (2nd Cir. 1984)), *cert. denied,* 513 U.S. 822 (1994).

A court's "consideration [on a motion to dismiss] is limited to facts stated on the face of

the complaint, in documents appended to the complaint or incorporated in the complaint by

reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell,*

*Inc.,* 945 F.2d 40, 44 (2nd Cir.1991); a*ccord, e.g., Faulkner v. Beer,* 463 F.3d 130, 134 (2nd Cir.

2006).

**B.     Plaintiffs Easily Satisfy the Pleading Requirements**
**for a Hybrid Section 301/DFR Claim**

According to the Second Circuit:

> To establish a hybrid 301/DFR [duty of fair representation] claim, a
> plaintiff must prove both (1) that the employer breached a collective
> bargaining agreement and (2) that the union breached its duty of
> fair representation vis-a-vis the union members.

*White v. White Rose Food,* 237 F.3d 174, 178-79 (2nd Cir. 2001).

The duty of  fair representation is breached if the union's conduct was "arbitrary,

discriminatory or in bad faith and . . . seriously undermine[d] the arbitral process." *Mack v. Otis*

*Elevator Co.,* 326 F.3d 116, 129 (2nd Cir. 2003); *Barr v. United Parcel Serv., Inc.,* 868 F.2d 36,

43 (2nd Cir. 1989).

Fraudulent, deceitful or dishonest conduct constitutes bad faith. *Amalgamated Ass'n of*

*St., Elec. Ry. & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 299 (1971) (quoting

*Humphrey v. Moore,* 375 U.S. 335, 348 (1964)).  Here, the factual allegations in the complaint

easily satisfy the pleading requirements for a hybrid  DFR/301 lawsuit, as the plaintiffs allege that

the Union inexplicably walked away from an arbitration award entitling the plaintiffs to millions of

dollars in gratuities and refused to enforce it against the Hotel. Further, plaintiffs allege that the Union colluded with the Hotel to set up and maintain a tip pool that violated the New York Labor Law, and instead allowed the Hotel to divert the gratuities away from the plaintiffs and into the Hotel's pocket. The Union "settled" the claims by entirely forgiving the Hotel the entire amount of gratuities it stole from the plaintiffs, and setting up a new gratuity system that flagrantly violated the IWA.

The alleged DFRs serve as more than an adequate basis for this hybrid claim and satisfy the Federal Rules of Civil Procedure 8(a)'s liberal pleading requirements.

Moreover, given the collusion alleged in the amended complaint between the Union and the Hotel, the Union's conduct has undermined and tainted the arbitral process within the meaning of *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976). Hence, the remaining open grievance issues raised in this lawsuit cannot be left to the arbitral process, but instead addressed to this Court, as the Union has totally compromised and corrupted the process. It is clear that no further exhaustion of plaintiffs' grievances should be required.

**C.    The Court Should Consider No Documents
Other than Copies of the Arbitration Awards
and Arbitration Notices**

In deciding the defendants' 12b(1) motion, the Court may take judicial notice of the relevant arbitration awards and notices attached to defendants' motion to dismiss and referenced in the amended complaint. With regard to the defendants' 12(b)(6) motion, however, the Court may not consider any of the other documents, including any offered affidavits, that the defendants have proffered on the motion, including correspondence between the various parties herein. Instead, the Court must decide the pending motion based on the allegations in the second

amended complaint. The documents provided by defendants are not referred to in the complaint and are not in any manner or respect integral to the pleadings. *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96 (2nd Cir. 2005) (on 12(b) motion court's consideration limited to facts stated in complaint or documents attached to complaint or incorporated by reference); *Sun Micro Medical Technologies Corp. v. Passport Health Comm'ns, Inc.,* 2006 WL 3500702 (S.D.N.Y. 2006) (documents outside of complaint may not be considered unless integral to the pleadings).

With regard to the IWA any reference to it is misleading since there are a series of relevant IC decisions that interpret it that plaintiffs have thus far been denied access. Thus, the court must treat the IWA as outside the scope of the pleadings and not relevant to the motions to dismiss.

## POINT II

### THE UNION'S REFUSAL TO ENFORCE THE TERMS OF AN ARBITRATION AWARD AGAINST THE HOTEL CONSTITUTES A DFR VIOLATION AND THEREBY CONFERS STANDING ON THE PLAINTIFFS TO SEEK ENFORCEMENT OF THE AWARD IN THIS COURT

**A.    The Union's Refusal to Enforce the Arbitration
       Award Constitutes a DFR Violation**

In *Carrion v. Enterprise Association, Metal Trades Branch Local Union 638,* the Second Circuit held:

> This Court has not previously held that a union's duty of fair representation includes the union's duty to enforce an arbitration award. Today we hold that it does. **An employee who alleges that his union failed to enforce an arbitration award alleges thereby that the union violated its duty of fair representation.** This allegation, in turn, forms the basis of a hybrid 301/fair representation claim.

22

227 F.3d 29 (2nd Cir. 2000) (emphasis supplied)[6]

Here, the Union refused to enforce an arbitration award against the Hotel which entitles the plaintiffs, collectively, to millions of dollars in gratuities that the arbitrator determined were illegally diverted and withheld by the Hotel. Instead, the Union re-filed an old grievance that pre-dated the pending award against the Hotel seeking to re-litigate the room rental issue as if no arbitration award existed. In other words, the re-filed grievance does not seek to determine the applicability of the award to the Hotel and thus assess the amount of damages, or gratuities owed, but rather re-litigate whether gratuities are owed.

Indeed, the Union understands full well the room rental issues was settled Industry wide by the Hilton award because it withdrew the grievance against the Hotel originally filed in 2005 representing at the time to the plaintiffs it was not necessary because the Hilton grievance would apply to the whole industry.

Further, when the Hilton decision was announced with its industry-wide application, the Union took no action to enforce the award, despite the fact that the banquet delegate specifically asked the Union to do so. Instead, the Union took no action until after this lawsuit was amended to include the room rental issue, thereby buttressing the plaintiffs' claim that it was the Union's intent to harm the plaintiffs prior to the institution of this action. As already stated, the action it did finally take was to undo the award by presenting again the issue of liability to an arbitrator.

---

[6] Defendants' reliance on *Katir v. Columbia University,* 15 F. 3d 23 (2nd Cir. 1994) is not contrary to plaintiffs' position. In *Katir,* a discharged university research assistant, acting *pro se,* brought an action challenging the arbitrator's finding that the university had just cause to fire him. The court simply held that if there is no claim by a union member that his union breached its duty of fair representation, then the individual employee generally does not have standing to challenge an arbitration proceeding to which the union and employer were the only parties. This ruling was neither remarkable nor groundbreaking.

The Union assumed an entirely contrary position with respect to the Mandarin Oriental hotel. In that case, the Union filed for arbitration to enforce the arbitration award rather than re-litigate the issues. The Mandarin grievance notice, in pertinent part, states: ". . . non-compliance with IC decision 2007-40 Hilton New York . . . ." [See Exhibit "G" to Union's Motion to Dismiss] The Union's decision to seek enforcement of the Award for one hotel's workers while it relitigates those issues as if the award does not exist for another hotel's employees is arbitrary, a bad faith act, and indefensible.

The doctrine of *functus officio* in arbitrations applies, which presumes that an arbitrator's final decision on an issue strips him of authority to consider that issue further. As a general rule, once an arbitration panel decides the submitted issues, it becomes *functus officio* and lacks any further power to act. *Proodos Marine Carriers Co. v. Overseas Shipping & Logistics,* 578 F.Supp. 207, 211 (S.D.N.Y. 1984). *See also, e.g., Trade & Transp., Inc. v. Natural Petroleum Charterers, Inc.,* 931 F.2d 191, 195 (2nd Cir. 1991). Defendants cite to no authority supporting the proposition that arbitrators may review compliance with their own awards. The arbitrator has no authority unless the parties agreed to submit the issue of compliance to the arbitrator. Thus, there is no longer a labor dispute as to the Hotel's liability for gratuities on room rentals, only the separate issue of the damages in each case exists.

Thus, the Union's stunning failure to enforce an arbitration award, consistent with *Carrion,* is a violation of the duty of fair representation and a motion to dismiss must be denied.

**B.     Plaintiffs Have Standing to Ask This Court**
**to Confirm the Ross Arbitration Award**

Because the Union has shown itself unwilling or incapable of enforcing the award, this court may confirm and enforce the award itself by ordering the Hotel to compensate Plaintiffs for

all losses incurred regarding the Hotel's failure to pay gratuities, with interest, out of the room rental and other charges collected by the Hotel that were billed by the Hotel in conjunction with banquet functions and to declare that such payments must be continued in the future, along with the costs and reasonable attorney fees of this action.  Since the Union's DFR violations have deprived Plaintiffs of the benefits of the award this court may fashion the proper remedy.

As the *Santos* court noted:

> It is well established that a person who loses in a contractually-prescribed arbitration proceeding may not, absent some showing of bad faith, ask a court to redetermine the merits of his claim . . . . But it is equally well established that the victor in an arbitration proceeding may seek court enforcement of his award under LMRA § 301(a). See, e.g., General Drivers, Local 89 v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963) (per curiam); White Motor Corp. v. UAW, 491 F.2d 189, 190 (2nd Cir. 1974) (per curiam); Textile Workers Union v. Cone Mills Corp., 268 F.2d 920 (4th Cir.), cert. denied, 361 U.S. 886, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959). Appellants, through their union, were the victors here, and all that they seek is judicial enforcement of the umpire's award. They have not asked and would have no reason to ask for judicial review of the propriety of the award.

In *Serrano v. Delmonico's Hotel,* 1992 WL 251447 (S.D.N.Y. 1992), the plaintiff, a former security guard for the Delmonico Hotel and a member of the New York Hotel and Motel Trades Council, AFL-CIO (the "Union") brought an action, pursuant to Section 301 of the LMRA, 29 U.S.C. § 185(a), to confirm an arbitration award, reinstating him to his position as defendant's security guard with full back pay.

The Union and the Hotel Association of New York City, Inc. had entered into a collective bargaining agreement, to which the employer was a signatory.  Plaintiff Serrano was fired and the Union successfully arbitrated the discharge and an award was issued that included the relief of reinstatement.  The employer failed to reinstate Mr. Serrano and he moved to confirm the award.

The District Court rejected the argument that Mr. Serrano lacked standing to initiate the

confirmation action because he was not a party to the arbitration proceeding, noting that it had

subject matter jurisdiction to confirm or vacate labor arbitration awards:

> [T]here is "no general doctrine" preventing an employee who,
> through his union, was the victor in an arbitration proceeding, from
> seeking judicial enforcement of the award. *See Santos,* 547 F.2d at
> 201. This is particularly the case here, where the CBA states that
> "[t]he decision rendered by the Impartial Chairman shall have the
> effect of a judgment entered upon an award made, as provided by
> the Arbitration Laws of the State of New York, entitling the entry
> of a judgment in a court of competent jurisdiction against the
> defaulting party who fails to carry out or abide by such decision."
> (CBA § 26). Thus, to the extent that plaintiff brings this action
> solely for confirmation of the Arbitrator's February 7, 1990 award,
> he has standing.

1992 WL 251447 at *3 (emphasis added).

As was the case in *Serrano*, in this case as a consequence of the defendant Union's bad

faith and breach of its duty to its membership in failing to properly enforce against the Hotel the

arbitration award, the plaintiffs have standing to confirm the Union's industry-wide arbitration

award and seek confirmation and enforcement of it from this Court.

## POINT III

### THE UNION'S REFUSAL TO SEEK REPAYMENT OF GRATUITIES ILLEGALLY TAKEN FROM PLAINTIFFS BY THE HOTEL THROUGH THE OPERATION OF A TIP POOL THAT VIOLATED NEW YORK STATE LAW AND THE UNION'S COLLUSION IN KEEPING THE TIP POOL RUNNING VIOLATED THE DFR

Because the Union acted in bad faith and colluded with the Hotel to maintain an illegal

labor practice which violated state law, it committed a DFR violation. *DelCostello v.*

26

*International Brotherhood of Teamsters*, 462 U.S. 151 (1983); *Ford v. Air line Pilots Ass'n Intl.*, 268 F.Supp.2d 271 (E.D.N.Y. 2003). For example, in *Ford* the court held that the "complete selling out of a bargaining unit" constitutes a duty of fair representation violation. Id. at 290.

The Hotel retained a portion of the gratuities contributed to the tip pool to enhance its own profits and to fund the compensation of employees who were not part of the class of employees for whom the tip pool was maintained. The Union acquiesced and colluded in the maintaining of this illegal tip pool as well as suppressed and destroyed evidence relating to the illegality of the tip pool.

Finally, when the complaints of its membership forced the Union to take some action it filed a secret grievance and secretly settled it without requesting a dime in recovery for the diverted and stolen gratuities. As in *Ford*, the Union completely "sold out the bargaining unit."

The Union's role through deception and collusion in maintaining an illegal tip pool has violated its duty of fair representation and the Hotel has violated its obligation to pay full contract gratuities on all banquet functions and not dilute Plaintiff's gratuities through the maintenance of an illegal Tip Pool.

The settlement sanctioned a violation of New York State law and the IWA and absolved both the Hotel and the Union from any wrongdoing regarding the Tip Pool and declared the Tip Pool was lawfully constituted and maintained, a system which deprived banquet servers of earned income estimated to be in the millions, for which no compensation was negotiated.

The Hotel and Union's bad faith actions continue as the settlement, which must be nullified, covers up the Union's dishonest and unfair dealings with its members during the arbitration process and allows the Hotel to violate the IWA as the Union has entered into a

settlement agreement that takes away the contractual guarantee of a minimum gratuity with respect to banquet functions. This is not a question of providing different kinds of benefits for members with competing interests, that might imply discretion, it is a question of permitting the Hotel to take away from the plaintiffs earned income to which State law and the IWA entitled them.

## POINT IV

### THE TIP POOL VIOLATED NEW YORK LABOR LAW §196-d

New York Labor Law § 196-d provides, in relevant part:

> No employer . . . shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or any charge purported to be a gratuity for an employee .
> . . .

The plaintiffs allege that the tip pool violated section 196-d because the Hotel employed it as a means to both divert a portion of the plaintiff's gratuities into its own pocket and to fund its compensation obligations to other Hotel employees with no contractual right to those gratuities. As a result, the plaintiffs maintain that the establishment of the tip pool was illegal.

The Hotel's argument that the New York Court of Appeals in *Samiento v. World Yacht, Inc.*, 10 N.Y.3d 70 (2008) has sanctioned tip pools as an exception to the proscriptions of Labor Law §196-d for banquet functions is a red herring. While the high court, in dicta, suggested that banquet functions may be exempted from the prohibition against pooling as established by prior judicial decisions interpreting section 196-d, it did not hold that employers were then free to

28

establish that participation in a tip pool as structured here was mandatory, and more important, use the opportunity represented by banquet functions to pool and then steal their employees' gratuities.

Yet, that is what the plaintiffs have alleged herein.  In addition, the plaintiffs are not basing the alleged violation simply on the fact that the Hotel pooled the tips, but that the Hotel made mandatory the pooling of tips and then permanently retained some of those tips to enhance its bottom line, and that those tips were used to pay other payroll expenses for employees not entitled to share in those tips.

As alleged the section 196-d violation is undeniable and states a cognizable claim.

## POINT V

### PLAINTIFFS' CLAIM UNDER NEW YORK LABOR LAW SECTION 196-d IS NOT PREEMPTED BY FEDERAL LAW

In *Lavidas v. Bradshaw*, 512 U.S. 107 (1994), the Supreme Court held:

> [W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claims to be extinguished.

State statutory wage claims are only preempted when the IWA must be interpreted to resolve the dispute.  Here, the IWA does not address tip pools or the Hotel's right to retain for its profit or alternative use a portion of plaintiffs' earned gratuities. Labor Law § 196-d addressed an entirely separate issue not dealt with by the IWA.  At most, a court asked to decide a dispute arising under Labor Law § 196-d may have to consult the IWA in order to determine the amount of gratuities that were owed but instead retained by the Hotel. *See Salamea v. Macy's East, Inc.*, 426 F.Supp.2d 149 (S.D.N.Y. 2006) (statutory claims for unpaid wages not pre-empted by

LMRA if they only require the collective bargaining agreement be consulted for damages calculation rather than interpreted to resolve dispute)

The tip pool violates New York State law, irrespective of the IWA, and may be decided and resolved under §196-d.

## POINT VI

### PLAINTIFFS' HYBRID DFR/ SECTION 301 CLAIMS, AS SET FORTH IN THE SECOND AND FOURTH CAUSES OF ACTION, ARE TIMELY

The defendant Union argues that certain of the plaintiff's hybrid DFR/section 301 claims are time-barred as not having been brought within the six-month statute of limitations found to apply to such claims as determined by the Supreme Court in *DelCostello v. International Broth. of Teamsters*, 462 U.S. 151 (1983). As indicated below, the Union's argument makes no sense because the gravamen of the complaint is the failure of the Union to take action after September 2007, not its inaction sometime in 1998.

The arbitration award that the plaintiffs are seeking to have enforced against the Hotel – the failure to enforce which serves as the basis for the DFR complaint against the Union – was issued on August 23, 2007. The plaintiffs were not informed of the decision until September 3, 2007. The amended complaint alleging the room rental issues was filed within six months of learning of the decision. In any event, during that interval, the Union took no action to enforce the award and so the plaintiffs understanding that the Union did not intend to enforce the award was acquired over time as they observed the Union taking no enforcement actions. Hence, the

plaintiffs' second cause of action was initiated well within the applicable six-month statute of limitations.

Further, the Union committed a further DFR violation when it filed a grievance on March 6, 2008 in which the Union sought to re-litigate anew the Hotel's liability despite the fact that the question had already been finally resolved by the August 23 Award. In response, the plaintiffs amended their complaint to include a claim based on this subsequent action by the Union. Because the second amended complaint was served on April 7, 2008, only thirty two days after the Union filed its grievance on March 6, this claim too is within the six-month statute of limitations.

With regard to the fourth cause of action, it was not until January 10, 2008, that the Union distributed proposals to remedy the alleged contract violations. The proposals were identical to those distributed in June, 2007. Further, the Hotel conceded that there had been no recent contract negotiations. SAC ¶¶ 248-253. It was only then that plaintiffs first realized that the Union had no intention of taking any genuine and concrete steps to resolve these outstanding issues in good faith. The act of distributing identical proposals in January of this year was a separate DFR violation and so the statute of limitations is not violated. *See, Hines, supra,* 424 U.S. at 567 (employees not required to await the final outcome of a grievance/arbitration process before filing a DFR claim); *Vallone v. Local Union No. 705,* 755 F.2d 520 (7th Cir. 1985).

## POINT VII

### THE UNION COMMITTED A SEPARATE DFR VIOLATION WHEN IT SECRETLY FILED A GRIEVANCE AND THEN SETTLED WITHOUT AUTHORIZATION THE PLAINTIFFS' TIP POOL CLAIM UNDER THE NEW YORK LABOR LAW

The defendants characterize the settlement of the tip pool issue as a sacrosanct event that definitively ended the labor dispute that can not be reviewed by a Court. The exception, of course, is if the settlement agreement is the product of collusion between the Hotel and the Union and entirely waived arbitrarily and irrationally any and all claims to earned wages that plaintiffs were deprived of because of the Hotel violation of Labor Law § 196-d. There is no justification for at least negotiating a compromise on plaintiffs' legitimate back pay claims. The settlement agreement, therefore, breached the Union's DFR obligation.

Further, the Union has no right to grieve and settle, without the plaintiffs' consent, their statutory wage claim the litigation of which does not depend on an interpretation of the IWA. The Union may only represent its membership, without explicit additional provided authority, concerning issues pertaining to the IWA.

In short, the Union had no standing, without the plaintiffs' express consent, to litigate and settle those state law claims. Indeed, it was accomplished entirely surreptitiously with the Union secretly grieving the issue, settling it, and then announcing to the plaintiffs' the outcome. As it concerns §196-d, the settlement agreement is null and void.

Plaintiffs retain the legal right to assert and litigate the §196-d claims.

## POINT VIII

### THE UNION'S FAILURE TO PROVIDE
### ACCESS TO THE IC DECISIONS IS A DFR
### VIOLATION

The plaintiffs are entitled to understand the manner in which the IWA is to be interpreted. Otherwise, they are not in a position to know whether or not the Union is representing them in a manner consistent with its DFR obligations.  By denying its membership access to the IC decisions, the Union is attempting to shield itself from scrutiny and gives it the opportunity to assume any position vis-a-vis the IWA – including inconsistent positions – without fear of being challenged.

For these reasons, the Unions actions in denying access to the plaintiffs to the IC decisions that interpret the IWA is arbitrary and bad faith and constitutes a DFR violation.

## POINT IX

### THE ACTION SHOULD NOT BE DISMISSED FOR
### FAILURE TO JOIN NECESSARY PARTIES

The defendant Hotel also claims that this action should be dismissed under Fed.R.Civ.P. 19 because there are necessary parties – to wit, those banquet servers who are employed at the St. Regis hotel but are not one of the party plaintiffs herein – who have not participated in this action. The Hotel's argument is grounded essentially in the claim that those individuals may be bound by what the Court may do in this action, and that the defendants could potentially face future claims by those persons, and there is a risk of inconsistent determinations.

Fed.R.Civ.P. 19(a) defines those parties who are "necessary" to an action.  It provides, in relevant part:

33

> (a) Persons to be Joined if Feasible. A person . . . shall be joined as a
> party . . .if . . . (2) the person claims an interest relating to the
> subject of the action and is so situated that the disposition of the
> action in the person's absence may (I) as a practical matter impair or
> impede the person's ability to protect that interest or (ii) leave any of
> the persons already parties subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent obligations by reason of
> the claimed interest . . . .'

In the first place, the Hotel has not demonstrated that there is anyone – including these unidentified banquet servers – who has claimed an interest in the action. It is not good enough that such persons hypothetically could make such a claim. There must be something other than speculation that they have actually manifested that intent in some way. Here, it is common sense that these potential persons are not ignorant of the Union's actions and how their fellow workers have chosen to respond. And yet, only a subset of those employees have determined to seek relief in this action as plaintiffs. When persons are aware of an action but choose not to claim an interest by failing to join in the action, they are not considered necessary parties. *United States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999) (holding that the district court did not err by finding that a party who was aware of an action but chose not to claim an interest was not a necessary party under Rule 19).

Moreover, even if it could be said that these unnamed individuals did have an interest, the Hotel has not shown that this action would "impair or impede" their ability to protect that interest. Absent parties are not necessary parties if their interests are adequately represented by existing parties. *See, e.g., Washington v. Daley,* 173 F.3d 1158 (9th Cir.1999). There can be no question but that the plaintiffs would advance the same arguments as these absent persons, that they are capable of advancing the claims and are ably represented by counsel, and that they have common interests that would not differ even in the absence of any participation by these unnamed persons.

34

Secondly, although the Hotel claims that they eventually may bring other lawsuits by these other servers, "[t]he threat of multiple litigation will not make a party indispensable [only] the threat of inconsistent obligations will." *Cornhill Insurance PLC v. Valsamis, Inc.,* 106 F.3d 80, 84 (5th Cir.), *cert. denied*, 522 U.S. 818 (1997). The phrase "inconsistent obligations" means that there is a possibility that those who are <u>already</u> parties might be subjected to inconsistent obligations, not inconsistent adjudications. 4 Moore's Federal Practice § 19.03[4][d] (3rd ed.). An action that determines relative rights and obligations to property does not expose any party to inconsistent obligations, notwithstanding the possibility that another party might later claim an interest in that property. See *Sindia Expedition, Inc. v. The Wrecked and Abandoned Vessel Known as the Sindia,* 895 F.2d 116 (3rd Cir. 1990) (holding that the state was not a necessary party to dispute over salvaged shipwreck based on state's claim of ownership rights therein). Just because the alleged absent parties claimed by the defendants may later assert a claim for payment under the contract does not make them necessary parties.

Thus, for example, in *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.,* 182 F.R.D. 512 (N.D. Ohio 1998), the district court rejected a similar argument by the defendant cigarette manufacturers in that case who argued that individual employees and insureds were necessary parties to the union ERISA trusts efforts to recover the costs of treating smoking-related illnesses the plan had paid. The defendants argued that they faced potential future claims by those fund participants. The district court correctly recognized that the defendants did not face paying the same parties twice, just as here the defendant Hotel will not have to pay the plaintiffs and the absent parties more than once on the claims asserted herein, even if the absent parties choose to sue separately at a later date.

35

It is apparent that the Hotel has failed to carry its burden of showing that the banquet servers who are not plaintiffs in this case are necessary parties within the meaning of Rule 19, and that they are so indispensable that the action cannot fairly proceed in their absence. Even if the Court were to find that these persons were necessary parties, and that their participation in this action was required, the Court could and should simply order their joinder, as opposed to dismissing the action.

## CONCLUSION

For all of the foregoing reasons, the plaintiffs respectfully submit that the Court should deny the defendants' motions in their entirety.

Dated: New York, New York
      June 17, 2008

                                            Kaiser Saurborn & Mair, P.C.
                                            Attorneys for Plaintiffs

By:               /s/
               Daniel J. Kaiser [DK-9387]

               111 Broadway, 18th floor
               New York, New York 10006
               (212) 338-9100